## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL SECURITY ARCHIVE,          )
Gelman Library                      )
George Washington University        )
2130 H Street, N.W., Suite 701      )
Washington, D.C. 20037              )
                                    )
SOCIETY FOR HISTORIANS OF           )
AMERICAN FOREIGN RELATIONS,         )
Department of History               )
Middle Tennessee State University   )
1301 East Main Street, Box 23       )
Murfreesboro, TN 37132              )
                                    )          Civil Action No.
AMERICAN HISTORICAL                 )
ASSOCIATION,                        )
400 A Street, S.E.                  )
Washington, D.C. 20004              )
                                    )
CITIZENS FOR RESPONSIBILITY         )
AND ETHICS IN WASHINGTON,           )
1101 K Street, N.W., Suite 201      )
Washington, D.C. 20005              )
                                    )
             Plaintiffs,            )
                                    )
        v.                          )
                                    )
DONALD J. TRUMP, PRESIDENT OF       )
THE UNITED STATES (in his official  )
capacity),                          )
1600 Pennsylvania Avenue, N.W.      )
Washington, D.C. 20503              )
                                    )
EXECUTIVE OFFICE OF THE             )
PRESIDENT,                          )
725 17th Street, N.W.               )
Washington, D.C. 20503              )
                                    )
JARED KUSHNER, SENIOR ADVISOR       )
TO THE PRESIDENT (in his official   )
capacity),                          )
1600 Pennsylvania Avenue, N.W.      )
Washington, D.C. 20503              )
                                    )

DAVID S. FERRIERO, ARCHIVIST OF )
THE UNITED STATES (in his official )
capacity), )
8601 Adelphi Road )
College Park, MD 70740-6001 )
)
NATIONAL ARCHIVES AND RECORDS )
ADMINISTRATION, )
8601 Adelphi Road )
College Park, MD 70740-6001 )
)
       Defendants. )
_____)

## COMPLAINT

1.     This is a civil action seeking declaratory, injunctive, and mandamus relief for violations of the Presidential Records Act, 44 U.S.C. §§ 2201–2209 ("PRA"). Plaintiffs challenge as contrary to law the destruction of records by the President and other White House officials, a White House records preservation policy that authorizes the destruction of Presidential record material, and the failure of the Archivist of the United States to take action to address these violations. With President Trump's term in office soon coming to an end, absent judicial intervention this conduct will permanently deprive Plaintiffs and the public of records documenting a critical part of our nation's history.

2.     Plaintiffs first challenge as contrary to law the President's planned or executed destruction of the records of his presidency without providing statutorily-mandated notice to either the Archivist of the United States or Congress. By flouting the PRA's disposal-notice requirements, President Trump has bypassed the safeguards Congress imposed through the PRA to prevent a president from destroying historically valuable records. Absent judicial intervention, Plaintiffs and the public will be permanently deprived of records documenting a critical part of our nation's history.

2

3.      Plaintiffs further challenge as contrary to law an official policy authorizing White House employees to preserve Presidential records generated from certain types of personal electronic messaging accounts merely by taking a "screenshot" of the record and forwarding it to an official messaging account. A screenshot does not capture an electronic message's associated metadata, attachments, functionality, or other digital artifacts needed to authenticate the message. Because the White House's screenshotting policy does not require preservation of all Presidential record material associated with electronic messages, it contravenes the PRA's requirement to preserve in an official White House account a "complete copy" of any Presidential record created or sent from a non-official electronic messaging account. 44 U.S.C. § 2209(a). Absent an order directing President Trump and the Executive Office of the President to immediately rescind the screenshotting policy and take steps to ensure preservation of "complete copies" of all such Presidential records before President Trump's term ends on January 20, 2021, Plaintiffs and the public will be permanently deprived of records documenting a critical part of our nation's history.

4.      Plaintiffs also challenge the knowing and routine failure of Senior White House Advisor Jared Kushner to preserve "complete copies" of all Presidential records created or sent from his non-official electronic messaging accounts, including his WhatsApp account, in violation of his non-discretionary duties under 44 U.S.C. § 2209(a). Given the central role Mr. Kushner has played in implementing the domestic and foreign policies of the Trump administration, the missing information is likely to yield historically important details about what the Trump administration did and why. Unless Mr. Kushner is directed to preserve "complete copies" of all such Presidential records before President Trump's term ends on January 20, 2021,

Plaintiffs and the public will be permanently deprived of records documenting a critical part of our nation's history.

5.      Finally, Plaintiffs challenge the failure of the National Archives and Records Administration ("NARA") and the Archivist of the United States (collectively, the "NARA Defendants") to take any action to address the White House's unlawful screenshotting policy described above. If left uncorrected, that policy will result in the improper removal, loss, or destruction of Presidential records, and thus will prevent the NARA Defendants from fulfilling their non-discretionary duties to "assume responsibility for the custody, control, and preservation of, and access to" all Presidential records generated during President Trump's term of office, 44 U.S.C. §§ 2203(f), (g)(1), and to make those records "available to the public as rapidly and completely as possible," *id.* § 2203(g)(1).[1]

## JURISDICTION AND VENUE

6.      This Court has personal and subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States); 44 U.S.C. §§ 2201–2209 (the PRA); 28 U.S.C. § 1361 (mandamus); 5 U.S.C. §§ 701–706 (the Administrative Procedure Act ("APA")), and 28 U.S.C. §§ 2201 and 2202 (the Declaratory Judgment Act).

7.      Venue in this district is proper pursuant to 28 U.S.C. § 1391(e).

## PARTIES

8.      Plaintiff National Security Archive ("the Archive"), founded in 1985 by journalists and scholars to check rising government secrecy, combines a unique range of functions: investigative journalism, a research institute on international affairs, and a library and

---

[1] To prevent any irretrievable removal, loss, or destruction of Presidential records, Plaintiffs intend to promptly move for a temporary restraining order requiring Defendants to preserve the records at issue in this suit pending final resolution of the litigation.

archive of declassified U.S. documents that is often considered the world's largest nongovernmental collection of such materials. The Archive is located at the George Washington University, and is one of the leading non-profit users of the Freedom of Information Act ("FOIA"). In these roles, the Archive has established an extraordinary track record of highly credible, award-winning investigative journalism and scholarship, including receipt of the George Polk Award in 2000 for "piercing self-serving veils of government secrecy, guiding journalists in search for the truth, and informing us all." Together with its founding director Scott Armstrong, the Archive brought the series of lawsuits against the Executive Office of the President that resulted in the recognition that White House email recordkeeping practices and guidelines are subject to judicial review.

9.      Since its founding, the Archive has filed thousands of FOIA and declassification review requests with the Truman, Eisenhower, Kennedy, Johnson, Nixon, Ford, Carter, Reagan, George H.W. Bush, Clinton, and George W. Bush Presidential Libraries. The documents released in response to these requests have illuminated United States foreign policy and national security history since the Second World War. Among other things, the documents the Archive acquired from these presidential libraries have shed light on the Cuban Missile Crisis, the origins of the Vietnam War, President Nixon's opening to China, communications between the Soviet Union and the United States throughout the Cold War and as the Cold War ended, and the U.S. role during the human rights atrocities in the former Yugoslavia and Rwanda. Continued access to a full historical record of each modern presidency is critical to the Archive's work. The Archive intends to file requests with the Trump Presidential Library as soon as is legally permitted, likely on a range of topics covering the Trump presidency's foreign policy.

