**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| NATIONAL SECURITY ARCHIVE, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 20-3500-KBJ |
| ) | |
| DONALD J. TRUMP, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

**MEMORANDUM IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

STATUTORY FRAMEWORK ............................................................................................... 2

FACTUAL BACKGROUND ................................................................................................... 5

I.      President Trump's Disregard for His PRA Obligations ........................................... 5

II.     Other White House Officials' Disregard for Their PRA Obligations...................... 9

III.    The White House's Official Policy Authorizing "Screenshotting" As a Method of
        Preserving Certain Electronic Records ...................................................................... 11

ARGUMENT ............................................................................................................................ 15

I.      Plaintiffs Are Entitled to a Temporary Restraining Order to Prevent the Irretrievable
        Removal, Loss, or Destruction of Historically Important Presidential Records................ 15

        A.      Standard for Entry of a Temporary Restraining Order. ......................................... 15

        B.      Plaintiffs Are Likely to Prevail on Counts I through VI of the Complaint........... 16

                1.      Plaintiffs Are Likely to Prevail on Their Claims Against the President and
                        the EOP (Counts I and II). ........................................................................ 17

                2.      Plaintiffs Are Likely to Prevail on Their Claims Challenging the White
                        House's Official Screenshotting Policy as Contrary to the PRA (Counts III
                        and IV). ...................................................................................................... 20

                3.      Plaintiffs Are Likely to Prevail on Their Claims Challenging Defendant
                        Kushner's Failure to Preserve "Complete Copies" of Presidential Records
                        as Required by Section 2209(a) of the PRA (Counts V and VI). ............. 25

        C.      Plaintiffs Will Suffer Irreparable Injury Absent the Requested Relief................ 26

        D.      Defendants Will Not Be Harmed by the Requested Relief................................... 29

        E.      The Balance of Equities and Public Interest Favor the Requested Relief. ........... 29

CONCLUSION........................................................................................................................ 30

# TABLE OF AUTHORITIES

## Cases

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014)................................................................ 15, 16

*Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29 (D.C. Cir. 1983)............................................. 2

*Am. Friends Serv. Comm. v. Webster*, 485 F. Supp. 222 (D.D.C. 1980)..................................... 27

*Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183 (D.C. Cir. 2016)....................................................... 17

*American Historical Ass'n v. Peterson*, 876 F. Supp. 1300 (D.D.C. 1995) ............................... 25

*Archdiocese of Washington v. Washington Metro. Area Transit Auth.*,
    897 F.3d 314 (D.C. Cir. 2018) ................................................................................................ 15

*Armstrong v. Bush* ("*Armstrong I*"), 924 F.2d 282 (D.C. Cir. 1991) .......................................... 19

*Armstrong v. EOP* ("*Armstrong II*"), 1 F.3d 1274 (D.C. Cir. 1993) .......................... 19, 22, 23, 24

*Bean LLC v. John Doe Bank*, 291 F. Supp. 3d 34 (D.D.C. 2018) ............................................... 15

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)................ 15, 26

*CREW v. Cheney*, 577 F. Supp. 2d 328 (D.D.C. 2008) ................................................. 2, 16, 27, 28

*CREW v. Cheney*, 593 F. Supp. 2d 194 (D.D.C. 2009) ................................................................ 24

*CREW v. EOP*, No. 07-cv-1707, ECF No. 18 (D.D.C. Nov. 12, 2007)............................. 2, 16, 27

*CREW v. Trump*, 924 F.3d 602 (D.C. Cir. 2019)..................................................................... 2, 24

*CREW v. Trump*, No. 19-cv-01333 (D.D.C. Oct. 3, 2019)........................................... 2, 16, 27

*Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009) ......................................... 15

*Green v. NARA*, 992 F. Supp. 811 (E.D. Va. 1998)...................................................................... 2

*Hall v. Johnson*, 599 F. Supp. 2d 1 (D.D.C. 2009)..................................................................... 15

*Lovitky v. Trump*, 949 F.3d 753 (D.C. Cir. 2020).................................................................. 17, 23

*Mons v. McAleenan*, 2019 WL 4225322 (D.D.C. Sept. 5, 2019) ................................................ 16

*Nixon v. Administrator*, 433 U.S. 425 (1977) ............................................................................. 20

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................... 29

*Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) ................................. 29

*R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ............................................... 29

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) .................................................. 29

*Sterling Comm. Credit—MI, LLC, v. Phoenix Industries I, LLC*,
    762 F. Supp. 2d 8 (D.D.C. 2011) ............................................................................ 15

*Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996) ........................................................... 17

*United States v. Menasche*, 348 U.S. 528 (1955) ......................................................... 20

*Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7 (2008) ................................... 15

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .................................... 20

*Zhi Chen v. District of Columbia*, 839 F. Supp. 2d 7 (D.D.C. 2011) ........................... 28

*Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003) ............................. 28

**Statutes**

28 U.S.C. § 1361 ............................................................................................................ 17

44 U.S.C. § 2112(c) ......................................................................................................... 4

44 U.S.C. § 2202 ........................................................................................................ 3, 30

44 U.S.C. § 2203(a) ............................................................................................. 3, 21, 23

44 U.S.C. § 2203(c) .................................................................................................. 3, 17

44 U.S.C. § 2203(d) .......................................................................................................... 3

44 U.S.C. § 2203(g)(1) ................................................................................................. 3, 4

44 U.S.C. § 2204(a) .......................................................................................................... 5

44 U.S.C. § 2204(c) .......................................................................................................... 5

44 U.S.C. § 2209(a) ................................................................................................. passim

44 U.S.C. § 2209(a)(2) .................................................................................................. 23

44 U.S.C. § 2209(b) ........................................................................................... 25

44 U.S.C. § 2209(c)(1) ................................................................................... 4, 25

44 U.S.C. § 2209(c)(2) ......................................................................................... 5

44 U.S.C. § 2209(c)(3) ......................................................................................... 5

44 U.S.C. § 2911 .................................................................................................. 4

**Legislative Materials**

124 Cong. Rec. 34,894 (daily ed. Oct. 10, 1978) ............................... 18, 20, 29

124 Cong. Rec. 36,845 (daily ed. Oct. 13, 1978) ....................................... 18

124 Cong. Rec. S36843 (daily ed. Oct. 13, 1978) ...................................... 30

H.R. Rep. No. 95-1487, 95th Cong., 2d Sess. 11 (1978) .......................... 2, 24

Presidential and Federal Records Act Amendments of 2014, Pub. L. 113-187, 128 Stat. 2003 (2014) ................................................................................................. 4

S. Rep. 113-218, 113th Cong., 2d Sess. (2014) ....................................... 5, 24

## INTRODUCTION

In less than two months, President Donald Trump will leave office and the records of his presidency will be transferred to the National Archives and Records Administration ("NARA") for eventual public access under the Freedom of Information Act ("FOIA"). Unfortunately, the actions of the President and his staff present an unacceptable risk that valuable historical records will be permanently lost once his term ends. From the outset of his presidency, President Trump has flouted his recordkeeping obligations under the Presidential Records Act ("PRA") in myriad ways. His White House has also adopted an official PRA policy authorizing employees to preserve electronic records from certain types of non-official, personal messaging accounts merely by taking a "screenshot" of the record and forwarding it to an official messaging account. Because a screenshot does not capture metadata, attachments, and functionality associated with the original record, the White House's policy contravenes the PRA's requirement to preserve "complete copies" of such records, 44 U.S.C. § 2209(a), and, if left unaddressed before President Trump's term ends, is certain to result in the improper removal, loss, or destruction of Presidential record material.