10.     Archive staff have published books based on records of former presidents. For example, Archive Executive Director Thomas S. Blanton and Archive Senior Analyst Dr. Svetlana Savranskaya have published two books based on head-of-state meeting transcripts from the Reagan and George H.W. Bush libraries combined with others from Soviet archives. One volume, also co-authored with Dr. Vladislav Zubok, analyzed the fall of the Berlin Wall in 1989 based on documents of heads-of-state meetings, and the other published and analyzed a complete series of the Reagan and Bush superpower summit meeting transcripts with then-Soviet leader Mikhail Gorbachev. Their future plans include filing FOIA requests for Presidential records from the Trump administration as soon as they are legally permitted on a range of topics that likely will include U.S. relations with Russia and China, U.S. military action in Africa, the role of foreign lobbyists, and the nuclear escalation between North Korea and the United States.

11.     Another Archive staffer, Senior Analyst William Burr, has published books and other writings drawing on declassified records of presidential meetings with foreign leaders. One book, *The Kissinger Transcripts: The Top Secret Talks with Beijing and Moscow* (New Press 1998), published for the first time the White House record of President Richard Nixon's meeting with Mao Zedong in February 1972. Another book, *Nixon's Nuclear Specter: The Secret Alert of 1969, Madman Diplomacy, and the Vietnam War* (University Press Kansas 2015), drew upon records kept by National Security Adviser Henry Kissinger of his meetings and telephone conversations with President Nixon. Other publications, such as edited collections of documents posted on the Archive's website, have included declassified records prepared by State Department and White House officials of presidential meetings with foreign leaders.

12.     Plaintiff Society for Historians of American Foreign Relations ("SHAFR") is a professional society dedicated to the study of U.S. foreign relations. On behalf of its nearly 1,300

members, it advances its mission "to promote *the study, advancement and dissemination of knowledge about U.S. foreign policy*" by awarding research grants and prizes, holding conferences, publishing an academic journal, *Diplomatic History*, and furthering archival access to government documents.

13.     SHAFR's members depend on preservation of and access to Presidential records in order to present a full and accurate accounting of the past in their teaching, public speaking, exhibitions, and publications. SHAFR members have disseminated research findings to the public and testified to congressional committees on the basis of archival research conducted in every presidential library. SHAFR members have filed many thousands of FOIA and mandatory declassification review requests with presidential libraries and have long advocated for the preservation, declassification, and public availability of government records, notably including Presidential records, because of the fundamental importance of these records for their investigation of the country's past.

14.     SHAFR members will begin using the internal diplomatic and national security records of the Trump administration as soon as they become available. They and their scholarship on the Trump administration will be substantially harmed by a failure to properly create and maintain key Presidential records. Policymakers, national security personnel, political analysts, and the wider public rely on the archival research SHAFR members conduct on Presidential records for evidence-based analyses of presidential decision-making and other topics of great importance to U.S. democracy. Without the proper creation and preservation of Presidential records, SHAFR members will not be able to fulfill their professional responsibility to provide evidence-based assessments of the conduct of U.S. foreign policy during the Trump administration.

15.     SHAFR's journal *Diplomatic History* routinely publishes articles based on new research in presidential libraries, such as a 2017 article by Frédéric Bozo based on FOIA requests relating to Iraq from the Clinton Presidential Library. Recent books published by SHAFR members that are based on records in presidential libraries include Kelly J. Shannon's *U.S. Foreign Policy and Muslim Women's Human Rights*, which used Clinton Library records to trace that administration's global women's rights policies. Books by SHAFR members that rely heavily on accounts of conversations and meetings between U.S. presidents and foreign leaders include Jeffrey Engel's *When the World Seemed New: George H.W. Bush and the End of the Cold War*.

16.     The American Historical Association ("AHA") is a non-profit membership organization founded in 1884 and incorporated by Congress in 1889 for the promotion of historical studies. AHA is a trusted voice that advocates for history education, works to sustain and enhance the professional work of historians, and promotes the critical role of historical thinking in public life.

17.     As the largest organization of professional historians in the world, AHA represents more than 12,000 members and serves historians representing every historical period and geographical area in a wide variety of professions. AHA's journal, the *American Historical Review*, is the most widely read and cited professional historical journal in the world.

18.     The American Historical Association, chartered by the Congress  "for the promotion of historical studies, the collection and preservation of historical manuscripts, and for kindred purposes in the interest of American history, and of history in America," depends on the integrity of presidential records to fulfill this mission. Its members rely on Presidential records to explore and reveal the functioning of every aspect of the executive branch—from policy

consideration to policy implementation. This research provides an unparalleled look inside an administration's activities that would, if absent, leave the world wholly reliant upon the memoirs and memories of those whose deeds we professionally investigate and evaluate.

19.     Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") is a nonprofit, non-partisan corporation, organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to protecting the right of citizens to be informed about the activities of government officials and to ensuring the integrity of government officials. To advance its mission, CREW uses a combination of research, litigation, advocacy, and public education to disseminate information to the public about public officials and their actions. CREW researches and reviews information made available to the public under the PRA and the Federal Records Act ("FRA"), including records of former presidents, and uses the FOIA to obtain information about the government critical to its mission and purpose. CREW has filed hundreds of FOIA requests since the start of the Trump administration, including with those EOP components subject to the FOIA.

20.     CREW also has a longstanding interest in government compliance with recordkeeping laws, including the PRA and the FRA. CREW has brought numerous lawsuits to compel compliance with these laws, including *CREW v. Trump*, 924 F.3d 602 (D.C. Cir. 2019), and *CREW v. Trump*, 438 F. Supp. 3d 54 (D.D.C. 2020), that challenge the failure of President Trump and EOP to comply with the mandatory, non-discretionary duties the PRA imposes on them. CREW's interest in the preservation of Presidential records also is evidenced by CREW's 2007 litigation of whether the EOP's Office of Administration is an agency subject to the FOIA, *see CREW v. Office of Admin.*, 559 F. Supp. 2d 9 (D.D.C. 2008), *aff'd*, 566 F.3d 219 (D.C. Cir. 2009); a report entitled "Without a Trace: The Story Behind the Missing White House E-Mails

and the Violations of the Records Act," *see* https://www.citizensforethics.org/reports-investigations/crew-reports/crew-releases-new-report-without-a-trace-the-missing-white-house-emails-violations-of-the-pra/; and a 2015 FOIA request to the George W. Bush Presidential Library seeking the production of all records of communications between August 1, 2005 and February 1, 2007 between the White House and Republican Members of the House that referred, mentioned, or pertained to then-Representative Mark Foley.

21.     CREW will continue its practice of submitting FOIA requests for documents from executive branch agencies on matters that relate to CREW's ongoing research, litigation, advocacy, and public education efforts. CREW also anticipates that it will file FOIA requests for Presidential records from this administration once they become available pursuant to the FOIA. Failure to create Presidential records and improper classification of agency records as Presidential records harms CREW by preventing or delaying CREW's access to agency and Presidential records. A president's failure to obtain the Archivist's approval in writing and to submit a disposal schedule to Congress prior to disposing of Presidential records deprives CREW of an opportunity to learn of improper disposal decisions until long after they occur.

22.     For all Plaintiffs, access to Presidential records is essential to fulfill their core missions. The ongoing failure of President Trump and his top advisors to preserve records of their actions and the performance of their duties have prevented and will continue to prevent the Plaintiffs from accessing the documentary history of this presidency and administration. In the process, Plaintiffs and other members of the American public will lose vital information and insight into presidential policies and decision making, which are critical to interpret and prevent illegal or unwise government action.

23.    President Donald J. Trump is the President of the United States and is sued in his official capacity only. President Trump is subject to the requirements of the PRA, including the requirement that he obtain the written views of the Archivist on the proposed destruction of any Presidential record, 44 U.S.C. § 2203(c)(1)-(2), and upon receipt of written confirmation that the Archivist intends to take any action with respect to the proposed destruction that he notify the appropriate congressional committee of his intention 60 days before the proposed disposal. 44 U.S.C. § 2203(d).