Plaintiffs—historians and good government groups that rely on Presidential records to fulfill their missions—sought to avoid these risks by repeatedly asking Defendants President Trump, the Executive Office of the President ("EOP"), and Senior White House Advisor Jared Kushner (collectively, "White House Defendants") for assurances that all Presidential records would be preserved as the law requires, and that the White House's deficient screenshotting policy would be corrected. Defendants have refused to provide those assurances. As a result, Plaintiffs and the public face a very real threat of irreparable harm absent this Court's immediate intervention.

To prevent this harm, Plaintiffs now seek a temporary restraining order requiring the White House Defendants to preserve while this litigation is pending all Presidential records generated during President Trump's term of office, including but not limited to "complete copies" of all Presidential records created or sent from White House officials' non-official electronic messaging accounts. Such an order would prevent any irretrievable removal, loss, or destruction of Presidential records during the pendency of this case, while merely requiring Defendants to do what the PRA already mandates.

Courts have routinely granted emergency injunctive relief requiring the preservation of Presidential, Vice Presidential, and Federal records pending resolution of litigation challenging the potential destruction of those records. *See, e.g.*, *CREW v. Cheney*, 577 F. Supp. 2d 328 (D.D.C. 2008) (granting preliminary injunction requiring preservation of records in PRA case); Order, *CREW v. EOP*, No. 07-cv-1707, ECF No. 18 (D.D.C. Nov. 12, 2007) (adopting Report and Recommendation, *CREW v. EOP*, No. 07-cv-1707, ECF No. 11 (D.D.C. Oct. 19, 2007)) (granting temporary restraining order requiring preservation of records in PRA case); Minute Order, *CREW v. Trump*, No. 19-cv-01333 (D.D.C. Oct. 3, 2019) (entering preservation order in PRA case); *Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29, 35 (D.C. Cir. 1983) (district court entered preliminary injunction requiring preservation of records in Federal Records Act case); *Green v. NARA*, 992 F. Supp. 811, 816 (E.D. Va. 1998) (same). For the reasons outlined below, this Court should do the same.

## STATUTORY FRAMEWORK

The PRA "'establish[es] the public ownership of records created by . . . presidents and their staffs in the course of discharging their official duties.'" *CREW v. Trump*, 924 F.3d 602, 603 (D.C. Cir. 2019) (quoting H.R. Rep. No. 95-1487, 95th Cong. at 2). Toward that end, the

statute provides that "[t]he United States shall reserve and retain complete ownership,

possession, and control of Presidential records[.]" 44 U.S.C. § 2202.

> To ensure a full historical record, the PRA directs that the
>
> President shall take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records pursuant to the requirements of this section and other provisions of law.

44 U.S.C. § 2203(a) (emphasis added).

The PRA imposes a multi-step process on the President before any Presidential records

can be destroyed. While in office, a President may dispose of his or her Presidential records only

after making an affirmative determination that the records "no longer have administrative,

historical, informational, or evidentiary value[.]" 44 U.S.C. § 2203(c). After making that

determination, the President must obtain the written views of the Archivist on the proposed

destruction. 44 U.S.C. § 2203(c)(1)-(2). If the President receives written confirmation that the

Archivist intends to take any action with respect to the proposed destruction, the President must

notify the appropriate congressional committee of the President's intention 60 days before the

proposed disposal. 44 U.S.C. § 2203(d). This process reflects the care Congress took to ensure

that Presidential records could be destroyed only after considered deliberation by multiple

stakeholders.

After a President leaves office, the Archivist assumes "responsibility for the custody,

control, and preservation of, and access to" the former president's records. 44 U.S.C. §

2203(g)(1). Once in possession of a former President's records, the PRA empowers the Archivist

to "exercise . . . all the functions and responsibilities otherwise vested in him pertaining to

Federal records or other documentary materials in his custody or under his control." 44 U.S.C. §

2112(c). The PRA directs the Archivist in negotiating for the deposit of Presidential materials "to secure to the Government, as far as possible, the right to have continuous and permanent possession of the materials." *Id.* The PRA further provides that the "Archivist shall have an affirmative duty to make" a former president's "records available to the public as rapidly and completely as possible consistent with the provisions of this chapter." *Id.* § 2203(g)(1).

In 2014, Congress amended both the PRA and the Federal Records Act ("FRA") through the Presidential and Federal Records Act Amendments of 2014, Pub. L. 113-187, 128 Stat. 2003 (2014) ("2014 Amendments"). The 2014 Amendments sought to "modernize[] records management by focusing more directly on electronic records." NARA Press Release, Nationa<u>l Archives Welcomes Presidential and Federal Records Act Amendments of 2014</u>, Dec. 1, 2014, <u>https://bit.ly/3o1Yw7T</u>.

The 2014 Amendments explicitly restrict White House employees' use of "non-official electronic messaging account[s]" to "create or send" Presidential records unless they "(1) cop[y] an official electronic messaging account. . . in the original creation or transmission of the Presidential record," or "(2) forward[] a *complete copy* of the Presidential . . . record to an official electronic messaging account . . . not later than 20 days after the original creation or transmission of the Presidential . . . record." 44 U.S.C. § 2209(a)(1)-(2) (emphasis added). The Amendments similarly restrict the use of non-official electronic message accounts under the FRA. 44 U.S.C. § 2911.

Section 2209 of the PRA defines "covered employee" to include both "the immediate staff of the President," and "a unit or individual of the Executive Office of the President whose function is to advise and assist the President." 44 U.S.C. § 2209(c)(1)(A), (C). The amended statute broadly defines "electronic messages" to mean "electronic mail and other electronic

messaging systems that are used for purposes of communicating between individuals." 44 U.S.C. § 2209(c)(2). It likewise broadly defines "electronic messaging account" to mean "any account that sends electronic messages." 44 U.S.C. § 2209(c)(3).

The legislative history for Section 2209 confirms what the statutory text makes plain: that Congress wanted both the "President" and his "staff" to "ensure that *all* Presidential records, even those sent from a personal electronic messaging account, are properly preserved and maintained in an official electronic messaging account." S. Rep. 113-218, 113th Cong., 2d Sess., at 6 (2014) (emphasis added).

To implement the 2014 Amendments, NARA has issued guidance confirming that a "complete" version of an electronic record—including electronic messages generated in non-official accounts—should include the record's associated metadata, attachments, and functionality. *See* NARA Bulletin 2015-02, July 29, 2015, https://bit.ly/2Jeyrnh; NARA Bulletin 2015-04, Sept. 15, 2015, https://bit.ly/37cA1xX; Compl. ¶¶ 47-54.

Beginning five years after a President leaves office, the public can access Presidential records from NARA through the procedures that the FOIA establishes. 44 U.S.C. § 2204(c). Although some materials can be withheld or redacted for an extended period of time, they too eventually become available to members of the public, including Plaintiffs. 44 U.S.C. § 2204(a).