24.    Defendant Executive Office of the President ("EOP") includes the agency known as the EOP and its individual components. With the exception of the Council on Environmental Quality, the Office of Management and Budget, the Office of National Drug Control Policy, the Office of Science and Technology Policy, and the Office of the United States Trade Representative, the EOP is subject to the PRA.

25.    Defendant Jared Kushner is a Senior Advisor to the President and is sued solely in his official capacity. As a senior advisor he is a "covered employee" under section 2209 of the PRA, 44 U.S.C. § 2209(c)(1)(A), (C). As a covered employee, Mr. Kushner must, for any Presidential record he creates or sends using a non-official electronic message account, forward to his official electronic messaging account either (1) a copy "in the original creation or transmission of the Presidential record" or (2) "a complete copy of the Presidential . . . record . . . not later than 20 days after the original creation or transmission[.]" 44 U.S.C. § 2209(a)(1)-(2).

26.    Defendant David S. Ferriero is the Archivist of the United States and is sued solely in his official capacity. As Archivist, Mr. Ferriero supervises and directs the National Archives and Records Administration ("NARA"). 44 U.S.C. § 2102. In that capacity, Mr. Ferriero is responsible for the preservation of both federal and Presidential records, and is

charged with the responsibility for making Presidential records available to the public at the earliest practical date. Mr. Ferriero is subject to the requirements of the PRA, including its requirement that he assume custody and control of Presidential records at the conclusion of the President's term of office and deposit them in an appropriate depository. 44 U.S.C. §§ 2203(f), 2207. Moreover, under the PRA, Mr. Ferriero has a role to play whenever an incumbent president seeks to dispose of Presidential records; the president may do so only after: (1) a determination that the records no longer have administrative, historical, informational or evidentiary valued; (2) obtaining in writing the views of the Archivist; and (3) notifying Congress 60 days before the proposed disposal date of his intention to dispose of the records.

27.     Defendant NARA is an agency of the United States operating under the direction of Defendant Ferriero. NARA is responsible for carrying out the Archivist's responsibilities under the PRA and has promulgated guidance implementing the 2014 Amendments discussed below.

## STATUTORY FRAMEWORK

28.     Congress enacted the PRA in 1978 to ensure both "the preservation of the historical record of the future Presidencies" and "public access to the materials" of a presidency. H.R. Rep. No. 95-1487, 95th Cong., 2d Sess. § 2 (1978). Through the PRA and its predecessor statute, the Presidential Recordings and Materials Preservation Act of 1974, Congress sought to prevent a repeat of the protracted legal battle that ensued between the United States and President Richard M. Nixon over the ownership and control of his Presidential records after leaving office.

29.     The House Report on the PRA suggests that Congress intended the PRA to bind the President. The report states that the PRA "would terminate the tradition of private ownership

of Presidential papers and the reliance on volunteerism to determine the fate of their disposition.

Instead, the preservation of the historical record of the future Presidencies would be *assured* and

public access to the materials would be consistent under *standards fixed in law*." *Id.* (emphasis

added).

30.     Most fundamentally, the PRA "'establish[es] the public ownership of records

created by . . . presidents and their staffs in the course of discharging their official duties.'"

*CREW v. Trump*, 924 F.3d at 603 (quoting H.R. Rep. No. 95-1487, 95th Cong. at 2). Toward that

end, the statute provides that "[t]he United States shall reserve and retain complete ownership,

possession, and control of Presidential records[.]" 44 U.S.C. § 2202.

31.     To ensure a full historical record, the PRA directs the President as follows:

> the President *shall* take all such steps as may be necessary to assure that the
> activities, deliberations, decisions, and policies that reflect the performance of the
> President's constitutional, statutory, or other official or ceremonial duties are
> adequately documented and that such records are preserved and maintained as
> Presidential records pursuant to the requirements of this section and other
> provisions of law.

44 U.S.C. § 2203(a) (emphasis added).

32.     In imposing these requirements through the PRA, Congress recognized that with

the President (and his staff), "a great number of what might ordinarily be construed as one's

private activities are, because of the nature of the presidency, considered to be of public nature,

*i.e.*, they effect the discharge of his official or ceremonial duties." H.R. Rep. No. 95-1487, 95th

Cong., 2d Sess. §§ 11–12. Congress considered "few" of a president's activities to be "truly

private and unrelated to the performance of his duties[.]" *Id.* § 12.

33.     The PRA's definition of "Presidential records" reflects this breadth by defining

Presidential records as:

> documentary materials . . . created or received by the President, the President's
> immediate staff, or a unit or individual of the Executive Office of the President
> whose function is to advise or assist the President, in the course of conducting
> activities which relate to or have an effect upon the carrying out of the
> constitutional, statutory, or other official or ceremonial duties of the President.

44 U.S.C. § 2201(2).

34.     The PRA also includes within the definition of "documentary material"

"electronic or mechanical recordations." 44 U.S.C. § 2201(1).

35.     In enacting the PRA, Congress voiced its concern with the "tendency [of a

President] to release certain papers, presenting the President in a positive light, rather than others

which cast doubt on the President's performance . . . The deletion of even a handful of important

papers can distort the historical record beyond recognition." Hearings Before a Subcomm. of the

Comm. on Gov't Operations on H.R. 10998 and Related Bills, 95th Cong., 2d Sess. at 811

(1978) (Sen. Nelson's introduction of S. 2596).

36.     The PRA imposes a multi-step process on the President before any Presidential

records can be destroyed. While in office, a President may dispose of his or her Presidential

records only after making an affirmative determination that the records "no longer have

administrative, historical, informational, or evidentiary value[.]" 44 U.S.C. § 2203(c). After

making that determination, the President must obtain the written views of the Archivist on the

proposed destruction. 44 U.S.C. § 2203(c)(1)-(2). If the President receives written confirmation

that the Archivist intends to take any action with respect to the proposed destruction, the

President must notify the appropriate congressional committee of the President's intention 60

days before the proposed disposal. 44 U.S.C. § 2203(d). This process reflects the care Congress

took to ensure that Presidential records could be destroyed only after considered deliberation by

multiple stakeholders.

37.     As the D.C. Circuit recognized in *CREW v. Trump*, "[d]isposal decisions matter because Presidential records—if not previously discarded, that is—become available for public release several years after a president leaves office." 924 F.3d at 604 (citation omitted).

38.     Once a President leaves office, the Archivist assumes "responsibility for the custody, control, and preservation of, and access to" the former president's records. 44 U.S.C. § 2203(g)(1). Once in possession of a former President's records, the PRA empowers the Archivist to "exercise . . . all the functions and responsibilities otherwise vested in him pertaining to Federal records or other documentary materials in his custody or under his control." 44 U.S.C. § 2112(c). The PRA directs the Archivist in negotiating for the deposit of Presidential materials "to secure to the Government, as far as possible, the right to have continuous and permanent possession of the materials." *Id.* The PRA further provides that the "Archivist shall have an affirmative duty to make" a former president's "records available to the public as rapidly and completely as possible consistent with the provisions of this chapter." *Id.* § 2203(g)(1).

39.     In 2014, Congress amended both the PRA and the FRA through the Presidential and Federal Records Act Amendments of 2014, Pub. L. 113-187, 128 Stat. 2003 (2014) ("2014 Amendments"). The 2014 Amendments sought to "modernize[] records management by focusing more directly on electronic records." NARA Press Release, National Archives Welcomes Presidential and Federal Records Act Amendments of 2014, Dec. 1, 2014, https://bit.ly/3o1Yw7T.

40.     The 2014 Amendments explicitly restrict White House employees' use of "non-official electronic messaging account[s]" to "create or send" Presidential records unless they "(1) cop[y] an official electronic messaging account. . . in the original creation or transmission of the Presidential record," or "(2) forward[] a *complete copy* of the Presidential . . . record to an

official electronic messaging account . . . not later than 20 days after the original creation or

transmission of the Presidential . . . record." 44 U.S.C. § 2209(a)(1)-(2) (emphasis added). The

Amendments similarly restrict the use of non-official electronic message accounts under the

FRA. 44 U.S.C. § 2911.