## FACTUAL BACKGROUND

## I.   President Trump's Disregard for His PRA Obligations[1]

From the outset of his presidency, President Trump has shown a disregard, if not an outright disdain, for his recordkeeping obligations under the PRA. Early on in his presidency it was revealed that the President has a practice of ripping up his notes at the close of meetings, a

---

[1] These facts are drawn directly from the Complaint in this action.

practice some have called "his unofficial 'filing system.'" Annie Karni, <u>Meet the guys who tape Trump's papers back together</u>, *Politico*, June 10, 2018, https://politi.co/33cqS7p; Jill Lepore, <u>Will Trump Burn the Evidence?</u>, *New Yorker*, Nov. 16, 2020, https://bit.ly/3kZesWy. Records managers were able to save at least parts of some of these records by gathering the pieces and taping them back together, *id.*, but it is far from clear that they were able to recreate complete copies before their abrupt termination in 2018, when they were "marched off the White House grounds by Secret Service agents." Timothy Noah, <u>The Trump You've Yet to Meet</u>, *The Atlantic*, Nov. 30, 2020, https://bit.ly/3ofJ2gy.

Throughout his presidency, President Trump has used Twitter extensively to communicate what the White House has labeled official statements, Rachel Treisman, <u>As President Trump Tweets and Deletes, the Historical Record Takes Shape</u>, *NPR*, Oct. 25, 2019, https://n.pr/3pYdhKz, a characterization that is underscored by the purposes his tweets have served, such as a vehicle to fire cabinet officials and other top White House aides. Nevertheless, the President often deletes his tweets, despite a warning from NARA that such records destruction violates the PRA. Lepore, *New Yorker*, Nov. 16, 2020. The degree to which the White House is preserving even the President's non-deleted tweets in a White House recordkeeping system is far from clear. *Id.*

President Trump also has ignored or flouted his statutory obligation under the PRA to document his essential transactions and communications. For example, during his first reported face-to-face meeting with Russian President Vladimir Putin in July 2017 in Hamburg, Germany during the G-20 Summit, President Trump reportedly confiscated his interpreter's notes after the meeting and ordered the interpreter not to disclose to anyone what he had heard, including to administration officials. Peter Baker, <u>Trump and Putin Have Met Five Times, What Was Said Is</u>

a Mystery, *New York Times*, Jan. 15, 2019, https://nyti.ms/397bQDK; Greg Miller, Trump has concealed details of his face-to-face encounters with Putin from senior officials in administration, *Washington Post*, Jan. 13, 2019, https://wapo.st/3fqArEy. Reportedly no records exist for five meetings President Trump had with Putin. Lepore, *New Yorker*, Nov. 16, 2020.

Indeed, as revealed by the report of Special Counsel Robert Mueller, President Trump has a general antipathy toward note taking. In a meeting with then-White House Counsel Don McGahn, the President chastised him for taking notes, proclaiming, "Lawyers don't take notes. I never had a lawyer who took notes[.]" *Report on the Investigation into Russian Interference in the 2016 Election*, Vol. II, at 117.

The President's resistance to preserving the records of his administration accords with his well-documented efforts throughout his career to prevent the disclosure of any details about how he conducts himself. He carried over to the White House his business practice of requiring non-disclosure agreements from those who work for him. Reportedly President Trump demanded that senior White House staff sign non-disclosure agreements, a demand that then-Chief of Staff Reince Priebus carried out despite concerns about their unenforceability. Lepore, *New Yorker*, Nov. 16, 2020.

With the approaching onset of a new presidency, much public attention has focused on the likelihood that President Trump, or White House personnel acting at his behest, will destroy records of his presidency before he leaves office, fearing the consequences to him and his legacy should the records become public. As has been pointed out, throughout his term in office President Trump has attempted to suppress unfavorable evidence, which does not "bode[] well for the historical record and for the scheduled transfer of materials from the White House to the National Archives, on January 20, 2021." Lepore, *New Yorker*, Nov. 16, 2020. Now, having lost

the presidential election, President Trump has shown an even greater propensity to flout norms

and laws by seeking to undermine the electoral process and engaging in conduct that some have

called an effort to sabotage the presidential transition. *See, e.g.*, Michael D. Shear, <u>Trump Using</u>

<u>Last Days to Lock In Policies and Make Biden's Task More Difficult</u>, *New York Times*, Nov. 21,

2020, https://nyti.ms/39ejvA7; Alex Woodward, <u>What Trump might do now that he's lost the</u>

<u>election: From pardoning cronies to sabotaging the transition</u>, *The Independent*, Nov. 17, 2020,

https://bit.ly/2J6KnHa. The President's actions since losing the election—unrestrained by truth

and facts—have heightened concerns that he will destroy records of his "potential malfeasance

and crimes." Woodward, *The Independent*, Nov. 17, 2020; *see also* Peter Nicholas, <u>The 3 Norms</u>

<u>Trump Could Still Break</u>, *The Atlantic*, Nov. 21, 2020, https://bit.ly/3pUHw54.

 In light of the growing and well-founded concerns that President Trump is likely to

destroy many of his records before leaving office, Plaintiff National Security Archive wrote to

White House Counsel Pat Cipollone on November 13, 2020, requesting written assurances that

all of the Presidential records of this administration will be preserved and transferred to NARA

by January 20, 2021. The letter also reminded Mr. Cipollone that, under the PRA, the public is

the rightful owner of these records. Similarly, Plaintiff CREW in a letter dated November 12,

2020, urged the White House Counsel to ensure that all White House staff are aware of and

comply with their obligations to maintain and preserve records in accordance with the PRA.

CREW's letter also reminded Mr. Cipollone that, as the September 2017 White House Counsel

memorandum noted, "[t]he willful destruction or concealment of federal records is a federal

crime[.]"

 To date, neither Mr. Cipollone nor anyone else associated with the White House has

responded to either letter.

## II.     Other White House Officials' Disregard for Their PRA Obligations

Other White House officials have also shown a shocking disregard for their recordkeeping obligations under the PRA. Chief among them is Senior White House Advisor Jared Kushner, who has routinely used non-official, personal messaging accounts to communicate about some of the most pressing domestic and foreign policy issues facing our nation during the Trump presidency.

In September 2017, *Politico* reported that Mr. Kushner had "corresponded with other administration officials about White House matters through a private email account set up during the transition [in December 2016], part of a larger pattern of Trump administration aides using personal email accounts for government business." Josh Dawsey, Kushner used private email to conduct White House business, *Politico*, Sept. 24, 2017, https://politi.co/2UGFR4J. *Politico* further reported that White House "[a]ides who have exchanged emails with Kushner on his private account since President Donald Trump took office in January include former chief of staff Reince Priebus, former chief strategist Steve Bannon, National Economic Council director Gary Cohn, and spokesman Josh Raffel." *Id.*

Following this reporting, House Oversight and Government Reform Committee Chairman Trey Gowdy and Ranking Member Elijah E. Cummings sent a letter on September 25, 2017, to then-White House Counsel Don McGahn requesting documents related to the use by the President's top advisors of private email accounts, non-governmental servers, and private domains to conduct official business. Letter from Reps. Trey Gowdy and Elijah E. Cummings to Don McGahn, Sept. 25, 2017, https://wapo.st/3m39auq; Letter from Rep. Elijah E. Cummings to Pat A. Cipollone, Mar. 21, 2019, https://bit.ly/2J7Cfqy ("Mar. 21, 2019 Oversight Letter"). Separately, Rep. Cummings sent a document request to Mr. Kushner that same day, seeking, among other things, email addresses and accounts from which Mr. Kushner conducted official

business. Letter from Rep. Elijah E. Cummings to Jared Kushner, Sept. 25, 2017,

https://bit.ly/2KL4wnc. The request "explicitly directed Mr. Kushner to preserve his email

records, including taking reasonable steps to prevent the 'relocation' of those email records."