41.     Section 2209 of the PRA defines "covered employee" to include both "the

immediate staff of the President," and "a unit or individual of the Executive Office of the

President whose function is to advise and assist the President." 44 U.S.C. § 2209(c)(1)(A), (C).

42.     The amended statute broadly defines "electronic messages" to mean "electronic

mail and other electronic messaging systems that are used for purposes of communicating

between individuals." 44 U.S.C. § 2209(c)(2).

43.     The amended statute likewise broadly defines "electronic messaging account" to

mean "any account that sends electronic messages." 44 U.S.C. § 2209(c)(3).

44.     The legislative history for section 2209 confirms what the statutory text makes

plain: that Congress wanted both the "President" and his "staff" to "ensure that *all* Presidential

records, even those sent from a personal electronic messaging account, are properly preserved

and maintained in an official electronic messaging account." S. Rep. 113-218, 113th Cong., 2d

Sess., at 6 (2014) (emphasis added).

45.     Section 2209 provides that any intentional violation of this provision "shall be a

basis for disciplinary action[.]" 44 U.S.C. § 2209(b).

46.     The public can access Presidential records through the FOIA. Beginning five

years after a President leaves office, members of the public can begin filing FOIA requests for

Presidential records. 44 U.S.C. § 2204(b)(2). Although some materials can be withheld or

redacted for an extended period of time, they too eventually become available to members of the public, including Plaintiffs. 44 U.S.C. § 2204(a).

## NARA'S IMPLEMENTING GUIDANCE

47.     To implement the 2014 Amendments, NARA issued guidance in July 2015 that applies to "text messaging, chat/instant messaging, messaging functionality in social media tools or applications, voice messaging, and similar forms of electronic messaging systems." NARA Bulletin 2015-02, July 29, 2015, https://bit.ly/2Jeyrnh.

48.     NARA's July 2015 guidance confirms that the term "electronic messages" as used in the 2014 Amendments broadly encompasses "Chat/Instant Messaging," "Text messaging," "Voicemail messaging," and "Other messaging platforms or apps, such as social media or mobile applications," including "WhatsApp," among other applications. *Id.*

49.     The guidance instructs agencies to "[c]apture . . . *complete records, including metadata and any attachments*, in a manner that ensures their authenticity and availability." *Id.* (emphasis added).

50.     The guidance further directs agencies to "[e]nsure electronic messages *with associated metadata and attachments* can be exported from the original system to meet any agency needs, including long term preservation." *Id.* (emphasis added).

51.     In subsequent guidance on managing electronic records issued in September 2015, NARA again confirmed that a "complete" version of an electronic record must include the record's associated "metadata." NARA Bulletin 2015-04, Sept. 15, 2015, https://bit.ly/37cA1xX.

52.     That same guidance, entitled "Metadata Guidance for the Transfer of Permanent Electronic Records," defines "metadata as

> elements of information that answer the questions of 'who, what, where, when, and why' regarding electronic records. Metadata elements provide administrative,

descriptive, and technical information that describe the structure and content of electronic records. Metadata elements also provide contextual information that explains how electronic records were created, used, managed and maintained prior to their transfer to NARA, and how they are related to other records.

*Id.*

53.     NARA's September 2015 guidance provides detailed instructions on "the minimum set of metadata elements that must accompany transfers of permanent electronic records to the National Archives." *Id.*

54.     Even before NARA issued this guidance, it recognized that taking "screenshots" of electronic records did not comply with NARA guidelines. In a May 2013 White Paper, NARA reported a finding by the Social Media Subgroup of the Federal Records Council that "screenshots" of certain electronic records "were not a helpful tool for capture" because "[s]creenshots only create[] a picture of content and do not preserve the metadata and functionality of the content, which does not comply with NARA's transfer guidance for permanent web content records." NARA, White Paper on Best Practices for the Capture of Social Media Records, May 2013, https://bit.ly/2V5Zm74.

## FACTUAL BACKGROUND

### *President Trump's Continuing Disregard for His PRA Obligations*

55.     From the outset of his presidency, President Trump has shown a disregard, if not an outright disdain, for his recordkeeping obligations under the PRA. His actions and those of his aides pose an unacceptable risk that valuable historical records will be irretrievably lost.

56.     For example, President Trump has a practice of ripping up his notes at the close of meetings, a practice some have called "his unofficial 'filing system.'" Annie Karni, Meet the guys who tape Trump's papers back together, *Politico*, June 10, 2018, https://politi.co/33cqS7p; Jill Lepore, Will Trump Burn the Evidence?, *New Yorker*, Nov. 16, 2020, https://bit.ly/3kZesWy.

Records managers were able to save at least parts of some of these records by gathering the pieces and taping them back together. *Id.*

57.     President Trump also has a practice of tweeting and then deleting his tweets, despite a warning from NARA that such records destruction violates the PRA. Lepore, *New Yorker*, Nov. 16, 2020. The White House has made clear that the President's tweets should be considered to be official statements, Rachel Treisman, <u>As President Trump Tweets and Deletes, the Historical Record Takes Shape</u>, *NPR*, Oct. 25, 2019, <u>https://n.pr/3pYdhKz</u>, a conclusion that is underscored by the purposes they have served, such as a vehicle to fire cabinet officials and other top White House aides. The degree to which the White House is preserving even the President's non-deleted tweets in a White House recordkeeping system is far from clear. *Id.*

58.     President Trump also has ignored or flouted his statutory obligation under the PRA to document his essential transactions and communications. For example, during his first reported face-to-face meeting with Russian President Vladimir Putin in July 2017 in Hamburg, Germany during the G-20 Summit, President Trump reportedly confiscated his interpreter's notes after the meeting and ordered the interpreter not to disclose to anyone what he had heard, including to administration officials. Peter Baker, <u>Trump and Putin Have Met Five Times, What Was Said Is a Mystery</u>, *New York Times*, Jan. 15, 2019, <u>https://nyti.ms/397bQDK</u>; Greg Miller, <u>Trump has concealed details of his face-to-face encounters with Putin from senior officials in administration</u>, *Washington Post*, Jan. 13, 2019, <u>https://wapo.st/3fqArEy</u>. Reportedly no real records exist for five meetings President Trump had with Putin. Lepore, *New Yorker*, Nov. 16, 2020.

59.     As revealed by the report of Special Counsel Robert Mueller, President Trump has a general antipathy toward note-taking. In a meeting with then-White House Counsel Don

McGahn, the President chastised him for taking notes, proclaiming, "Lawyers don't take notes. I never had a lawyer who took notes." *Report on the Investigation Into Russian Interference In the 2016 Election*, Vol. II, at 117.

60.    The President's resistance to preserving the records of his administration accords with his well-documented efforts throughout his career to prevent the disclosure of any details about how he conducts himself. He carried over to the White House his business practice of requiring non-disclosure agreements from those who work for him. Reportedly President Trump demanded that senior White House staff sign non-disclosure agreements, a demand that then-Chief of Staff Reince Priebus carried out despite concerns about their unenforceability. Lepore, *New Yorker*, Nov. 16, 2020.

61.    With the approaching onset of a new president, much public attention has focused on the likelihood that President Trump, or White House personnel acting at his behest, will destroy records of his presidency before he leaves office, fearing the consequences to him and his legacy should they become public. As has been pointed out, throughout his term in office President Trump has attempted to suppress unfavorable evidence, which does not "bode[] well for the historical record and for the scheduled transfer of materials from the White House to the National Archives, on January 20, 2021." Lepore, *New Yorker*, Nov. 16, 2020.