Mar. 21, 2019 Oversight Letter.

  Notwithstanding these requests and the preservation directive, Mr. Kushner and his wife

and Advisor to the President Ivanka Trump reportedly re-routed their personal email accounts to

Trump Organization computers within one to two days of receiving the September 25, 2017

letters. *Id.*

  In a December 2018 interview with then-House Oversight and Government Reform

Chairman Gowdy and Ranking Member Cummings, Mr. Kushner's counsel "confirmed that Mr.

Kushner has used—and continues to use—WhatsApp" to create or send Presidential records,

including to communicate "with people outside the United States." Mar. 21, 2019 Oversight

Letter, at 6. When asked by Rep. Cummings if "Mr. Kushner has ever used WhatsApp [a non-

official, electronic messaging application] to discuss classified information," his counsel replied,

"That's above my pay grade." *Id.* Mr. Kushner's lawyer further explained that Mr. Kushner

preserves Presidential records created or sent from his WhatsApp account by "tak[ing]

'*screenshots*' of these communications and forward[ing] them to his official White House email

account or to the National Security Council." Mar. 21, 2019 Oversight Letter, at 6 (emphasis

added). Mr. Kushner's attorney also admitted that between January and August 2017, Mr.

Kushner used his personal email account to send or receive official emails. *Id.*

  Public reporting provides further details about this use. In March 2019, *CNN* reported

that Mr. Kushner "has used WhatsApp to communicate with Saudi Crown Prince Mohammed

bin Salman, who sources have told CNN the CIA assesses with high confidence ordered the

murder and dismemberment of Washington Post journalist Jamal Khashoggi." Kevin Collier, Jared Kushner's use of WhatsApp raises concerns among cybersecurity experts, *CNN*, Mar. 23, 2019, https://cnn.it/33bmOnL. In September 2020, *Vanity Fair* reported that Mr. Kushner "[o]ften" uses WhatsApp to communicate with members of a shadow coronavirus task force he established that operates outside of federal transparency laws. Katherine Eban, That's Their Problem, *Vanity Fair*, Sept. 17, 2020, https://bit.ly/3fqHblO. And in October 2020, the *Wall Street Journal* reported that Mr. Kushner had established an "open line" of communication through WhatsApp to discuss policy matters with Facebook CEO Mark Zuckerberg. Deepa Seetharaman and Emily Glazer, How Mark Zuckerberg Learned Politics, *Wall Street Journal*, Oct. 16, 2020, https://on.wsj.com/3meFGKh.

Public reporting also disclosed that Ivanka Trump used a personal email account with a domain shared with her husband, Jared Kushner, to send hundreds of emails concerning official White House business. Carol D. Leonnig and Josh Dawsey, Ivanka Trump used a personal email account to send hundreds of emails about government business last year, *Washington Post*, Nov. 19, 2018, https://wapo.st/2J3zXIP. Documents obtained by the House Committee on Oversight and Reform reveal that other White House officials used personal email for official White House business, including former Deputy National Security Advisor K.T. McFarland and former White House Chief Strategist Steve Bannon. Mar. 21, 2019 Oversight Letter.

**III.    The White House's Official Policy Authorizing "Screenshotting" As a Method of Preserving Certain Electronic Records**

Official White House policy authorizes employees to preserve Presidential records created via certain types of non-official electronic messaging accounts—namely, text message, instant messaging systems, social networks, and other non-email means of electronic

communication—merely by taking a "screenshot" of the record and forwarding the screenshot to an official White House account.

The White House has repeatedly confirmed the existence of this policy. For instance, in February 2017, the White House Counsel issued a memorandum advising White House staff that use of personal email, text messaging, instant messaging, social networks, messaging apps, and other internet-based means of communication to conduct official business is generally not permitted. White House Memorandum, Presidential Records Act Obligations, Feb. 22, 2017, https://bit.ly/3o06VbV ("Feb. 22, 2017 White House Memo"). Although the February 2017 memorandum states that White House staff "should not use [non-official] instant messaging systems, social networks, or other internet-based means of electronic communication to conduct official business without the approval of the Office of the White House Counsel," it adds that if a White House employee "ever generate[s] or receive[s] [P]residential records on [non-official messaging] platforms," the employee "must preserve them by sending them to [their] EOP email account *via a screenshot* or other means." Feb. 22, 2017 White House Memo (emphasis added).

In an October 2017 briefing with congressional staff, White House officials reiterated that they "advise[] employees that if texts occur involving official records on personal devices, individuals should *screenshot the text* and email it to their official account to be captured under [the] PRA." Senate Homeland Security and Government Affairs Committee Democratic Staff Memorandum, Briefing from White House Counsel on Private Email Use, Oct. 27, 2017, https://bit.ly/2V7qjqS (emphasis added) ("Oct. 27, 2017 Congressional Staff Briefing Memo"). During the same briefing, White House officials stated that "direct messages sent to official [White House] Twitter accounts are not automatically captured," and that "[t]hese direct messages to official Twitter accounts would have to be *screenshot* and forwarded by email than

12

official account to be captured under PRA." *Id.* (emphasis added). Counsel for Mr. Kushner has confirmed that he utilizes this screenshotting method to preserve Presidential records created or sent from his WhatsApp account. Mar. 21, 2019 Oversight Letter, at 6.

A "screenshot" of an electronic message is not a complete copy of the original message because it does not capture the message's associated metadata, attachments, functionality (including text searchability), or other digital artifacts needed to authenticate the message. As NARA has acknowledged, "[s]creenshots only create[] a picture of content and do not preserve the metadata and functionality of the content, which does not comply with NARA's transfer guidance for permanent web content records." NARA, White Paper on Best Practices for the Capture of Social Media Records, May 2013, https://bit.ly/3lEWGIy. WhatsApp messages, in particular, include high-value metadata "showing which numbers contacted which over WhatsApp, when, and for how long, as well as the IP addresses and phone identifiers." Thomas Brewster, Forget About Backdoors, This Is The Data WhatsApp Actually Hands To Cops, *Forbes*, Jan. 22, 2017, https://bit.ly/35YBk4n. A screenshot would not fully capture this metadata, if at all.

By accessing the original message from the application, service, or device in which it is stored, the metadata, attachments, and functionality associated with an electronic message can be captured and preserved. But the White House, on information and belief, does not utilize any such preservation methods with respect to Presidential records created via text message, instant messaging systems, social networks, and other non-email means of electronic communication. Moreover, despite the White House Counsel's awareness of the routine use by White House personnel, including Mr. Kushner, of non-official electronic messaging accounts for official business, neither the White House nor Mr. Kushner has, on information and belief, implemented

records management controls or taken other necessary actions to preserve complete copies of all Presidential records created or sent from non-official electronic messaging accounts, including those stored in Mr. Kushner's WhatsApp account.