62.    Now, having lost the presidential election, President Trump has shown an even greater propensity to flout norms and laws by seeking to undermine the electoral process, and has engaged in conduct that some have called an effort to sabotage the presidential transition. *See, e.g.*, Michael D. Shear, Trump Using Last Days to Lock In Policies and Make Biden's Task More Difficult, *New York Times*, Nov. 21, 2020, https://nyti.ms/39ejvA7; Alex Woodward, What

Trump might do now that he's lost the election: From pardoning cronies to sabotaging the transition, *The Independent*, Nov. 17, 2020, https://bit.ly/2J6KnHa.

63.     The actions of the President since losing the election—unrestrained by truth and facts—have heightened concerns that he will destroy records of his "potential malfeasance and crimes." Woodward, *The Independent*, Nov. 17, 2020; *see also* Peter Nicholas, The 3 Norms Trump Could Still Break, *The Atlantic*, Nov. 21, 2020, https://bit.ly/3pUHw54.

64.     In light of the growing and well-founded concerns that President Trump is likely to destroy many of his records before leaving office, Plaintiff National Security Archive wrote to White House Counsel Pat Cipollone on November 13, 2020, requesting written assurances that all of the Presidential records of this administration will be preserved and transferred to NARA by January 20, 2021. The letter also reminded Mr. Cipollone that, under the PRA, the public is the rightful owner of these records.

65.     In a letter dated November 12, 2020, Plaintiff CREW also wrote to White House Counsel Cipollone urging that he ensure that all White House staff are aware of and comply with their obligations to maintain and preserve records in accordance with the PRA. CREW's letter also reminded Mr. Cipollone that, as the September 2017 White House Counsel memorandum noted, "[t]he willful destruction or concealment of federal records is a federal crime[.]"

66.     To date, neither Mr. Cipollone nor anyone else associated with the White House has responded to either the National Security Archive's letter or CREW's letter.

### Other White House Officials' Disregard for their PRA Obligations

67.     Other White House officials have also shown a shocking disregard for their recordkeeping obligations under the PRA. Chief among them is Senior White House Advisor Jared Kushner, who has routinely used non-official, personal messaging accounts to

communicate about some of the most pressing domestic and foreign policy issues facing our nation during the Trump presidency.

68.     In September 2017, *Politico* reported that Mr. Kushner had "corresponded with other administration officials about White House matters through a private email account set up during the transition [in December 2016], part of a larger pattern of Trump administration aides using personal email accounts for government business." Josh Dawsey, <u>Kushner used private email to conduct White House business</u>, *Politico*, Sept. 24, 2017, https://politi.co/2UGFR4J.

69.     *Politico* further reported that White House "[a]ides who have exchanged emails with Kushner on his private account since President Donald Trump took office in January include former chief of staff Reince Priebus, former chief strategist Steve Bannon, National Economic Council director Gary Cohn, and spokesman Josh Raffel." *Id.*

70.     On September 25, 2017, House Oversight and Government Reform Committee Chairman Trey Gowdy and Ranking Member Elijah E. Cummings sent a letter to then-White House Counsel Don McGahn requesting documents related to the use by the President's top advisors of private email accounts, non-governmental servers, and private domains to conduct official business. Letter from Reps. Trey Gowdy and Elijah E. Cummings to Don McGahn, Sept. 25, 2017, https://wapo.st/3m39auq; Letter from Rep. Elijah E. Cummings to Pat A. Cipollone, Mar. 21, 2019, https://bit.ly/2J7Cfqy ("Mar. 21, 2019 Oversight Letter").

71.     Separately, Rep. Cummings sent a document request to Mr. Kushner that same day, seeking, among other things, email addresses and accounts from which Mr. Kushner conducted official business. Letter from Rep. Elijah E. Cummings to Jared Kushner, Sept. 25, 2017, https://bit.ly/2KL4wnc. The request "explicitly directed Mr. Kushner to preserve his email records, including taking reasonable steps to prevent the 'relocation' of those email records."

https://oversight.house.gov/news/press-releases/cummings-urges-gowdy-to-take-white-house-advice-obtain-documents-directly-from.

72.     Notwithstanding these requests and the preservation directive, Mr. Kushner and his wife and Advisor to the President Ivanka Trump reportedly re-routed their personal email accounts to Trump Organization computers within one to two days of receiving the September 25, 2017 letters. Mar. 21, 2019 Oversight Letter, at 3.

73.     In a December 2018 interview with then-House Oversight and Government Reform Chairman Gowdy and Ranking Member Cummings, Mr. Kushner's counsel "confirmed that Mr. Kushner has used—and continues to use—WhatsApp" to create or send Presidential records, including to communicate "with people outside the United States." Mar. 21, 2019 Oversight Letter, at 6. When asked by Rep. Cummings if "Mr. Kushner has ever used WhatsApp to discuss classified information," his counsel replied, "That's above my pay grade." *Id.*

74.     WhatsApp is a non-official, encrypted electronic messaging application.

75.     Mr. Kushner's lawyer further explained that Mr. Kushner preserves Presidential records created or sent from his WhatsApp account by "tak[ing] '*screenshots*' of these communications and forward[ing] them to his official White House email account or to the National Security Council." Mar. 21, 2019 Oversight Letter, at 6 (emphasis added).

76.     Mr. Kushner's attorney also admitted that between January and August 2017, Mr. Kushner used his personal email account to send and receive official emails. Mar. 21, 2019 Oversight Letter, at 2-3.

77.     In March 2019, *CNN* reported that Mr. Kushner "has used WhatsApp to communicate with Saudi Crown Prince Mohammed bin Salman, who sources have told CNN the CIA assesses with high confidence ordered the murder and dismemberment of Washington Post

journalist Jamal Khashoggi." Kevin Collier, <u>Jared Kushner's use of WhatsApp raises concerns among cybersecurity experts</u>, *CNN*, Mar. 23, 2019, <u>https://cnn.it/33bmOnL</u>.

78.     In September 2020, *Vanity Fair* reported that Mr. Kushner "[o]ften" uses WhatsApp to communicate with members of a shadow coronavirus task force he established that operates outside of federal transparency laws. Katherine Eban, <u>That's Their Problem</u>, *Vanity Fair*, Sept. 17, 2020, <u>https://bit.ly/3fqHblO</u>.

79.     In October 2020, the *Wall Street Journal* reported that Mr. Kushner had established an "open line" of communication through WhatsApp to discuss policy matters with Facebook CEO Mark Zuckerberg. Deepa Seetharaman and Emily Glazer, <u>How Mark Zuckerberg Learned Politics</u>, *Wall Street Journal*, Oct. 16, 2020, <u>https://on.wsj.com/3meFGKh</u>.

80.     Public reporting disclosed that Ivanka Trump also used a personal email account with a domain shared with her husband, Jared Kushner, to send hundreds of emails concerning official White House business. Carol D. Leonnig and Josh Dawsey, <u>Ivanka Trump used a personal email account to send hundreds of emails about government business last year</u>, *Washington Post*, Nov. 19, 2018, <u>https://wapo.st/2J3zXIP</u>.

81.     Documents obtained by the House Committee on Oversight and Reform revealed that other White House officials used personal email for official White House business, including former Deputy National Security Advisor K.T. McFarland and former White House Chief Strategist Steve Bannon. Mar. 21, 2019 Oversight Letter.

### *The White House's Official Policy Authorizing "Screenshotting" As a Method of Preserving Certain Electronic Records*

82.     Guidance from the White House Counsel's office issued in February 2017 advises White House staff that use of personal email, text messaging, instant messaging, social networks, messaging apps, and other internet-based means of communication to conduct official business is

generally not permitted. White House Memorandum, Presidential Records Act Obligations, Feb. 22, 2017, https://bit.ly/3o06VbV ("Feb. 22, 2017 White House Memo").

83.     The February 2017 memorandum also directs White House staff to forward to their work account any official communication they receive on a private email account. *Id*.