In light of these publicly-documented practices by Mr. Kushner and other White House personnel, and the failure of the White House to amend its guidance to comply with the PRA, Plaintiff CREW by letters dated October 28, November 12, and November 20, 2020 notified the White House Counsel, Mr. Kushner, and NARA that the White House's screenshotting policy does not comply with the PRA. CREW's November 20 letter requested corrective action to address the deficient policy by no later than November 27, 2020, in light of the upcoming transition. To date, neither Mr. Kushner, nor the White House, nor NARA has responded to CREW's requests.[2]

Given Defendants' failure to take appropriate corrective action, Plaintiffs were left with no choice but to file this suit on December 1, 2020. Plaintiffs now seek immediate injunctive relief requiring Defendants to preserve the records at issue in order to prevent irreparable injury to the Plaintiffs and the public resulting from the destruction of historically valuable Presidential records.

---

[2] Reflecting similar concerns, the Chairs of the House Committee on Oversight and Reform, the House Permanent Select Committee on Intelligence, the House Committee on Appropriations; the House Committee on Rules, the House Committee on Ways and Means, the House Committee on the Judiciary, the House Committee on Science, Space and Technology, and the House Committee on Energy and Commerce sent a letter on November 10, 2020, to White House Counsel Pat Cipollone reminding him of the records preservation obligations with which all employees of the Executive Office of the President must comply. Letter from House Committee Chairs to Pat Cipollone, Nov. 10, 2020, https://bit.ly/36e8YmC. The letter urged Mr. Cipollone "to ensure that President Trump and Executive Office of the President employees and officials do not inappropriately alter, conceal, or destroy any official records or materials." *Id.*

## ARGUMENT

I.   **Plaintiffs Are Entitled to a Temporary Restraining Order to Prevent the Irretrievable Removal, Loss, or Destruction of Historically Important Presidential Records.**

A.   **Standard for Entry of a Temporary Restraining Order.**

The standards for a temporary restraining order mirror those for a preliminary injunction, with the exception of the notice requirement for a preliminary injunction. *See* Fed. R. Civ. P. 65(a)(1); *Bean LLC v. John Doe Bank*, 291 F. Supp. 3d 34, 41 (D.D.C. 2018); *Sterling Comm. Credit—MI, LLC, v. Phoenix Industries I, LLC*, 762 F. Supp. 2d 8, 13 (D.D.C. 2011); *Hall v. Johnson*, 599 F. Supp. 2d 1, 3 (D.D.C. 2009). For both, the movant "must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

While the movant must demonstrate that all four factors weigh in favor of granting the relief, courts historically have used a "sliding scale" approach, which recognizes that courts may award relief when one factor is particularly strong, "even if the showings in the other areas are rather weak." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The D.C. Circuit has noted that the Supreme Court's decision in *Winter* "could be read to create a more demanding burden [on irreparable injury], although the decision does not squarely discuss whether the four factors are to be balanced on a sliding scale" and the Court in that case declined to "decide whether a stricter standard applies." *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009); *see also Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (declining to resolve whether sliding scale should be abandoned following *Winter*); *Mons v. McAleenan*, 2019 WL 4225322, at *3

(D.D.C. Sept. 5, 2019) ("the question of 'whether, in cases where the other three factors strongly favor issuing an injunction a plaintiff need only raise a serious legal question on the merits'" is unresolved) (quoting *Aamer*, 742 F.3d at 1043).

Here, regardless of which standard applies, Plaintiffs are entitled to immediate injunctive relief requiring preservation of the records at issue in this case—a form of relief that courts have routinely granted in PRA cases. *E.g.*, *CREW v. Cheney*, 577 F. Supp. 2d at 328; Minute Order, *CREW v. Trump*, No. 19-cv-01333 (D.D.C. Oct. 3, 2019); Order, *CREW v. EOP*, No. 07-cv-1707, ECF No. 18 (D.D.C. Nov. 12, 2007).

### B.  Plaintiffs Are Likely to Prevail on Counts I through VI of the Complaint.

Counts I through VI of the Complaint raise three challenges. First, Plaintiffs challenge the failure of the President and the EOP to comply with the mandatory pre-disposal notice requirements of the PRA, including obtaining the written views of the Archivist and transmitting a disposal schedule to Congress before destroying any Presidential records. *See* Compl. ¶¶ 96-103 (Count I) (declaratory relief), ¶¶ 104-114 (Count II) (mandamus relief). Second, Plaintiffs challenge as contrary to the PRA the White House's official screenshotting policy, which authorizes staff, as a means of complying with their PRA obligations, to "screenshot" Presidential records created from non-official electronic messaging accounts, thus preserving incomplete copies of records that do not include metadata, attachments, functionality, and other digital artifacts associated with the original record. *See id.* ¶¶ 115-123 (Count III) (declaratory relief), ¶¶ 124-136 (Count IV) (mandamus relief). And third, Plaintiffs challenge Defendant Kushner's failure to preserve in an official White House account complete copies of all Presidential records he has created or sent from his non-official electronic message accounts. *See id.* ¶¶ 137-144 (Count V) (declaratory relief), ¶¶ 145-156 (Count VI) (mandamus relief).

To prevail on these claims, Plaintiffs "must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016); *see* 28 U.S.C. § 1361. For a duty to be "clear" and enforceable through mandamus, it must "admit[] of no discretion, so that the official in question has no authority to determine whether to perform the duty." *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996). But "[t]his does not mean that mandamus actions are ruled out whenever the statute allegedly creating the duty is ambiguous.'" *Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020). "Instead, the court must interpret the statute and if, 'once interpreted,' the statute 'creates a peremptory obligation for the officer to act, a mandamus action will lie.'" *Id.*

Plaintiffs are likely to satisfy each of these elements as to Counts I through VI of the Complaint.

## 1. Plaintiffs Are Likely to Prevail on Their Claims Against the President and the EOP (Counts I and II).

As noted, Counts I and II challenge the failure of President Trump and the EOP to comply with their non-discretionary duties to comply with the PRA's notice requirements before destroying any Presidential records. The PRA dictates in mandatory terms that the President must obtain "the views, in writing, of the Archivist concerning the proposed disposal of . . . Presidential records" that he has determined "no longer have administrative, historical, informational, or evidentiary value[.]" 44 U.S.C. § 2203(c). Because the PRA "admits of no discretion" as to compliance with the statute's disposal-notice requirements, *Swan*, 100 F.3d at 977, the statute creates a duty enforceable through mandamus. And, as alleged here, President Trump has engaged in a pattern and practice of violating his non-discretionary duties by freely destroying Presidential records with no concern for their historical importance, and without

17

providing the Archivist the required notice. *See* Compl. ¶¶ 55-66. Just as concerning, there is a widespread and well-founded concern, shared by the Plaintiffs, that before leaving office President Trump will unlawfully destroy any record that could place him and his legacy at risk. *See id.*

In light of these concerns, Plaintiffs repeatedly sought assurances that the President and the EOP would preserve all his Presidential records and ensure their transfer to NARA, assurances the Defendants refused to provide. *See id.* ¶¶ 64-66. This failure reinforces the likelihood that President Trump will continue to destroy Presidential records in violation of the PRA's mandatory pre-disposal notice provision. It also demonstrates that Plaintiffs have no adequate alternative remedy to mandamus relief.