84.     Although the February 2017 memorandum states that White House staff "should not use [non-official] instant messaging systems, social networks, or other internet-based means of electronic communication to conduct official business without the approval of the Office of the White House Counsel," it adds that if a White House employee "ever generate[s] or receive[s] [P]residential records on [non-official messaging] platforms," the employee "must preserve them by sending them to [their] EOP email account *via a screenshot* or other means." Feb. 22, 2017 White House Memo (emphasis added).

85.     In an October 2017 briefing with congressional staff, White House officials reiterated that they "advise[] employees that if texts occur involving official records on personal devices, individuals should *screenshot the text* and email it to their official account to be captured under PRA." Senate Homeland Security and Government Affairs Committee Democratic Staff Memorandum, Briefing from White House Counsel on Private Email Use, Oct. 27, 2017, https://bit.ly/2V7qjqS (emphasis added).

86.     During the same briefing, White House officials stated that "direct messages sent to official [White House] Twitter accounts are not automatically captured," and that "[t]hese direct messages to official Twitter accounts would have to be *screenshot* and forwarded by email to an official account to be captured under PRA." *Id.* (emphasis added).

87.     As alleged above, counsel for Mr. Kushner has confirmed that he utilizes this screenshotting method to preserve Presidential records created or sent from his WhatsApp account. Mar. 21, 2019 Oversight Letter, at 6.

88.     A "screenshot" of an electronic message is not a complete copy of the original message because it does not capture the message's associated metadata, attachments, functionality (including text searchability), or other digital artifacts needed to authenticate the message.

89.     Indeed, as NARA itself has acknowledged, "[s]creenshots only create[] a picture of content and do not preserve the metadata and functionality of the content, which does not comply with NARA's transfer guidance for permanent web content records." NARA, White Paper on Best Practices for the Capture of Social Media Records, May 2013.

90.     WhatsApp messages, in particular, include high-value metadata "showing which numbers contacted which over WhatsApp, when, and for how long, as well as the IP addresses and phone identifiers." Thomas Brewster, Forget About Backdoors, This Is The Data WhatsApp Actually Hands To Cops, Forbes, Jan. 20, 2017, https://bit.ly/35YBk4n. A screenshot would not fully capture this metadata, if at all.

91.     Metadata, attachments, and functionality associated with an electronic message can be preserved by accessing the original message from the application, service, or device in which it is stored. But the White House, on information and belief, does not utilize any such means to capture and preserve those items with respect to Presidential records created via text message, instant messaging systems, social networks, and other non-email means of electronic communication.

92.     Despite the White House Counsel's awareness of the routine use by White House personnel, including Mr. Kushner, of non-official electronic messaging accounts for official business, the White House has not, on information and belief, implemented records management controls or taken other necessary actions to preserve complete copies of all Presidential records created or sent from non-official electronic messaging accounts, including but not limited to Presidential records stored in Mr. Kushner's WhatsApp account.

93.     In light of these publicly-documented practices by Mr. Kushner and other White House personnel, and the failure of the White House to amend its guidance to comply with the PRA, Plaintiff CREW by letters dated October 28, November 12, and November 20, 2020 notified the White House Counsel, Mr. Kushner, and NARA that the White House's screenshotting policy does not comply with the PRA. CREW's November 20 letter requested corrective action to address the deficient policy by no later than November 27, 2020, in light of the upcoming transition.

94.     To date, neither Mr. Kushner, nor the White House, nor NARA have responded to CREW's requests.

95.     On November 10, 2020, the Chairs of the House Committee on Oversight and Reform, the House Permanent Select Committee on Intelligence, the House Committee on Appropriations; the House Committee on Rules, the House Committee on Ways and Means, the House Committee on the Judiciary, the House Committee on Science, Space and Technology, and the House Committee on Energy and Commerce, and the House Committee on House Administration sent a letter to White House Counsel Pat Cipollone reminding him of the records preservation obligations with which all employees of the Executive Office of the President must comply. Letter from House Committee Chairs to Pat Cipollone, Nov. 10, 2020,

https://bit.ly/36e8YmC. The letter urged Mr. Cipollone "to ensure that President Trump and Executive Office of the President employees and officials do not inappropriately alter, conceal, or destroy any official records or materials." *Id.*

## CLAIMS FOR RELIEF

### COUNT I
**(For a Declaratory Judgment that the Failure of Defendants Trump and EOP to Obtain the Archivist's Written Views and to Transmit a Disposal Schedule to Congress Prior to Disposing of Records Violates the Presidential Records Act)**

96.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

97.     The President, his staff, and the EOP must engage in a basic, non-discretionary process before disposing of Presidential records. They must obtain the views of the Archivist in writing and transmit a disposal schedule to Congress prior to disposing of a Presidential record. *See* 44 U.S.C. § 2203(c), (d). In this way Congress protected both a president's right to control his or her records while in office and the public's right to a complete historical record of a president once that president leaves office.

98.     Notwithstanding these requirements, President Trump has disposed of and, on information and belief, threatens to dispose of Presidential records without first obtaining the views of the Archivist in writing and transmitting a disposal schedule to Congress prior to the proposed records disposal.

99.     In the face of this evidence and concerns, President Trump, the EOP, and NARA have refused to provide assurances that the President is complying with the PRA, including its records disposal provisions.

100.     By failing to comply with the disposal-notice requirements of the PRA, President Trump has deprived NARA of the opportunity to weigh in on the historical significance of any

record the President proposes to destroy, and Congress of any opportunity to act to prevent the proposed destruction.

101.    As a result of President Trump's refusal to comply with the PRA's disposal-notice requirements, the President has critically undermined the PRA by removing the two safety valves Congress enacted to guard against the unlawful destruction of Presidential records.

102.    As a result of this unlawful disposition and threatened future disposition, Plaintiffs are and will be deprived of future access to Presidential records through the FOIA that Plaintiffs are entitled to receive by law.

103.    Plaintiffs are therefore entitled to a declaratory judgment that by failing to obtain the views of the Archivist in writing and to transmit a disposal schedule to Congress prior to disposing of Presidential records, the President and EOP are violating the PRA.

**COUNT II**
**(For Mandamus Relief Directing Defendant Trump, His Staff, and Defendant EOP to Comply with Their Non-Discretionary Duties Under the Presidential Records Act)**

104.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

105.    Mandamus relief is appropriate where a plaintiff has a clear right to relief but no other adequate remedy, and the defendant has a clear duty to act. *See, e.g.*, *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931); *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996). No separate waiver of sovereign immunity is required to seek a writ of mandamus to compel an official to perform a duty required in his official capacity. *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005).

106.    The PRA imposes on the President, his staff, and the EOP the mandatory obligation to engage in a basic, non-discretionary process before disposing of Presidential

records. They must obtain the views of the Archivist in writing and transmit a disposal schedule to Congress prior to disposing of a Presidential record. *See* 44 U.S.C. § 2203(c), (d).

107.     The PRA leaves the President and his staff no discretion whether to comply with these requirements. The President has no discretion on whether to seek the views of the Archivists or to transmit a disposal schedule to Congress before disposing of Presidential records. *See* 44 U.S.C. § 2203(c).

108.     As alleged above, President Trump personally as well as by and through his staff has violated and, on information and belief, threatens to violate this mandatory, non-discretionary obligation by destroying or ordering the disposal of Presidential records without obtaining the Archivist's views in writing or producing a disposal schedule to Congress as the PRA requires.

109.     The President and the EOP have refused to provide assurances that they will preserve all Presidential records for transfer to NARA at the end of President Trump's term of office despite a request to do so and growing concern that, given the President's repeated behavior, he likely will destroy Presidential records before leaving office.

110.     President Trump, the EOP, and NARA have refused to provide more general assurances that the President is complying with the PRA, including its records disposal provisions.