The legislative history of the PRA explains that its intent was to guard against the very conduct this lawsuit challenges and to protect the interests of individuals and entities such as Plaintiffs here. Congress enacted the PRA to "promote the creation of the fullest possible documentary record" of a president and insure its preservation for "scholars, journalists, researchers and citizens of our own and future generations." 124 Cong. Rec. 34,894 (daily ed. Oct. 10, 1978) (statement of Rep. John A. Brademas). Indeed, part of the concern Congress had in the wake of the Watergate scandal was the possibility that "[e]vidence vital to ongoing criminal investigations could have been permanently lost." 124 Cong. Rec. 36,845 (daily ed. Oct. 13, 1978) (statement of Sen. Charles H. Percy). That concern has particular relevance here, given the pending investigations into the President's business conduct that are likely to survive after his presidency ends.

In opposing Plaintiffs' requested injunctive relief, Defendants may assert that Plaintiffs' claims are unreviewable under the D.C. Circuit's decisions in *Armstrong v. Bush* ("*Armstrong*

*I*"), 924 F.2d 282 (D.C. Cir. 1991), and *Armstrong v. EOP* ("*Armstrong II*"), 1 F.3d 1274 (D.C.

Cir. 1993). But any such argument would not provide a basis for denying Plaintiffs' requested

order requiring preservation of Presidential records so that Plaintiffs can fully litigate their

claims without the risk that the relief they seek will become impossible to order. This is a

temporary form of relief that, as noted above, courts have frequently granted in PRA cases.

Moreover, reading *Armstrong I* and *II* to preclude judicial review here would render the

PRA a nullity by ceding to the President unlimited power to ignore an act of Congress. In

*Armstrong I*, the court concluded that the PRA impliedly precluded review of a suit to prevent

President Ronald Reagan from erasing a specific set of tapes stored on a National Security

Council computer system, reasoning that such review would require it to second-guess the

President's decisions as to particular documents. 924 F.2d at 290. Two years later in *Armstrong*

*II*, the court narrowed the reach of *Armstrong I*, cautioning that its opinion in that case "must be

read in the context of the issue before the court," 1 F.3d at 1294, and rejecting an interpretation

of *Armstrong I* that would render "all decisions made pursuant to the PRA . . . [as] immune from

judicial review," *id.* at 1293. In reaching this conclusion, the court recognized the need to

preserve the careful balance Congress struck between a president's right to control decisions

about the creation, management, and disposal of specific records while in office, and the public's

right to a complete historical record of a former president's actions and decisions.

The challenged conduct here fits within the scope of judicial review *Armstrong II*

recognized, as it concerns a broader practice by President Trump of destroying a broad swath of

records based on considerations that have no support in the PRA. Moreover, denying judicial

review here would eviscerate the protections Congress put in place against such conduct: the

provisions requiring notice to the Archivist and Congress to provide them an opportunity to act in the face of a proposed destruction of historically valuable Presidential records.

Nor can it be argued that requiring the President to provide the statutorily-required notice would interfere with the President's day-to-day management decisions or prevent the President from "accomplishing [his] constitutionally assigned functions." *Nixon v. Administrator*, 433 U.S. 425, 443 (1977) (citation omitted). Even with the mandated notice, the President would retain control over his records and would remain free to accomplish his "constitutionally assigned functions," which the Supreme Court in *Youngstown Sheet & Tube Co. v. Sawyer* defined vis-à-vis an act of Congress (here, the PRA) as limited to the President's "functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad." 343 U.S. 579, 587-88 (1952).

A construction of the PRA that immunizes the President from any lawsuit seeking to hold him accountable to his disposal-notice obligations runs counter to the core purpose of the PRA— to ensure the preservation of the "fullest possible documentary record of the presidency, 124 Cong. Rec. 34,894—and would allow the President essentially to eviscerate the PRA, and deprive Plaintiffs and the public of the historical record of the Trump presidency. Accordingly, this Court must construe the PRA in a manner that accords with its language and purpose, *see United States v. Menasche*, 348 U.S. 528, 538-39 (1955), which here means permitting judicial review of Plaintiffs' claims against the President and the EOP.

> **2.     Plaintiffs Are Likely to Prevail on Their Claims Challenging the White House's Official Screenshotting Policy as Contrary to the PRA (Counts III and IV).**

Counts III and IV of the Complaint assert that the White House's official screenshotting policy is contrary to the PRA. These claims implicate two interrelated PRA provisions. The first

provides that, "[t]hrough the implementation of records management controls and other necessary action, the President *shall* take all such steps as may be necessary to assure that . . . [Presidential] records are preserved and maintained as Presidential records *pursuant to the requirements of this section and other provisions of law.*" 44 U.S.C. § 2203(a) (emphasis added). The second is a relatively new provision of the PRA, added by the 2014 Amendments, that requires that when White House employees "create or send a Presidential . . . record using a non-official electronic message account," they either "(1) cop[y] an official electronic messaging account. . . in the original creation or transmission of the Presidential record," or "(2) forward[] a *complete copy* of the Presidential . . . record to an official electronic messaging account . . . not later than 20 days after the original creation or transmission of the Presidential . . . record." 44 U.S.C. § 2209(a)(1)-(2) (emphasis added).

As a threshold matter, the White House has repeatedly acknowledged it has an official policy authorizing staff, as a means of satisfying their PRA obligations, to screenshot certain types of electronic messages and to forward the screenshot to an official account. *See* Compl. ¶¶ 82-87 (citing Feb. 22, 2017 White House Memo; Oct. 27, 2017 Congressional Staff Briefing Memo; and Mar. 21, 2019 Oversight Letter). The primary question on the merits is whether a screenshot of an electronic record is a "complete copy" within the meaning of Section 2209(a) of the PRA. The answer is no.

A "screenshot" of an electronic message does not capture the message's associated metadata, attachments, functionality (including text searchability), or other digital artifacts needed to authenticate the message. Compl. ¶ 88. Indeed, as NARA has acknowledged, "[s]creenshots only create[] a picture of content and do not preserve the metadata and functionality of the content, which does not comply with NARA's transfer guidance for

permanent web content records." NARA, <u>White Paper on Best Practices for the Capture of Social Media Records</u>, May 2013. And NARA guidance implementing the 2014 Amendments makes clear that a "complete" copy of an electronic record must include the record's associated metadata, attachments, and functionality. *See* NARA Bulletin 2015-02, July 29, 2015; NARA Bulletin 2015-04, Sept. 15, 2015. NARA's guidance further confirms that the term "electronic records," as used in the 2014 Amendments, broadly applies to "text messaging, chat/instant messaging, messaging functionality in social media tools or applications, voice messaging, and similar forms of electronic messaging systems," NARA Bulletin 2015-02, July 29, 2015; *see also* Compl. ¶¶ 47-54—*i.e.*, the very type of electronic messaging accounts to which the White House's screenshotting policy applies. Because the White House's policy calls for preserving incomplete copies of electronic Presidential records, it is facially non-compliant with Section 2209(a) of the PRA.