111.     Review of these violations is essential to prevent the President from rendering the PRA a nullity and depriving the public—the lawful owner of his Presidential records—from eventual access to those records as the PRA guarantees.

112.     Given the fast-approaching end of the Trump presidency and President Trump's demonstrated and repeated disdain for the rule of law, including the recordkeeping obligations

the PRA imposes on him, there is an acute and immediate need to prevent the irretrievable loss of Presidential records through their improper removal or destruction.

113.    As a result of this unlawful disposal, Plaintiffs are and will be deprived of future access to Presidential records through the FOIA that Plaintiffs are entitled to receive by law.

114.    Plaintiffs are therefore entitled to mandamus relief ordering the President, his staff, and the EOP to comply with their mandatory, non-discretionary duties under the PRA to obtain the views of the Archivist in advance of any proposed disposal of Presidential records and to produce a disposal schedule to the appropriate congressional committee before disposing of Presidential records during President Trump's term of office.

**COUNT III**
**(For a Declaratory Judgment that Defendant EOP's Official Screenshotting Policy is Contrary to the Presidential Records Act Because It Calls for Preserving Incomplete Copies of Presidential Records)**

115.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

116.    The PRA imposes on Defendants Trump and EOP a non-discretionary duty to "implement[] . . . records management controls and other necessary actions . . . to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records pursuant to the requirements of this section and other provisions of law." 44 U.S.C. § 2203(a).

117.    The PRA further requires that when White House employees "create or send a Presidential . . . record using a non-official electronic message account," they either "(1) cop[y] an official electronic messaging account. . . in the original creation or transmission of the Presidential record," or "(2) forward[] a *complete copy* of the Presidential . . . record to an

official electronic messaging account . . . not later than 20 days after the original creation or transmission of the Presidential . . . record." 44 U.S.C. § 2209(a)(1)-(2) (emphasis added).

118.    As alleged above, official White House policy authorizes staff, as a means of satisfying their PRA obligations, to "screenshot" Presidential records created or sent from certain non-official electronic messaging accounts, and to forward the screenshot to an official account.

119.    As further alleged above, senior White House staff, including but not limited to Jared Kushner, routinely have created and sent Presidential records from certain non-official electronic messaging accounts, and, to the extent they took any steps to preserve those messages, they did so by following the White House's official screenshotting policy.

120.    A screenshot is not a "complete copy" of a Presidential record within the meaning of 44 U.S.C. § 2209(a), because it lacks metadata, attachments, functionality, and other digital artifacts associated with the original record.

121.    Accordingly, the White House's official screenshotting policy fails to comply with the PRA because it calls for preserving incomplete copies of presidential records that lack metadata, attachments, and functionality associated with the original records, and because it does not otherwise require preservation of "complete copies" of such Presidential records in accordance with 44 U.S.C. § 2209(a).

122.    Left uncorrected, the official screenshotting policy of the White House will result in the irretrievable removal, loss, or destruction of information required to be preserved under the PRA, depriving Plaintiffs of future access to Presidential records through the FOIA that Plaintiffs are entitled to receive by law.

123.    Plaintiffs are therefore entitled to declaratory relief that the official screenshotting policy of the White House is contrary to the PRA.

**COUNT IV**
**(For Mandamus Relief Directing Defendants Trump and the EOP to Rescind the EOP's Screenshotting Policy and to Preserve "Complete Copies" of All Affected Presidential Records)**

124.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

125.    The PRA imposes on Defendants Trump and EOP a non-discretionary duty to "implement[] . . . records management controls and other necessary actions . . . to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records pursuant to the requirements of this section and other provisions of law." 44 U.S.C. § 2203(a).

126.    The PRA further requires that when White House employees "create or send a Presidential . . . record using a non-official electronic message account," they either "(1) cop[y] an official electronic messaging account. . . in the original creation or transmission of the Presidential record," or "(2) forward[] a *complete copy* of the Presidential . . . record to an official electronic messaging account . . . not later than 20 days after the original creation or transmission of the Presidential . . . record." 44 U.S.C. § 2209(a)(1)-(2) (emphasis added).

127.    As alleged above, official White House policy authorizes staff, as a means of satisfying their PRA obligations, to "screenshot" Presidential records created or sent from certain non-official electronic messaging accounts, and to forward the screenshot to an official account.

128.    As further alleged above, senior White House staff, including but not limited to Jared Kushner, routinely have created and sent Presidential records from certain non-official electronic messaging accounts, and, to the extent they took any steps to preserve those messages, they did so by following the White House's official screenshotting policy.

129.    A screenshot is not a "complete copy" of a Presidential record within the meaning of 44 U.S.C. § 2209(a), because it lacks metadata, attachments, functionality, and other digital artifacts associated with the original record.

130.    Accordingly, the White House's official screenshotting policy fails to comply with the PRA because it calls for preserving incomplete copies of Presidential records that lack metadata, attachments, and functionality associated with the original records, and because it does not otherwise require preservation of "complete copies" of such Presidential records in accordance with 44 U.S.C. § 2209(a).

131.    Left uncorrected, the official screenshotting policy of the White House will result in the irretrievable removal, loss, or destruction of information required to be preserved under the PRA, depriving Plaintiffs of future access to Presidential records through FOIA that Plaintiffs are entitled to receive by law.

132.    Plaintiff CREW has requested that Defendants Trump and EOP revise the White House's PRA policy and take appropriate corrective action to ensure preservation of all Presidential records created or sent from non-official electronic messaging accounts, but they have refused to do so.

133.    By adopting and implementing an official records preservation policy that is facially non-compliant with the PRA, Defendants Trump and EOP have violated their non-discretionary duties under 44 U.S.C. § 2203(a) and § 2209(a).

134.    Plaintiffs have no adequate alternative remedy to mandamus relief.

135.    Given the upcoming end of the Trump presidency and continued reliance by White House officials on the unlawful screenshotting policy, there is an imminent need to

prevent the irretrievable removal, loss, or destruction of Presidential records generated during President Trump's term of office before that term ends.

136.    Accordingly, Plaintiffs are entitled to mandamus relief directing Defendants Trump and EOP to rescind the unlawful policy and preserve "complete copies" of all Presidential records that were incompletely preserved pursuant to that policy.

**COUNT V**
**(For a Declaratory Judgment that Defendant Kushner's Failure to Preserve in an Official White House Account "Complete Copies" of All Presidential Records He Creates or Sends from His Non-Official Electronic Messaging Accounts Is Contrary to the Presidential Records Act)**

137.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

138.    As Senior Advisor to the President, Defendant Kushner is a "covered employee" under section 2209 of the PRA because he is part of "the immediate staff of the President" and an "individual of the Executive Office of the President whose function is to advise and assist the President." 44 U.S.C. § 2209(c)(1)(A), (C).

139.    When Defendant Kushner, in his official capacity as Senior Advisor to the President, "create[s] or send[s] a Presidential . . . record using a non-official electronic message account," section 2209 of the PRA imposes on him a non-discretionary duty to either "(1) cop[y] an official electronic messaging account. . . in the original creation or transmission of the Presidential record," or "(2) forward[] a *complete copy* of the Presidential . . . record to an official electronic messaging account . . . not later than 20 days after the original creation or transmission of the Presidential . . . record."  44 U.S.C. § 2209(a)(1)-(2) (emphasis added).

140.    As alleged above, Defendant Kushner routinely creates and sends Presidential records from certain non-official electronic messaging accounts, and, to the extent he takes any

steps to preserve those records, he takes screenshots of them and forwards them to an official White House account.

141.    As further alleged above, a screenshot is not a "complete copy" of a Presidential record within the meaning of 44 U.S.C. § 2209(a), because it lacks metadata, attachments, functionality, and other digital artifacts associated with the original record.