The D.C. Circuit's decision in *Armstrong II* reinforces that a screenshot is not a "complete copy" of an electronic record. There, certain White House components that generated records covered by the FRA insisted that they "reasonably discharged their FRA obligations by instructing employees to print out a paper version of any electronic communication that falls within the statutory definition of a 'record' and by managing the 'hard-copy' documents so produced in accordance with the Act." *Armstrong II*, 1 F.3d at 1277. The Circuit squarely rejected this argument, explaining that "the government's basic position is flawed because the hard-copy print-outs that the agencies preserve"—much like the screenshots at issue here—"may omit fundamental pieces of information which are an integral part of the original electronic records, such as the identity of the sender and/or recipient and the time of receipt." *Id.* Because the White House's screenshotting policy is materially identical to the "'print screen' policy"

rejected in *Armstrong II*, Plaintiffs here are likely to prevail on their claim seeking a "declaratory judgment invalidating [the policy's] future use." *Id.* at 1282.

So too are Plaintiffs likely to prevail on their request for mandamus relief as to the White House's screenshotting policy. By adopting and implementing an official records preservation policy that facially contravenes the PRA's preservation requirements, Defendants Trump and EOP have violated their non-discretionary duties under 44 U.S.C. § 2203(a) and § 2209(a). In particular, they have violated their non-discretionary duties to "implement[] . . . records management controls . . . to assure . . . that [Presidential] records are preserved and maintained as Presidential records *pursuant to the requirements of this section and other provisions of law*." 44 U.S.C. § 2203(a) (emphasis added). The specific PRA "requirement" that Defendants failed to implement is the non-discretionary directive to preserve a "complete copy" of any Presidential record created or sent from a non-official electronic messaging account in "an official electronic messaging account . . . not later than 20 days after the original creation or transmission of the Presidential . . . record," *id.* § 2209(a)(2). These statutory mandates, "once interpreted" by a court, "create[] . . . peremptory obligation[s] for the officer to act," *Lovitky*, 949 F.3d at 760, and Plaintiffs have exhausted all alternative avenues to seeking mandamus relief.

Any argument that judicial review of these claims is precluded by *Armstrong I* or *II* is unlikely to prevail. Both *Armstrong* decisions long pre-date the 2014 PRA Amendments on which Plaintiffs' claims are based, and, since their enactment, it does not appear that any court has construed Section 2209, let alone found it to be unenforceable through mandamus. Moreover, Section 2209 is unique in that it imposes on a specific group of employees clearly-defined duties mandating preservation of a particular category of Presidential records within a specified time period. *See* 44 U.S.C. § 2209(a)(2). Few other PRA provisions have this level of

specificity, which reflects Congress' unequivocal intent to "ensure that *all* Presidential records, even those sent from a personal electronic messaging account, are properly preserved and maintained in an official electronic messaging account." S. Rep. 113-218, 113th Cong., 2d Sess., at 6 (2014) (emphasis added).

To the extent that the reasoning of *Armstrong I* bears on claims alleging violations of provisions added by the 2014 Amendments, it does not foreclose judicial review here, as the case "does not stand for the unequivocal proposition that all decisions made pursuant to the PRA are immune from judicial review." *Armstrong II*, 1 F.3d at 1293. At bottom, *Armstrong I* instead stands for the proposition that "courts have no jurisdiction to review the President's 'day-to-day' . . . compliance with the PRA." *CREW v. Trump*, 924 F.3d at 609. But Plaintiffs here do not seek review of the White House's day-to-day records management decisions; rather, they seek review of an official *policy* that is facially non-compliant with the PRA's mandatory directives. *Cf. id.* 924 F.3d at 608-09 (declining mandamus relief after finding White House policy was "facially . . . compliant" with the particular PRA provisions at issue, which did not include Section 2209).

Review of Plaintiffs' claims is also a logical extension of *Armstrong II*'s holding that courts have "power to review guidelines outlining what is, and what is not, a 'presidential record' under the terms of the PRA." 1 F.3d at 1290. Indeed, the challenged White House policy essentially "[d]efine[s] the types of documentary materials falling within the ambit of either 'presidential' or 'personal' records"—which Congress has noted "is of primary importance to the [PRA]," H.R. No. 95-1487, 95th Cong., 2d Sess. 11 (1978)—by implicitly excluding metadata and attachments associated with electronic messages sent from non-official accounts from the PRA's preservation requirements. *See also CREW v. Cheney*, 593 F. Supp. 2d 194, 217 (D.D.C. 2009) (claim that vice president had adopted policies and guidelines that excluded most of his

24

records from the PRA's reach was "squarely within the types of claims . . . that are subject to judicial review" under *Armstrong II*); *American Historical Ass'n v. Peterson*, 876 F. Supp. 1300, 1313 (D.D.C. 1995) (court could properly review president's disposal decision after leaving office, reasoning "*Armstrong I* and *Armstrong II* do not mark the beginning and end of the complicated inquiry regarding judicial review under the PRA").

### 3. Plaintiffs Are Likely to Prevail on Their Claims Challenging Defendant Kushner's Failure to Preserve "Complete Copies" of Presidential Records as Required by Section 2209(a) of the PRA (Counts V and VI).

For similar reasons, Plaintiffs are also likely to succeed on their claims challenging Mr. Kushner's non-compliance with his non-discretionary duties under Section 2209(a). As a Senior Advisor to the President, Mr. Kushner is plainly a "covered employee" under Section 2209 because he is both part of "the immediate staff of the President," and an "individual of the Executive Office of the President whose function is to advise and assist the President." 44 U.S.C. § 2209(c)(1)(A), (C). That the 2014 Amendments were intended to impose discrete, individualized duties on White House employees like Mr. Kushner is reinforced by the separate provision stating that any intentional violation of Section 2209(a) "shall be a basis for disciplinary action[.]" 44 U.S.C. § 2209(b). Moreover, Mr. Kushner's own attorney has confirmed that he preserves Presidential records from his non-official electronic messaging accounts not by forwarding a "complete copy" to an official White House account, but rather by taking screenshots of such records, in keeping with the White House's deficient screenshotting policy. *See* Compl. ¶¶ 75, 87 (citing Mar. 21, 2019 Oversight Letter, at 6).

By failing to preserve complete copies of Presidential records created or sent from his non-official electronic messaging accounts, Mr. Kushner has violated, and continues to violate, his non-discretionary duties under 44 U.S.C. § 2209(a). Plaintiffs have, moreover, exhausted all

alternatives to mandamus relief to no avail. Thus, Plaintiffs are likely to prevail on their claims against Mr. Kushner.

### C.     Plaintiffs Will Suffer Irreparable Injury Absent the Requested Relief.

Plaintiffs brought this suit to challenge policies and practices that deprive the American public and Plaintiffs of a historical record that Congress requires the President to maintain and eventually make available to the public through the FOIA. As set forth in the Complaint, the President has engaged in a pattern of conduct that shows a blatant disregard for his recordkeeping responsibilities and raises the threat of the irreparable loss of historically valuable Presidential records absent this Court's intervention. Similarly, the White House has adopted and knowingly continued to implement a screenshotting policy that authorizes White House employees to preserve incomplete copies of certain electronic messages, also risking the permanent loss of metadata, attachments, and other record material associated with those messages. The rapidly approaching end of the Trump presidency presents only a very narrow window for the Court to act to ensure preservation of these records.