142.    By failing to preserve complete copies of Presidential records created or sent from his non-official electronic messaging accounts, Defendant Kushner has violated, and continues to violate, his non-discretionary duties under 44 U.S.C. § 2209(a).

143.    Left uncorrected, Defendant Kushner's actions will result in the irretrievable removal, loss, or destruction of information required to be preserved under the PRA, depriving Plaintiffs of future access to Presidential records through the FOIA that Plaintiffs are entitled to receive by law.

144.    Plaintiffs are therefore entitled to a declaratory judgment that Defendant Kushner is in violation of his mandatory duties under the PRA by failing to preserve in an official White House account "complete copies," as that term is used in the PRA and implementing guidance, of all Presidential records created or sent from his non-official electronic messaging accounts.

**COUNT VI**
**(For Mandamus Relief Directing Defendant Kushner to Comply with His Non-Discretionary Duty to Preserve in an Official White House Account "Complete Copies" of All Presidential Records Created or Sent from His Non-Official Electronic Messaging Accounts)**

145.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

146.    As Senior Advisor to the President, Defendant Kushner is a "covered employee" under section 2209 of the PRA because he is part of "the immediate staff of the President" and

an "individual of the Executive Office of the President whose function is to advise and assist the President." 44 U.S.C. § 2209(c)(1)(A), (C).

147.    When Defendant Kushner, in his official capacity as Senior Advisor to the President, "create[s] or send[s] a Presidential . . . record using a non-official electronic message account," section 2209 of the PRA imposes on him a non-discretionary duty to either "(1) cop[y] an official electronic messaging account. . . in the original creation or transmission of the Presidential record," or "(2) forward[] a *complete copy* of the Presidential . . . record to an official electronic messaging account . . . not later than 20 days after the original creation or transmission of the Presidential . . . record." 44 U.S.C. § 2209(a)(1)-(2) (emphasis added).

148.    As alleged above, Defendant Kushner routinely creates and sends Presidential records from certain non-official electronic messaging accounts, and, to the extent he takes any steps to preserve those records, he takes screenshots of them and forwards them to an official White House account.

149.    As further alleged above, a screenshot is not a "complete copy" of a Presidential record within the meaning of 44 U.S.C. § 2209(a), because it lacks metadata, attachments, functionality, and other digital artifacts associated with the original record.

150.    By failing to preserve complete copies of Presidential records created or sent from his non-official electronic messaging accounts, Defendant Kushner has violated, and continues to violate, his non-discretionary duties under 44 U.S.C. § 2209(a).

151.    Left uncorrected, Defendant Kushner's actions will result in the irretrievable removal, loss, or destruction of information required to be preserved under the PRA, depriving Plaintiffs of future access to Presidential records through the FOIA that Plaintiffs are entitled to receive by law.

152.    Plaintiff CREW has requested that Defendants Trump, EOP, and Kushner take appropriate corrective action to ensure preservation of all Presidential records created or sent from Mr. Kushner's non-official electronic messaging accounts, and that Defendants Trump and EOP rescind and correct their unlawful screenshotting policy.

153.    Defendants Trump, EOP, and Kushner have refused to comply with CREW's requests.

154.    Given the upcoming end of the Trump presidency, there is an acute and imminent need to prevent the irretrievable removal, loss, or destruction of Presidential records generated during President Trump's term of office before that term ends.

155.    Plaintiffs have no adequate alternative remedy to mandamus relief directing Defendant Kushner's compliance with his non-discretionary duties.

156.    Accordingly, Plaintiffs are entitled to mandamus relief directing Defendant Kushner to comply with his non-discretionary duty to preserve, in an official White House account, "complete copies," as that term is used in the PRA and implementing guidance, of all Presidential records created or sent from his non-official electronic messaging accounts.

**COUNT VII**
**(For Injunctive Relief Directing Defendants NARA and the Archivist to Take Action to Ensure Preservation of "Complete Copies" of All Presidential Records Created or Sent from Non-Official Electronic Messaging Accounts During President Trump's Term of Office)**

157.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

158.    The PRA imposes on the NARA Defendants a non-discretionary duty to "assume responsibility for the custody, control, and preservation of, and access to, the Presidential records" of a former President. 44 U.S.C. § 2203(f), (g)(1).

159.    The PRA further imposes on the NARA Defendants a non-discretionary and "affirmative duty to make" a former President's "records available to the public as rapidly and completely as possible consistent with the provisions of this chapter." 44 U.S.C. § 2203(g)(1).

160.    As alleged above, the White House's official screenshotting policy is facially non-compliant with the PRA and will, if left uncorrected, result in the irretrievable removal, loss, or destruction of records that the PRA requires to be preserved.

161.    Plaintiff CREW has requested that the NARA Defendants take action to address the White House's unlawful PRA policy, but they have refused to do so.

162.    As a result of the NARA Defendants' refusal to act, they will be unable to fulfill their non-discretionary duties to "assume responsibility for the custody, control, and preservation of, and access to" all of the Presidential records President Trump generated, 44 U.S.C. §§ 2203(f), (g)(1), and to make those records "available to the public as rapidly and completely as possible," *id.* § 2203(g)(1).

163.    The NARA Defendants' failure to take such action is "agency action unlawfully withheld or unreasonably delayed," and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the APA, 5 U.S.C. §§ 706(1), 706(2)(A).

164.    In light of the imminent end of the Trump presidency, there is an immediate and acute need to prevent the irretrievable removal, loss, or destruction of Presidential records generated during President Trump's terms of office before that term ends.

165.    Accordingly, Plaintiffs are entitled to injunctive relief directing the NARA Defendants to take all necessary action to ensure the preservation of "complete copies," as that term is used in the PRA and implementing guidance, of all Presidential records created or sent from non-official electronic messaging accounts during President Trump's term of office.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.      Declare that by failing to obtain the views of the Archivist in writing and to transmit a disposal schedule to Congress prior to disposing of Presidential records, the President and EOP are violating the PRA;

2.      Order the President, his staff, and the EOP to comply with their mandatory, non-discretionary duties under the PRA to obtain the views of the Archivist in advance of any proposed disposal of Presidential records and to produce a disposal schedule to the appropriate congressional committee before disposing of Presidential records during President Trump's term of office;

3.      Declare that the White House's official screenshotting policy is contrary to the PRA;

4.      Order Defendants Trump and EOP to rescind the White House's unlawful screenshotting policy;

5.      Order Defendants Trump and EOP to preserve "complete copies," of all Presidential records that were incompletely preserved pursuant to the White House's unlawful screenshotting policy;

6.      Declare that Defendant Kushner, by failing to preserve in an official White House account "complete copies" of all Presidential records created or sent from his non-official electronic messaging accounts, is in violation of his mandatory duties under the PRA;

7.      Order Defendant Kushner to preserve, in an official White House account, "complete copies" of all Presidential records created or sent from his non-official electronic messaging accounts;

8.     Order the NARA Defendants to take all necessary steps to ensure the preservation in accordance with the PRA of "complete copies" of all Presidential records created or sent from non-official electronic messaging accounts during President Trump's term of office;

9.     Award Plaintiffs their costs and attorneys' fees in this action; and

10.     Grant any other relief the Court deems appropriate.


Dated: December 1, 2020         Respectfully submitted,

*/s/ Anne L. Weismann*
Anne L. Weismann
(D.C. Bar No. 298190)
6117 Durbin Road
Bethesda, MD  20817
301-717-6610
weismann.anne@gmail.com

*/s/ Nikhel S. Sus*
Nikhel S. Sus
(D.C. Bar No. 1017937)
CITIZENS FOR RESPONSIBILITY AND ETHICS
IN WASHINGTON
1101 K St. N.W., Suite 201
Washington, DC 20005
Telephone: (202) 408-5565
Fax: (202) 588-5020
nsus@citizensforethics.org

*Counsel for Plaintiffs*