Against this backdrop, Plaintiffs here—historians and good government groups that rely on Presidential records to fulfill their missions—can plainly demonstrate an injury that is "both certain and great," and "beyond remediation." *Chaplaincy*, 454 F.3d at 297. For instance, Plaintiff National Security Archive ("the Archive") has relied extensively on Presidential records to fulfill its organizational mission, and plans to continue doing so in the future. *See* Declaration of Thomas S. Blanton ("Blanton Decl.") ¶¶ 6-15. "Archive staff's future plans include filing FOIA requests for Presidential records from the Trump administration as soon as they are legally permitted on a range of topics that likely will include U.S. relations with Russia and China, U.S. military action in Africa, the role of foreign lobbyists, and the nuclear escalation between North

Korea and the United States." *Id.* ¶ 10. "Given the unequivocal intent of Archive staff to seek

and utilize the Presidential records at issue in this case as part of their future work, and

considering the records' unique and substantial historical value, any removal, loss, destruction,

or failure to preserve complete copies of the records will irreparably harm the Archive" by

"imped[ing], if not entirely preclud[ing], the Archive's ability to comprehensively piece together

the historical record of the Trump administration's actions and policies." *Id.* ¶ 14. And with

"President Trump's term of office coming to an end in less than 50 days, there is an urgent need

to ensure preservation of these records to prevent" this harm. *Id.* ¶ 15.

It is well established that an irretrievable loss of government records—and particularly

the historically important records covered by the PRA—qualifies as irreparable harm. *See, e.g.*,

*CREW v. Cheney*, 577 F. Supp. 2d at 338-40; *Am. Friends Serv. Comm. v. Webster*, 485 F. Supp.

222, 233-34 (D.D.C. 1980). Indeed, "the threat of such obliteration is a text book example of

irreparable harm." Report and Recommendation, *CREW v. EOP*, No. 07-cv-1707, ECF No. 11,

at 3 (D.D.C. Oct. 19, 2007) (adopted in Order, *CREW v. EOP*, No. 07-cv-1707, ECF No. 18

(D.D.C. Nov. 12, 2007)). Applying this principle, courts have granted immediate injunctive

relief requiring a government defendant to preserve documents during the pendency of litigation

challenging the defendant's recordkeeping policies and practices.

In *CREW v. Trump*, No. 19-cv-01333 (D.D.C. Oct. 3, 2019), for example, the district

court entered a preservation order in similar circumstances ordering the President and the EOP to

preserve all records at issue and all records potentially subject to discovery. Similarly, in *CREW

v. EOP*, which challenged the deletion of millions of emails on White House servers, the district

court entered a temporary restraining order requiring the EOP to maintain back-up tapes pending

resolution of the litigation. Order, *CREW v. EOP*, No. 07-cv-1707, ECF No. 18 (D.D.C. Nov. 12,

2007) (adopting Report and Recommendation, *CREW v. EOP*, No. 07-cv-1707, ECF No. 11 (D.D.C. Oct. 19, 2007). And in *CREW v. Cheney*, the court entered a preliminary injunction requiring the EOP, the Vice President, and the Office of the Vice President, among others, to "preserve throughout the pendency of this litigation" all records fitting the statutory definition of Vice Presidential records. 577 F. Supp. 2d at 330-31. This Court should do likewise and enter the requested injunction.

Further bolstering Plaintiffs' showing of irreparable harm is Defendants' refusal to provide any assurances that at the end of the Trump presidency all Presidential records will be preserved and transferred to NARA. Defendants have ignored multiple requests from Plaintiffs to correct the White House's unlawful screenshotting policy and to respond to the widely-held concern that President Trump will destroy records that could expose his wrongdoing prior to leaving office. *See* Compl. ¶¶ 64-66; 93-94; *see also CREW v. Cheney*, 577 F. Supp. 2d at 339 (defendants' "unwillingness" to "agree to preserve all records potentially at issue in this litigation" bolstered finding of irreparable harm). Moreover, Plaintiffs simply seek to enforce preservation obligations to which Defendants already are subject. A party to litigation has an obligation "to preserve potentially relevant evidence . . . once that party anticipates litigation." *Zhi Chen v. District of Columbia*, 839 F. Supp. 2d 7, 12 (D.D.C. 2011) (citation omitted); *see also Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003).

Absent the requested relief, Plaintiffs effectively will lose the ability to vindicate through this litigation their rights and those of the public to a complete historical record of the Trump presidency. Facing the irreparable loss of important Presidential records, Plaintiffs can be afforded full and effective relief only if the President, the EOP, and Jared Kushner are ordered to preserve all of their records, including any metadata and attachments associated with electronic

28

messages. "There is an extraordinary public interest in understanding the events and actions of the Trump presidency, which has been marked with controversy and repeated violations of the rule of law, norms that have governed the President since our nation's founding, and unprecedented ethical transgressions." Blanton Decl. ¶ 14. The possibility that we will lose part of this history forever is simply too great a risk to bear, underscoring the need for immediate injunctive relief to prevent irreparable harm.

> **D.      Defendants Will Not Be Harmed by the Requested Relief.**

The immediate relief that Plaintiffs seek will require nothing more of Defendants than what the law already mandates: the preservation of Presidential records under the President's custody pursuant to the PRA. Requiring Defendants to comply with the law cannot properly be characterized as a burden. Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)); *accord R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015).

> **E.      The Balance of Equities and Public Interest Favor the Requested Relief.**

Finally, the balance of equities and the public interest, which "merge" when "the [g]overnment is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), weigh heavily in favor of a temporary restraining order.

Beyond the harm to Plaintiffs, the public interest also strongly favors a temporary restraining order. Congress enacted the PRA to "promote the creation of the fullest possible documentary record" of a president and ensure its preservation for "scholars, journalists, researchers and citizens of our own and future generations." 124 Cong. Rec. H34894 (daily ed. Oct. 10, 1978) (Statement of Rep. John A. Brademas). Toward that end, the PRA vests the public

with ownership rights in the records of a presidency and provides a process of public access to those papers once a president leaves office. *See* 44 U.S.C. § 2202. Recognizing the "immense historical value" of a president's papers, 124 Cong. Rec. S36843 (daily ed. Oct. 13, 1978) (Statement of Sen. Percy), Congress wanted to provide the people with a key to our past, in the hope it will shed light on the course we should chart for the future. It is self-evident that Defendants' non-compliance with the PRA's directives frustrates the statute's purpose and intent and risks irreparable harm to Plaintiffs. The public interest in upholding and protecting the rights the PRA confers is best served by issuing the requested temporary restraining order.

## CONCLUSION

Despite their best efforts, Plaintiffs were unable to obtain assurances from the Defendants that at the conclusion of President Trump's term in office, all Presidential records would be transferred to NARA. As a result, Plaintiffs regrettably have no choice but to seek this Court's emergency intervention to ensure their rights and those of the American people can be vindicated. Accordingly, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for a temporary restraining order.

Dated: December 4, 2020

Respectfully submitted,

*/s/ Anne L. Weismann*
Anne L. Weismann
(D.C. Bar No. 298190)
6117 Durbin Road
Bethesda, MD  20817
301-717-6610
weismann.anne@gmail.com

Nikhel S. Sus
(D.C. Bar No. 1017937)
CITIZENS FOR RESPONSIBILITY AND ETHICS
IN WASHINGTON
1101 K St. N.W., Suite 201
Washington, DC 20005
Telephone: (202) 408-5565

Fax: (202) 588-5020
nsus@citizensforethics.org

*Counsel for Plaintiffs*