**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL SECURITY ARCHIVE, *et al*., | |
| Plaintiffs, | |
| v. | No. 20-cv-3500 KBJ |
| DONALD J. TRUMP, *et al*., | |
| Defendants. | |

**<u>DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

    I.     Legal Framework Governing Executive Branch Records ................................. 3

         A.    The Federal Records Act ............................................................... 5

         B.    The Presidential Records Act........................................................ 6

    II.    Plaintiffs' Claims ............................................................................................. 8

STANDARD OF REVIEW .................................................................................................. 9

ARGUMENT....................................................................................................................... 10

    I.     THE PRESIDENTIAL RECORDS ACT'S BAR ON JUDICIAL REVIEW
         REQUIRES DISMISSAL OF THIS CASE IN ITS ENTIRETY ..................................... 10

         A.    Judicial Review of Defendants' Compliance with the PRA Is Precluded Under
            D.C. Circuit Precedent ............................................................... 10

               1.    Counts I and II Impermissibly Attempt to Regulate the President's
                  Recordkeeping Practices................................................................. 13

               2.    Counts III–VII Impermissibly Challenge the Implementation of PRA
                  Guidance. ......................................................................... 14

         B.    The Exception in *Armstrong II* Does Not Apply Here ............................ 16

    II.    PLAINTIFFS FAIL TO ESTABLISH THE ELEMENTS NECESSARY FOR
         MANDAMUS JURISDICTION (COUNTS II, IV, VI)................................... 21

         A.    Plaintiffs Cannot Establish a Clear Right to Relief ................................ 22

         B.    Plaintiffs Cannot Establish a Clear Duty to Act .................................... 23

         C.    No Writ of Mandamus Can Lie Against the President (Counts II and IV)............. 25

    III.    IN THE ABSENCE OF MANDAMUS JURISDICTION, PLAINTIFFS' CLAIMS
         SEEKING DECLARATORY RELIEF CANNOT PROCEED (COUNTS ONE,
         THREE, AND FIVE)................................................................ 26

    IV.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR RELIEF UNDER THE
         APA (COUNT SEVEN) ............................................................. 27

CONCLUSION.................................................................................................................... 29

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Ali v. Rumsfeld,*
   649 F.3d 762 (D.C. Cir. 2011) ................................................................................. 26

*Am. Hosp. Ass'n v. Burwell,*
   812 F.3d 183 (D.C. Cir. 2016) ........................................................................... 22, 24

*Armstrong v. Exec. Office of the President,*
   90 F.3d 553 (D.C. Cir. 1996) ................................................................................. 17

*Armstrong v. Bush,*
   924 F.2d 282 (D.C. Cir. 1991) ......................................................................... *passim*

*Armstrong v. Exec. Office of the President,*
   810 F. Supp. 335 (D.D.C. 1993) ............................................................................. 16

*Armstrong v. Exec. Office of the President,*
   1 F.3d 1274 (D.C. Cir. 1993) ........................................................................... *passim*

*Arpaio v. Obama,*
   797 F.3d 11 (D.C. Cir. 2015) ................................................................................... 9

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ......................................................................................... 9, 10

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ......................................................................................... 9, 10

*Browning v. Clinton,*
   292 F.3d 235 (D.C. Cir. 2002) ................................................................................. 9

*CREW v. Trump,*
   438 F. Supp. 3d 54 (D.D.C. 2020) ................................................................... *passim*

*CREW v. Trump,*
   924 F.3d 602 (D.C. Cir. 2019) ......................................................................... *passim*

*CREW v. Trump,*
   302 F. Supp. 3d 127 (D.D.C. 2018) ........................................................................... 6

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) ............................................................................................. 9

*Democracy Forward Found. v. White House Office of Am. Innovation*,
  356 F. Supp. 3d 61 (D.D.C. 2019) ................................................................. 4

*EEOC v. St. Francis Xavier Parochial Sch.*,
  117 F.3d 621 (D.C. Cir. 1997) ..................................................................... 10

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ............................................................................... 25, 26

*In re Cheney*,
  406 F.3d 723 (D.C. Cir. 2005) ................................................................ 21, 22

*Islamic Am. Relief Agency v. Gonzales*,
  477 F.3d 728 (D.C. Cir. 2007) ..................................................................... 9

*Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*,
  845 F. Supp. 2d 288 (D.D.C. 2012) ........................................................... 22

*Kissinger v. Reporters Comm. for Freedom of the Press*,
  445 U.S. 136 (1980) ...................................................................................... 4

*Kokkonen v. Guardian Life Ins. Co.*,
  511 U.S. 375 (1994) ...................................................................................... 9

*Lovitky v. Trump*,
  949 F.3d 753 (D.C. Cir. 2020) ................................................................ 22, 25

*Mississippi v. Johnson*,
  71 U.S. (4 Wall.) 475 (1867) ....................................................................... 25

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010) .................................................................. 25

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ...................................................................................... 27

*Privacy Info. Ctr. v. Drone Advisory Comm.*,
  369 F. Supp. 3d 27 (D.D.C. 2019) .............................................................. 26

*Reg'l Corp. v. U.S. Dep't of Interior*,
  654 F.2d 758 (D.C. Cir. 1980) .................................................................... 24

*Skelly Oil Co. v. Phillips Petroleum Co.*,
  339 U.S. 667 (1950) .................................................................................... 26

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) ........................................................................... 24, 25

*United States ex rel. McLennan v. Wilbur*,
   283 U.S. 414 (1931) ...................................................................................................... 24

## **Statutes**

5 U.S.C. § 552 ............................................................................................................ 4, 7

5 U.S.C. § 706 .................................................................................................................. 27

28 U.S.C. § 1361 .............................................................................................................. 25

28 U.S.C. § 2201 .......................................................................................................... 4, 26

44 U.S.C. § 2112 .......................................................................................................... 8, 28

44 U.S.C. § 2202 ................................................................................................................ 6

44 U.S.C. § 2203 ...................................................................................................... *passim*

44 U.S.C. § 2204 ................................................................................................................ 7

44 U.S.C. § 3101 .......................................................................................................... 3, 5

44 U.S.C. § 3106 ................................................................................................................ 5

44 U.S.C. § 3301 ................................................................................................................ 3

## **Rule**

Fed. R. Civ. P. 12(b) ...................................................................................................... 9, 10

## INTRODUCTION

This action constitutes Plaintiffs' third attempt to micromanage White House compliance with the Presidential Records Act ("PRA"), contrary to this Circuit's precedent.  Two judges of this Court have held—and the Court of Appeals has affirmed—that there is no subject matter jurisdiction to hear such claims.  Yet, for the third time in as many years, Plaintiffs seek declaratory and mandamus relief with respect to White House records management practices.  In particular, Plaintiffs reassert their prior challenges to alleged records disposal, and ask the Court to change the options available for storing electronic communications not sent or received on official platforms.  But as the courts have explained time and again, the PRA places such decisions squarely—and solely—in the President's hands.  For the same reasons that Plaintiffs' prior actions failed, the instant complaint also must be dismissed.

Nearly three decades of D.C. Circuit precedent preclude Plaintiffs' claims.  In *Armstrong v. Bush* ("*Armstrong I*"), 924 F.2d 282 (D.C. Cir. 1991), the D.C. Circuit recognized that important separation of powers concerns led Congress to bar judicial review of compliance with the PRA.  *See id.* at 290–91.  Just last year, the Court of Appeals found that guidance issued to White House staff in 2017 "unquestionably speaks to the White House's efforts to satisfy the President's PRA obligations" and "does just what the PRA requires."  *CREW v. Trump*, 924 F.3d 602, 607, 608 (D.C. Cir. 2019).[1]  Indeed, as detailed below, the 2017 guidance correctly identifies electronic communications not on official platforms as presidential records; instructs that they must be preserved; and lists multiple options for how that can be accomplished.  Options for preservation include electronic forwarding, copying a user's official account, taking

---

[1] *See* Memorandum for All Personnel Regarding Presidential Records Act Obligations (Feb. 22, 2017), https://go.usa.gov/xEckn (National Archives) ("2017 Memo").  In 2019, after a new Counsel to the President took office, substantively identical guidance was re-issued under the new Counsel's name.

and forwarding a screenshot, or other means.  The crux of Plaintiffs' complaint is to challenge

one of the options:  preservation by means of a screenshot.  In other words, Plaintiffs ask this

Court to review the manner in which the White House is complying with the PRA.  *Armstrong I*

and its progeny unequivocally bar that inquiry.

   While Plaintiffs may argue that their claims fit within a narrow exception to *Armstrong I*

articulated by the D.C. Circuit in *Armstrong v. Exec. Office of the President* ("*Armstrong II*"), 1

F.3d 1274 (D.C. Cir. 1993), that is not so.  *Armstrong II* permits review only of the

determination of whether material constitutes a "presidential record," placing it within the scope

of the PRA in the first instance.  *Id.* at 1292–93.  Indeed, in identifying that limited judicial

review, the Court of Appeals reiterated that the PRA bars judicial review of the President's

management of "admittedly presidential records," *id.* at 1292, such as the materials at issue here.

Taken together, *Armstrong I* and *Armstrong II* require the dismissal of all seven of Plaintiffs'

claims.

   Plaintiffs' claims seeking mandamus relief must be dismissed for the additional reason

that Plaintiffs can establish neither a clear and indisputable right to relief nor a clear duty to act,

both necessary to establish mandamus jurisdiction.  Furthermore, because declaratory judgment

is not a cause of action in itself and must be based on an underlying viable legal claim, the

deficiencies in Plaintiffs' mandamus claims also require dismissal of Plaintiffs' requests for

declaratory judgment.

   Finally, Plaintiffs' Administrative Procedure Act ("APA") claim against the National

Archives and Records Administration ("NARA") and the Archivist (collectively, the "NARA

Defendants") also must be dismissed.  In their APA claim, Plaintiffs ask the Court to order the

NARA Defendants to "address" the White House's inclusion of screenshots as an acceptable

means of preserving certain electronic communications.  In other words, Plaintiffs seek an injunction requiring NARA Defendants to change the White House's records management practices.  The PRA precludes such intercession.  Far from establishing that the action sought is legally required—a necessary predicate for an APA claim directed at an alleged failure to act—Plaintiffs here cannot even show that the action is legally *permitted*.  As discussed above, for the duration of the President's term of office, the PRA vests him with sole responsibility for his records management practices.  Just as the courts have no role in reviewing the President's compliance with the PRA, the statutory framework does not permit NARA and the Archivist to veto a sitting President's records management decisions.

For all these reasons, as explained herein, this Court should dismiss the Complaint in its entirety.

## BACKGROUND

### I.    Legal Framework Governing Executive Branch Records

Executive branch records are governed by either the Federal Records Act ("FRA"), 44 U.S.C. §§ 2101–2120, 2901–2911, 3101–3107, 3301–3314, or the PRA.  As the D.C. Circuit has explained, "[t]he FRA and the PRA apply to distinct categories of documentary materials." *Armstrong II*, 1 F.3d at 1290.  Specifically, the FRA governs records that are "made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them."  44 U.S.C. § 3301(a)(1)(A).

The Presidential Records Act of 1978, 44 U.S.C. §§ 2201–2209, in turn, applies to Presidential records—in other words, materials that are "created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2). The PRA expressly excludes from the definition of Presidential records any materials that qualify as "official records of an agency (as defined in [the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(f)[2]])." 44 U.S.C. § 2201(2)(B).[3] It also excludes "personal records," which are materials "of a purely private or nonpublic character which do not relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2)(B), (3). Personal records include, for example, "diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal which are not prepared or utilized for, or circulated or communicated in the course of, transacting Government business. *Id.* § 2201(3)(A).

The existence of two separate records regimes—one, under the FRA, governing agency records, and the other, under the PRA, governing Presidential records—is significant because the

---

[2] Although the PRA, 44 U.S.C. § 2201(2)(B), refers to subsection (e) of the FOIA, that subsection has been re-codified at 5 U.S.C. § 552(f).

[3] With respect to the Executive Office of the President ("EOP"), the Supreme Court has recognized that "the President's immediate personal staff" as well as "units in the Executive Office whose sole function is to advise and assist the President" are not included within FOIA's definition of "agency." *See Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980). For example, the White House Office and the National Security Council are not subject to FOIA and not covered by the FRA. *See, e.g., Democracy Forward Found. v. White House Office of Am. Innovation*, 356 F. Supp. 3d 61, 66 (D.D.C. 2019). Accordingly, an EOP component's records are governed either by the PRA or by the FRA, depending on whether that component is within the White House Office, which is categorically excluded from the definition of an agency, or, for components outside the White House Office, whether the component's sole function is to advise and assist the President.

two regimes create very different systems of records management, reflecting Congress's concern to avoid encroaching upon the President's authority to manage his own records during his term in office.

### A.    The Federal Records Act

Under the FRA, "[t]he head of each Federal agency shall make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities."  44 U.S.C. § 3101.  The statute further provides, among other things, that agency heads must "establish safeguards against the removal or loss of records the head of such agency determines to be necessary and required by regulations of the Archivist."  *Id.* § 3105; *see Armstrong II*, 1 F.3d at 1278–79 (providing overview of FRA).

The FRA states that "[t]he head of each Federal agency shall notify the Archivist" if the agency head becomes aware of the unlawful removal or destruction of records, "and with the assistance of the Archivist shall initiate action through the Attorney General for the recovery of records the head of the Federal agency knows or has reason to believe have been unlawfully removed from that agency."  44 U.S.C. § 3106(a); *see also id.* § 2905 (requiring Archivist to notify the agency head of unlawful removal or destruction of records and to assist the agency head in initiating action through the Attorney General).  If the agency head "does not initiate an action for such recovery or other redress within a reasonable period of time . . . , or is participating in, or believed to be participating in any such unlawful action, the Archivist shall request the Attorney General to initiate such an action, and shall notify Congress when such a request has been made."  *Id.* § 3106(b).

### B.      The Presidential Records Act

The PRA's statutory text vests broad authority in the President over recordkeeping during his term in office.  The PRA directs the President to take "all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records pursuant to the requirements of this section and other provisions of law."  44 U.S.C. § 2203(a).  The PRA also directs the President, "to the extent practicable," to "categorize[]" materials as Presidential records or personal records "upon their creation or receipt" and to "file[] [them] separately." *Id.* § 2203(b).

The D.C. Circuit has recognized that "the PRA accords the President virtually complete control over his records during his term of office." *Armstrong I*, 924 F.2d at 290; *see CREW*, 924 F.3d at 603–04 ("Although the PRA makes clear that the United States, 'retain[s] complete ownership, possession, and control of Presidential records,' 44 U.S.C. § 2202, it also provides that the President, during his term in office, shall assume 'exclusive[] responsib[ility] for custody, control, and access to such Presidential records.").  This control encompasses "creation" decisions, as well as "management, and disposal decisions." *Armstrong I*, 924 F.2d at 290.  Thus, the courts may not impose limits on "which records to maintain or destroy." *CREW v. Trump*, 302 F. Supp. 3d 127, 137 (D.D.C. 2018), *aff'd* 924 F.3d 602 (D.C. Cir. 2019); *cf. Armstrong II*, 1 F.3d at 1294 (explaining that "'[m]anagement decisions' describes the day-to-day process by which presidential records are maintained," and "'disposal decisions' describes the process outlined in 44 U.S.C. § 2203(c)–(e) for disposing of presidential records").

Indeed, unlike the FRA, the PRA contemplates a limited role for the Archivist during a President's time in office, including in connection with the potential destruction of records. During the President's term in office, the President may dispose of records that he determines "no longer have administrative, historical, informational, or evidentiary value," provided that he first obtains the written views of the Archivist of the United States.  *Id.* § 2203(c).  However, although the Archivist may then "inform Congress of the President's desire to dispose of the records, neither the Archivist nor the Congress has the authority to veto the President's disposal decision."  *Armstrong I*, 924 F.2d at 290.  Nor may "the Archivist [or] an agency head . . . initiate any action through the Attorney General to effect recovery or to ensure preservation of presidential records."  *Armstrong II*, 1 F.3d at 1291 (noting that such actions are authorized for federal records under the FRA, but not for Presidential records under the PRA).

In addition, the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, which applies to federal records, does not apply to Presidential records while the President is in office.  Once a President's time in office has concluded, the Archivist receives the Presidential records and deposits them in a Presidential archival depository, commonly referred to as a Presidential library, or another archival facility operated by the United States.  *See* 44 U.S.C. § 2203(g)(1)–(2).  The library, under the direction of the Archivist, must then begin processing and organizing the records to provide for public access.  *Id.*  Pursuant to the PRA, Presidential records become subject to public request under FOIA five years following the President's final term in office, *see* 44 U.S.C. § 2204(b)(2), but the President may designate certain categories of records as exempt from FOIA for a period of up to twelve years, *see id.* § 2204(a).  Once a President's term ends and his Presidential records have been transferred to NARA, the Archivist assumes "responsibility for the custody, control, and preservation of, and access to, the Presidential

records of [the] President." *Id.* § 2203(g); *see also id.* § 2112(c).

## II.     Plaintiffs' Claims

Plaintiffs filed the instant Complaint on December 1, 2020, alleging seven counts. *See* Compl., ECF No. 1. Plaintiffs' claims fall into two categories.

The first category is directed at alleged disposal decisions by the President. Counts I and II constitute claims for mandamus and declaratory relief based on Plaintiffs' allegation that the President "has disposed of and . . . threatens to dispose of Presidential records without first obtaining the views of the Archivist in writing and transmitting a disposal schedule to Congress." *Id.* ¶ 98; *see id.* ¶¶ 96–114 (Counts I and II).

The second category of claims addresses what Plaintiffs terms the White House's "screenshotting policy," *i.e.,* that the 2017 guidance includes screenshots of communications on an electronic platform as an acceptable means of preserving electronic presidential records. Count III seeks a declaration that the inclusion of screenshots is contrary to the PRA, *see id.* ¶¶ 115–123, and Count IV seeks mandamus relief requiring a change in the manner in which electronic records will be preserved. *See id.* ¶¶ 124–136. Counts V and VI seek declaratory and mandamus relief with respect to the alleged use of screenshots by Senior Advisor to the President, Jared Kushner, to preserve electronic records. *See id.* ¶¶ 137–156. Finally, Count VII asks the Court to order NARA and the Archivist to "take action" to address what the Complaint refers to as "the White House's unlawful PRA policy," that is, the inclusion of screenshots as an option to preserve electronic records. *Id.* ¶ 161; *see id.* ¶¶ 157–165 (Count VII).

## **STANDARD OF REVIEW**

Defendants move for dismissal of all seven claims under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.  In reviewing a motion to dismiss under Rule 12(b)(1), a court is guided by the principle that "[f]ederal courts are courts of limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).  Thus, a federal court must presume that it "lack[s] jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006).  The burden of demonstrating the contrary rests upon the party asserting jurisdiction.  *Id.*  When considering jurisdiction based on the face of a plaintiff's complaint, a court must accept "well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor."  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).  However, the court need not "accept as true a legal conclusion couched as a factual allegation," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), or "accept inferences that are unsupported by the facts set out in the complaint," *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007).  Rather, in order to avoid dismissal, a complaint must contain sufficient factual matter "to state a claim [of standing] that is plausible on its face."  *Iqbal*, 556 U.S. at 678.  The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  Thus, where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

Defendants also move for dismissal pursuant to Fed. R. Civ. P. 12(b)(6), on the ground that Plaintiffs fail to state a claim upon which relief can be granted.  A Rule 12(b)(6) challenge "tests the legal sufficiency of a complaint."  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In evaluating such a claim, the plausibility requirement of *Iqbal* and *Twombly* applies to

the merits of a plaintiff's claims.  "While legal conclusions can provide the framework of a

complaint, they must be supported by factual allegations."  *Iqbal*, 556 U.S. at 679.  Thus, in

order to withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must "plead[] factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id.* at 678.  The plaintiff's allegations must be sufficiently detailed "to

raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  The court may

consider "the facts alleged in the complaint, any documents either attached to or incorporated in

the complaint and matters of which [the court] may take judicial notice."  *EEOC v. St. Francis*

*Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## ARGUMENT

### I.    THE PRESIDENTIAL RECORDS ACT'S BAR ON JUDICIAL REVIEW REQUIRES DISMISSAL OF THIS CASE IN ITS ENTIRETY

#### A.    Judicial Review of Defendants' Compliance with the PRA Is Precluded Under D.C. Circuit Precedent

A well-developed line of authority in this Circuit establishes that judicial review of

claims alleging PRA violations is unavailable except in narrow circumstances that are not

present here, and that such claims therefore should be dismissed.  The D.C. Circuit held in

*Armstrong I* that the PRA "precludes judicial review of the President's recordkeeping practices

and decisions."  *Armstrong I*, 924 F.2d at 291.  The *Armstrong* decision arose from a lawsuit,

filed on the last full day of the Reagan Administration, alleging that President Reagan, Vice

President Bush, and the National Security Council ("NSC"), a component of the Executive

Office of the President, "intend[ed] to delete material from the White House computer systems in

violation of the FRA and the PRA."  *Id.* at 286.  The *Armstrong* plaintiffs sought to preserve

access to these computer records, which contained emails and other communications of

administration officials over the course of several years.  *Id*. at 286–87.  The plaintiffs sought a

"declaration that many of the documents stored in the [computer] system at the close of the

Administration are federal and presidential records" and an "injunction prohibiting the

destruction of these documents and directing the President and NSC to classify and preserve the

documents as required by the FRA and PRA."  *Id*. at 287.

The D.C. Circuit rejected the plaintiffs' claims for relief under the PRA.  It explained that

although the PRA "contains no provision expressly precluding judicial review," "the PRA is one

of the rare statutes that does impliedly preclude judicial review."  *Id.* at 290.  The court based

this holding on a recognition that "permitting judicial review of the President's compliance with

the PRA would upset the intricate statutory scheme Congress carefully drafted to keep in

equipoise important competing political and constitutional concerns."  *Id.*  On the one hand,

"Congress sought to establish the public ownership of presidential records and ensure the

preservation of presidential records for public access after the termination of a President's term

in office."  *Id.*  On the other hand, Congress was "keenly aware of the separation of powers

concerns that were implicated by legislation regulating the conduct of the President's daily

operations," and thus "sought assiduously to minimize outside interference with the day-to-day

operations of the President and his closest advisors and to ensure executive branch control over

presidential records during the President's term in office."  *Id*.  With the PRA, Congress resolved

these competing concerns by "requiring the President to maintain records documenting the

policies, activities, and decisions of his administration, but leaving the implementation of such a

requirement in the President's hands."  *Id*.

Given Congress's clear intent to limit any administrative interference with the President's

records management practices, the court in *Armstrong I* also rejected the prospect of a judicial

oversight role, finding no suggestion in the PRA that Congress intended "courts, at the behest of

private citizens, to rule on the adequacy" of such practices, or to "overrule [the President's] records creation, management, and disposal decisions." *Armstrong I*, 924 F.3d at 290. Ultimately, the court declined to "second-guess" Congress's decision "[not] to give outsiders the right to interfere with White House recordkeeping practices," but instead simply to "rel[y] on the fact that subsequent Presidents would honor their statutory obligations to keep a complete record of their administrations." *Id.* at 290–91. In short, the court held "that the PRA precludes judicial review of the President's recordkeeping practices and decisions." *Id.* at 291. Accordingly, the court dismissed the *Armstrong* plaintiffs' claims seeking injunctive and declaratory relief under the PRA. *See id.* at 287, 291.

Applying these principles, the D.C. Circuit and another judge of this District have already rejected two attempts by a number of the organizations bringing the instant action to intervene in White House recordkeeping practices. First, in *CREW v. Trump*, 924 F.3d 602 (D.C. Cir. 2019), two of the four plaintiffs bringing the instant case sought declaratory and mandamus relief prohibiting the use of messaging platforms that delete messages as soon as they are read. *See* 924 F.3d at 603. They claimed that use of such platforms violated, *inter alia*, the PRA's requirement that records be categorized; the PRA's predisposal notification requirements; and the PRA's requirement that the President implement records management controls. *See id.* at 607–08. As in this case, plaintiffs relied on press reports regarding alleged record-keeping practices at the White House, submitting such reports as evidence of alleged noncompliance with the guidance set forth in the 2017 Memo.[4]  *See id.* at 608.

The D.C. Circuit rejected plaintiffs' claims, holding that under the D.C. Circuit's "two key PRA precedents," the Court lacked jurisdiction "to review the President's day-to-day

_____

[4] Plaintiffs in that case objected to consideration of the 2017 Memo at the motion to dismiss stage, but the Court held that the 2017 Memo was "clearly subject to judicial notice." 924 F.3d at 607.

operations" for compliance with the PRA.  *Id.* at 609 (quotation omitted).  The D.C. Circuit's

decision "[made] clear that when applying the *Armstrong* precedents, a district judge must steer

clear of efforts to supervise day-to-day operations within the White House, even when a

complaint presents legitimate concerns about an ongoing practice that threatens the preservation

of, and public access to, presidential records."  *CREW*, 438 F. Supp. 3d at 61 (discussing *CREW*

*v. Trump*, 924 F.3d 602 (D.C. Cir. 2019)).

Less than one year later, another judge of this Court followed the same binding principles

in rejecting claims alleging, *inter alia*, that the President and his staff violated the PRA by failing

to create, maintain, and properly dispose of records of interactions with foreign leaders.  *CREW*

*v. Trump*, 438 F. Supp. 3d 54 (D.D.C. 2020).  In that case, three of four plaintiffs bringing the

instant action claimed that the President violated the PRA's requirements, *inter alia*, "by

maintaining recordkeeping policies, guidelines, and practices that improperly classify agency

records as presidential records" and by failing to comply with the PRA's predisposal notice

requirements.  *Id.* at 63.  The Complaint in the instant case constitutes the third attempt by

Plaintiffs to micromanage the President's recordkeeping practices.

1.  <u>Counts I and II Impermissibly Attempt to Regulate the President's
    Recordkeeping Practices.</u>

The first category of claims, based on alleged violation of the PRA's predisposal notice

requirements, falls squarely within the D.C. Circuit's description of the claims barred under the

PRA, and, indeed, mirrors claims already rejected in prior cases.  Plaintiffs allege, based on third

party media reports, that the President "has a practice of ripping up his notes at the close of

meetings" and that he "also has a practice of tweeting and then deleting his tweets."  Compl., ¶¶

56, 57.  Plaintiffs therefore argue that the President "has disposed of . . . and threatens to dispose

of Presidential records without first obtaining the views of the Archivist in writing and

13

transmitting a disposal schedule to Congress," *id.* ¶ 98, and seek relief on those grounds.

These claims invite the Court "to do precisely what it is precluded from doing:  to review . . . the adequacy of the President's records management practices . . . and disposal decisions." *CREW*, 438 F. Supp. 3d at 66 (quoting *Armstrong I*, 924 F.2d at 290).  As discussed above, the Court of Appeals and another judge of this Court recently held that the PRA precluded similar challenges.  *See CREW*, 924 F.3d at 608 (rejecting challenge to alleged ongoing use of message-deleting apps); *CREW*, 438 F. Supp. 3d at 65–66 (concluding that challenge to alleged destruction of interpreter's notes "cannot be viewed as anything other than a challenge to the President's day-to-day management of his records under the PRA").  This Court should dismiss Counts I and II for the same reasons.

### 2.    Counts III–VII Impermissibly Challenge the Implementation of PRA Guidance.

The PRA likewise bars the balance of Plaintiffs' claims addressing the availability of screenshots as an option to preserve electronic records, *see* Counts III–VII, because the gravamen of those claims, too, is a challenge "to the President's recordkeeping practices and decisions."  Specifically, these claims amount to a challenge to the way the President has chosen to implement the PRA's requirements.

As the Court of Appeals previously recognized, the 2017 Memo "unquestionably speaks to the White House's efforts to satisfy the President's PRA obligations."  *CREW*, 924 F.3d at 608.  Consistent with the PRA, the 2017 Memo categorizes as "presidential records" electronic materials including "[e]mails, chats, and other electronic communications that are created or received in the course of conducting activities related to the performance of the President's duties," 2017 Memo at 2, including those "sent from or received on non-official accounts," and explains what steps must be taken "to ensure their preservation."  *Id.* at 1–2.  The 2017 Memo

14

identifies multiple ways to preserve electronic communications that constitute presidential records: copying or forwarding to an official account; sending a screenshot; or by other means. *Id.* at 3. Although the Complaint focuses much of its discussion on WhatsApp, one electronic messaging application, *see* Compl. ¶¶ 4, 73–75, 78–79, 92, the 2017 Memo is broad and addresses numerous "internet-based means of electronic communication," some of which are not susceptible to electronic forwarding. The inclusion of different options for preservation of such materials reflects the reality that different communications platforms have different capabilities, and that the available platforms and their respective capabilities will change over time.

Plaintiffs contend that, because the 2017 Memo lists screenshots among the acceptable means of preserving certain materials, the 2017 Memo "calls for preserving incomplete copies of presidential records." Compl. ¶¶ 121, 130. That is not so. The 2017 Memo instructs users that, if they "*ever send or receive email that qualifies as a presidential record using [a non-EOP account], [they] **must** preserve that email by copying it to [their] official EOP email account within twenty (20) days.*" 2017 Memo at 3 (emphasis in original). It goes on to admonish users that "[**a]ny employee who intentionally fails to take these actions may be subject to administrative or even criminal penalties**." *Id.* (emphasis in original). In the next line, the memo states: "The same rules apply to other forms of electronic communication, including text messages." *Id.* Thus, this guidance first calls for electronic forwarding. Only after that, when discussing various other platforms such as social networks and instant messaging where copying to email or electronic forwarding may not have been available, does the 2017 Memo indicate that presidential records may be preserved "via screenshot or other means." *Id.* Far from calling for preservation of incomplete records, the 2017 Memo emphasizes the obligation to preserve electronic materials that constitute presidential records irrespective of the technological platform

on which those materials reside.[5]

"To be sure, the Memo may not *guarantee* full compliance with the PRA," *CREW*, 924 F.3d at 606, but any further inquiry into the manner in which the White House manages the preservation of presidential records plainly is foreclosed. *See id.* at 608 (declining to delve into "'open questions' regarding the precise scope and effect of the facially PRA-compliant [2017] Memo"). Therefore—as with Plaintiffs' prior requests that the Court review "the adequacy of the President's records management practices or . . . his records creation, management, and disposal decisions," *CREW*, 438 F. Supp. 3d at 66 (quoting *Armstrong I*, 924 F.2d at 290)—the Court should dismiss Plaintiffs' claims for lack of subject matter jurisdiction.

## B.  The Exception in *Armstrong II* Does Not Apply Here

Plaintiffs contend that their claims are not precluded by *Armstrong I* and its progeny, citing an exception to the jurisdictional bar that the D.C. Circuit created in *Armstrong II*.  Mem. in Support of Pls.' Mot. For a TRO, ECF No. 9-1 (Pls.' Mem.) at 19.  But "the narrow and specific *Armstrong II* exception," *CREW,* 438 F. Supp. 3d at 64, does not apply here.

In *Armstrong II*, the plaintiffs had dropped their PRA claims entirely.  *Armstrong v. EOP*, 810 F. Supp. 335, 337 n.1 (D.D.C. 1993).  Instead, they invoked the FRA and FOIA to argue that guidelines issued by the White House improperly classified certain material as presidential records when in fact they qualified as "agency records subject to the FRA." *See Armstrong II*, 1 F.3d at 1290.[6]  The court in *Armstrong II* held that, when facing such a claim, "courts may

---

[5] Plaintiffs err in arguing that electronic transmission best preserves data in every case on those platforms on which it is available.  In some instances, electronic forwarding can corrupt or change metadata, rendering a screenshot or other format a more accurate record of the communication.  Regardless, because the 2017 Memo on its face calls for the preservation of presidential records regardless of platform, the Court is without jurisdiction to probe the mechanics of its implementation.

[6] At the time of *Armstrong II*, NSC, the EOP component whose guideline was at issue, considered itself to be subject to the FRA.  *See Armstrong II*, 1 F.3d at 1290.  In a later decision in the *Armstrong* case, the D.C. Circuit

review guidelines outlining what is, and what is not, a 'presidential record,'" as opposed to a federal record.  *Id.* at 1294.  But *Armstrong II* was careful to stress that the earlier holding in *Armstrong I* remains robust.  As *Armstrong II* emphasized, the President's records creation, management, and disposal decisions remain outside the scope of permissible judicial review.  *Id.*

Plaintiffs' claims fall well outside the limited exception that *Armstrong II* identified. Unlike in *Armstrong II*, Plaintiffs have not asserted a claim against any White House component that is subject to the FRA, nor have they identified any federal agency subject to the FRA as a defendant in this case.  In addition, Plaintiffs point to no guideline setting forth a definition of Presidential records that, in their view, captures records that are in fact an agency's federal records.  Nor could they.  For one thing, the 2017 Memo circulated to White House staff sets forth a definition of "Presidential records" that limits such records to those covered by the PRA, *see CREW*, 924 F.3d at 607 (quoting PRA definition), and Plaintiffs do not challenge that definition.  As the D.C. Circuit recognized in *CREW*, the 2017 Memo "does just what the PRA requires." *Id.*

Plaintiffs have offered four arguments as to why their claims allegedly fall within the *Armstrong II* exception.  All four are unavailing.  First, with respect to Counts I and II, Plaintiffs' challenge to alleged disposal of records, Plaintiffs argue that the challenged conduct "fits within the scope of judicial review *Armstrong II* recognized, as it concerns a broader practice by President Trump of destroying a broad swath of records based on considerations that have no support in the PRA."  Pls.' Mem. at 19.  But as the *CREW* court recently explained, "the

---

held that the NSC in fact was not governed by the FRA because, as an EOP component with the primary function of advising and assisting the President, it did not qualify as an agency subject to FOIA.  *Armstrong v. EOP, (Armstrong III)*, 90 F.3d 557, 567 (D.C. Cir. 1996) (describing post-*Armstrong II* Office of Legal Counsel opinion determining that NSC was not a "[federal] agency," and ultimately holding, consistent with that opinion, that NSC was not an agency subject to FOIA and therefore was not required to comply with the FRA).

*Armstrong II* holding is not sufficiently broad to permit judicial review of all presidential recordkeeping practices, even if they are alleged to be repeated or ongoing."  438 F. Supp. 3d at 64 n.7.  "Rather, *Armstrong II* was narrowly confined to the review of policies and guidelines issued by the administration governing the initial classification of documents as presidential records subject to the PRA and the President's control."  *Id.*  No such policies or guidelines are at issue here, and therefore Plaintiffs' claims fall outside of this limited exception.

Second, as to Counts III and IV,[7] Plaintiffs contend that their claims are not precluded because they are challenging "an official *policy* that is facially non-compliant with the PRA's mandatory directives."  Pls.' Mem. at 24 (emphasis Plaintiffs').  Plaintiffs assert that *Armstrong I* precludes only the review of "the White House's day-to-day records management decisions," *id.*, but that is not so.  In *CREW*, where plaintiffs had alleged a "policy and practice of repeatedly failing and/or affirmatively refusing to create records," 438 F. Supp. 3d at 63 (quoting plaintiffs' complaint), the Court explained, "plaintiffs' mere invocation of the word 'policy' is not enough to relieve the parties of the jurisdictional bar recognized in *Armstrong I* or to bring these claims within the ambit of the narrow and specific *Armstrong II* exception."  *Id.* at 64.  As noted above, to fall within the *Armstrong II* exception, a challenged policy must pertain specifically to the classification of documents as presidential records.  *See supra* 16–17.

Plaintiffs' third argument as to why their claims fall within the *Armstrong II* exception focuses on that very point:  Plaintiffs contend that review of their claims is a "logical extension of *Armstrong II's* holding," since the challenged policy here "essentially defines the types of documentary materials falling within the ambit of either presidential or personal records . . . by

---

[7] As to Counts V and VI, the claims seeking review of Mr. Kushner's compliance with the PRA, Plaintiffs are silent; they attempt no explanation of how such claims can proceed in light of D.C. Circuit precedent.  *See* Pls.' Mem. at 25–26.

implicitly excluding metadata and attachments associated with electronic messages sent from non-official accounts from the PRA's preservation requirements." Pls.' Mem. at 24. Plaintiffs err for two reasons. First, the 2017 Memo, discussed above, contains no such implicit exclusion. In fact, the first method of preservation listed for electronic messages is electronic forwarding or copying, methods that would capture metadata or attachments. *See* 2017 Mem. at 3. That one potential method of preservation listed may not include metadata or attachments does not add to the memorandum a classification scheme whereby part of a message is classified as a presidential record, and part is not. On the contrary, the 2017 Memo enumerates electronic communications that constitute presidential records if they are "created or received in the course of conducting activities related to the performance of the President's duties," including "emails, chats, and other electronic communications." 2017 Mem. at 2. The only natural reading of that list is that the *entire* email, chat, or other electronic communication is a presidential record.

Moreover, if the loss or disposal of any part of a record transformed the act of disposal into a classification, then the *Armstrong II* exception would swallow the *Armstrong I* rule; every disposal of a record would be subject to challenge and the PRA's jurisdictional bar would be meaningless. Instead, the Courts have rejected Plaintiffs' previous attempts to re-characterize as a "classification decision" any decision concerning the disposition or creation of materials. *See CREW*, 438 F. Supp. 3d at 64 ("if the Court of Appeals rejected CREW's attempt to cast the intentional, regular use of an application that ensured the deletion of an entire set of communications between aides as a reviewable 'classification' decision covered by *Armstrong II*, then this Court is constrained by that precedent to reject a similar attempt here."). This Court should do so as well.

Finally, Plaintiffs contend that their claims should proceed because they seek to litigate

under Section 2209 of the PRA, the requirement that employees preserve a "complete copy" of

any Presidential record in an official electronic messaging account not later than 20 days after its

creation or transmission.  Pls.' Mem. at 23.  They contend that Section 2209 is both more recent

than the *Armstrong* decisions, and more specific than other PRA provisions under which

mandamus relief was not permitted.  In advancing these arguments, Plaintiffs overlook that the

crux of the D.C. Circuit's reasoning, when it determined that the PRA impliedly precludes

judicial review, was based on separation of powers concerns that motivated Congress when

creating the entire statutory framework.  *See Armstrong I*, 924 F.2d at 290–91 (discussing how

Congress "balanced [its] competing goals" in the statute); *id*. at 290 (noting "the intricate

statutory scheme Congress carefully drafted to keep in equipoise important competing political

and constitutional concerns").  As the Court of Appeals repeatedly held, that framework does not

"allow courts, at the behest of private citizens, to rule on the adequacy of the President's records

management practices or overrule his records creation, management, and disposal decisions."  *Id.*

Neither the age nor the specificity of any particular PRA provision has any role in that analysis.

Plaintiffs also advance two other, policy-based arguments, which cannot overcome the

D.C. Circuit's clear commands and are easily dismissed.  First, Plaintiffs argue that their claims

must be found within the scope of the *Armstrong II* exception because, if judicial review were

precluded here, the PRA would be rendered a nullity.  But that is not so.  Congress retains the

ability to act if its purposes are not served by the current statutory framework.  As the *CREW*

court recognized, Congress "has the power to revisit its decision to accord the executive such

unfettered control [over presidential records] or to clarify its intentions if they were

mischaracterized by the Court of Appeals." *CREW*, 438 F. Supp. 3d at 64.

Second, Plaintiffs contend that their claims must be permitted because immunizing the

President from suit would "run[] counter to the core purpose of the PRA—to ensure the preservation of 'the fullest possible documentary record of the presidency.'"  Pls.' Mem. at 20 (quoting Cong. Rec. 34,894).  But Plaintiffs overlook that, in creating the PRA, Congress "was also keenly aware of the separation of powers concerns that were implicated by legislation regulating the conduct of the President's daily operations."  *Armstrong I*, 924 F.2d at 290.  In reality, it is the Plaintiffs' claims, if permitted to go forward, that would subvert Congress's intentions.  As the D.C. Circuit explained:  "Allowing judicial review of the President's general compliance with the PRA at the behest of private litigants would substantially upset Congress's carefully crafted balance of presidential control of records creation, management, and disposal during the President's term of office and public ownership and access to the records after the expiration of the President's term."  *Id.* at 291.

For all these reasons, Plaintiffs' allegations fail to support application of the *Armstrong II* exception.

## II.   PLAINTIFFS FAIL TO ESTABLISH THE ELEMENTS NECESSARY FOR MANDAMUS JURISDICTION (COUNTS II, IV, VI)

In addition to the bar on judicial review of Plaintiffs' claims—which by itself requires dismissal of this case in its entirety—this Court lacks jurisdiction over Counts Two, Four, and Six for a separate reason:  namely, their failure to satisfy the elements necessary to establish mandamus jurisdiction.  Each of these claims seeks mandamus relief that would compel Defendants to comply with the PRA.  Mandamus jurisdiction "is strictly confined. . . mandamus is 'drastic'; it is available only in 'extraordinary situations'; it is hardly ever granted; those invoking the court's mandamus jurisdiction must have a 'clear and indisputable' right to relief.'"  *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc); *accord CREW*, 924 F.3d at 606 ("[T]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations.").

In order to establish a court's jurisdiction over such a claim, a plaintiff seeking mandamus relief must show (1) "a 'clear and indisputable right to relief,'" (2) "that the defendant has a "'clear duty to act,'" and (3) "that 'no adequate alternative remedy exists.'" *Id.* (quoting *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016)); *see also Lovitsky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020).  Even when these requirements are met, "a court may grant relief only when it finds compelling equitable grounds." *Lovitsky*, 949 F.3d at 759.  As discussed below, Plaintiffs fail to establish either the first or the second requirement.

### A.      Plaintiffs Cannot Establish a Clear Right to Relief

In assessing whether Plaintiffs are entitled to mandamus, the first question is whether they have a "clear and indisputable" right to relief.  *In re Cheney*, 406 F.3d at 729.  "[T]he party seeking mandamus has the burden of showing that its right to issuance of the writ is clear and indisputable." *Lovitsky*, 949 F.3d at 759–60 (quoting *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)) (internal quotation omitted).  Here, Plaintiffs cannot make such a showing; not only does the PRA lack any private right of action, *see Judicial Watch, Inc. v. NARA*, 845 F. Supp. 2d 288, 299 n.5 (D.D.C. 2012), but, as discussed above, the D.C. Circuit has concluded that it affirmatively precludes judicial review.  In light of this affirmative bar, Plaintiffs cannot possibly establish a "clear and indisputable" right to relief.  Their mandamus claim necessarily fails for that reason alone.

In the D.C. Circuit's recent *CREW* decision, the court considered a claim that, like Plaintiffs' Counts Two, Four, and Six here, sought mandamus relief based on alleged PRA violations—in that case, seeking to compel the White House to implement records management guidelines with respect to message-deleting apps.  *See CREW*, 924 F.3d. at 605.  The court in *CREW* recognized that the preclusion of judicial review, as established in *Armstrong I*, failed to

support the "clear and indisputable right to relief" prong of mandamus jurisdiction.  *See id.* at 609.  The same conclusion is warranted here.  Indeed, that bar suffices, on its own, to require dismissal of Plaintiffs' mandamus claim.

Even if review were theoretically available, the court in *CREW* also identified another reason for its conclusion—the absence of any plausible allegation that the White House was "defying the law."  *Id.* at 606.  The court concluded that the plaintiffs "failed to do so" because, for one thing, the White House's 2017 Memo specifically required that Presidential records conveyed through instant messaging systems be preserved, and, indeed, did "just what the PRA requires" in its directions to White House personnel regarding their obligations to preserve and maintain presidential records.  *See id.* at 606–07.

Plaintiffs here have also failed to plausibly allege that Defendants "[are], in effect, defying the law."  *See id.* at 606.  Indeed, the D.C. Circuit in *CREW* rejected a similar argument because, even assuming that news articles raise "questions about 'what is actually happening in the White House,'" "these types of 'open questions' regarding the precise scope and effect of the facially PRA-compliant February 2017 Memo 'are the antithesis of the "clear and indisputable" right needed for mandamus relief.'"  *CREW*, 924 F.3d at 608; *see also supra* 14–15 (explaining why, notwithstanding Plaintiffs' objections, the 2017 Memo is facially compliant with the PRA).  The Court should reject Plaintiffs' claims here for the same reason.

### B.      Plaintiffs Cannot Establish a Clear Duty to Act

Because Plaintiffs fail to establish a clear right to relief, the Court "may 'begin and end with the first' of the three mandamus requirements," and may dismiss Counts II, IV and VI without addressing the other two requirements.  *CREW*, 924 F.3d at 609.  However, Plaintiffs also fail to establish the second prong of mandamus jurisdiction—that Defendants are violating a

clear duty to act.  *See Am. Hosp. Ass'n*, 812 F.3d at 189.  In the context of mandamus, the duty to be performed must be "ministerial and the obligation to act peremptory, and clearly defined." *13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980) (quoting *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931)).  A ministerial duty "is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty."  *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996).

Plaintiffs rely on the notion that the PRA imposes "non-discretionary" or "mandatory obligation[s]" on the President in regard to his creation, management, and disposal of records. *See*, *e.g.*, Compl. ¶¶ 97, 106.  However, the PRA does not set forth any ministerial duty owed by the President to Plaintiffs.  As relevant here, the statute provides that the President "shall take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records pursuant to the requirements of this section and other provisions of law." 44 U.S.C. § 2203(a).  Rather than defining any clear or ministerial duty appropriate for mandamus relief, the PRA leaves it to the President to determine what steps are "necessary" for this purpose.  As the Court in *CREW* explained:  "The use of the word 'shall' often denotes a mandatory obligation, but what the President must do is exercise his discretion, and the rest of the text calls for considerable judgment."  438 F. Supp. 3d at 68; *see also id.* ("This duty necessarily involves the application of judgment and the formation of policy.").

Thus, courts have not viewed the PRA as imposing ministerial obligations on the President.  To the contrary, the President's "virtually complete control" over records creation, management, and disposal during his term of office, *see Armstrong I*, 924 F.2d at 290, is entirely

incompatible with the notion that he is subject to such ministerial obligations.[8]

The PRA therefore cannot be interpreted to impose ministerial duties on the President

that can be enforced through mandamus relief.

### C.     No Writ of Mandamus Can Lie Against the President (Counts II and IV)

Aside from Plaintiffs' failure to satisfy the requirements for mandamus jurisdiction,

Plaintiffs' request that the Court issue a writ of mandamus to the President disregards controlling

authority that makes clear that, "[w]ith regard to the President, courts do not have jurisdiction to

enjoin him." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citing *Mississippi v.*

*Johnson,* 71 U.S. (4 Wall.) 475, 501 (1867)), and *Franklin v. Massachusetts*, 505 U.S. 788, 827–

28 (1992) (Scalia, J., concurring in part and concurring in the judgment)); *see also id.* at 1012

("A court—whether via injunctive or declaratory relief—does not sit in judgment of a

President's executive decisions.").  As the D.C. Circuit observed in *Swan,* it has "never

attempted to exercise power to order the President to perform a ministerial duty," explaining that

"[t]he reasons why courts should be hesitant to grant such relief are painfully obvious":  the

President "is a coequal branch of government, and for the President to 'be ordered to perform

particular executive . . . acts at the behest of the Judiciary,' . . . at best creates an unseemly

appearance of constitutional tension and at worst risks a violation of the constitutional separation

of powers."  *Swan*, 100 F.3d at 978 (citations omitted; ellipsis in original) (quoting *Franklin*, 505

U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment)).  For this reason, quite

---

[8] Even if Plaintiffs had identified any ministerial obligation that the PRA imposes on Defendants, they fail to allege a violation of any such duties *owed to Plaintiffs*.  *See* 28 U.S.C. § 1361 ("The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed *to the plaintiff*." (emphasis added)).  Any duties created by the PRA are owed not to Plaintiffs, but to the public at large.  *See, e.g.*, *Armstrong I*, 924 F.2d at 290 ("Congress sought to establish the *public* ownership of presidential records and ensure the preservation of presidential records for *public* access after the termination of a President's term in office."  (emphasis added)).  This is another reason why Plaintiffs cannot obtain mandamus relief.

apart from the questions about the Court's jurisdiction, the Court should refrain, as a matter of its equitable discretion, from issuing such relief against the President due to the extraordinary separation of powers concern that it would raise.  Counts Two and Four therefore should be dismissed for this reason as well.

## III.    IN THE ABSENCE OF MANDAMUS JURISDICTION, PLAINTIFFS' CLAIMS SEEKING DECLARATORY RELIEF CANNOT PROCEED (COUNTS ONE, THREE, AND FIVE)

Counts One, Three, and Five of Plaintiffs' Complaint seek declaratory relief based on the same factual allegations advanced to support Plaintiffs' mandamus requests in Counts Two, Four, and Six.  *Compare* Compl. ¶ 98 (Count I), *with id.* ¶ 108 (Count II); *compare id.* ¶¶ 118, 119 (Count III), *with* ¶¶ 127–128 (Count IV); *compare id.* ¶¶ 138–140 (Count V), *with* ¶¶ 146–148 (Count VI).  However, the Declaratory Judgment Act, 28 U.S.C. § 2201, simply "enlarged the range of remedies available in the federal courts"; it did not "extend their jurisdiction." *Skelly Oil Co. v. Phillips Petroleum Co*., 339 U.S. 667, 671 (1950); *see also Lovitsky*, 949 F.3d at 758 ("resort to the Declaratory Judgment Act will not fill a gap in subject matter jurisdiction.") (quotation omitted).  Thus, "the availability of [declaratory] relief presupposes the existence of a judicially remediable right."  *Lovitsky*, 949 F.3d at 758 (quoting *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011)).  "Accordingly, courts in this circuit have generally found that [a] count for declaratory judgment is not cognizable as a separate cause of action but is more properly included in the[] prayer for relief."  *Elec. Privacy Info. Ctr. v. Drone Advisory Comm*., 369 F. Supp. 3d 27, 38 (D.D.C. 2019) (internal quotation omitted).  Consistent with these rulings, the D.C. Circuit in *CREW* concluded that its dismissal of the plaintiff's mandamus claim "also disposes of CREW's claims for declaratory relief."  *CREW*, 924 F.3d at 610 ("For the same reasons that we decline to 'resort to mandamus' to micromanage the President's day-to-day compliance with the PRA, we shall 'not entertain [a claim] for declaratory relief.'").  Here as

26

well, the Court should dismiss Counts One, Three, and Five for the same reasons explained above with respect to Counts Two, Four, and Six.

## IV.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR RELIEF UNDER THE APA (COUNT SEVEN)

In Count Seven, Plaintiffs ask the Court to order the NARA Defendants to "take action to address" the availability of screenshots as a means of preserving electronic records.  Plaintiffs style this request as an APA claim, asserting that the NARA Defendants' not having taken such action to date constitutes "agency action unlawfully withheld or unreasonably delayed" in violation of APA Section 706(1).[9]  Compl. ¶¶ 161, 163.  But Plaintiffs fall far short of stating a claim under the APA.

As the Supreme Court has explained, a claim under APA Section 706(1) "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original).  Citing the Attorney General's Manual on the Administrative Procedure Act, the Supreme Court further noted that the APA "empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing how it shall act.'"  *Id.*

The action at issue here—intervention by NARA "to address" what Plaintiffs refer to as "the White House's unlawful PRA policy" fits none of these requirements.  To begin, the NARA Defendants are not "required" by law to intervene in White House records management.  The Complaint cites no provision of the PRA creating a duty for NARA Defendants to intervene in a

---

[9] Plaintiffs also cite APA Section 706(2)(A), but that provision, by its terms, can apply only when an agency action has already occurred.  In relevant part, Section 706 provides:  "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.  On its face, then, 706(2)(A) has no application here.

President's records management while that President remains in office.  Indeed, any such intervention would be contrary to the very PRA provisions upon which Plaintiffs rely.  *See* Compl. ¶¶ 158, 159, 162 (citing 44 U.S.C. §§ 2203(f), (g)(1)).  Section 2203(f) of the PRA provides that, "[d]uring a President's term of office, the Archivist may maintain and preserve Presidential records on behalf of the President," but "[t]he President shall remain exclusively responsible for custody, control, and access to such Presidential records."  44 U.S.C. § 2203(f); *see also id.* ("The Archivist may not disclose any such records, except under direction of the President").  Section 2203(g), on the other hand, contemplates that NARA will be responsible for Presidential records only "[u]pon the conclusion of a President's term of office."

The Court of Appeals in *Armstrong I* recognized that separation of powers concerns led Congress to circumscribe the role of the Archivist during a President's time in office.  *See Armstrong I*, 924 F.2d at 290.  The Court highlighted that, for example, "[t]he Archivist lacks the authority under the PRA to inspect the President's records or survey the President's records management practices."  *Id.*  And, "although the FRA authorizes the Archivist to promulgate guidelines and regulations to assist the agencies in the development of a records management system [for federal records], the PRA lacks an analogous provision [for Presidential records]."  *Id.*  Moreover, unlike the FRA, the PRA also omits any express enforcement role for the Archivist or the Attorney General with respect to the disposal of records while the President is in office.  *See id.* (recognizing that the Archivist has no "authority to veto the President's . . . decision[s]" regarding records disposal and that Congress can only do so by passing legislation prohibiting disposal of particular documents); *cf.* 44 U.S.C. § 2112(c) (recognizing the Archivist assumes, with respect to Presidential records, "all the functions and responsibilities otherwise vested in him pertaining to Federal records" only after they have already been deposited, after

the President has left office).

Summarizing this statutory scheme, the Court of Appeals observed that, under the PRA, the Archivist "lack[s] . . . *any* authority to interfere with [the President's] records management practices." *Armstrong I*, 924 F.2d at 290 (emphasis added). Thus, the PRA cannot support the Plaintiffs' argument that the NARA Defendants had a duty to act—much less a ministerial duty as would be required to state an APA claim, *see supra*—and the Court, for this additional reason, should dismiss Count VII.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' claims in their entirety, with prejudice.


Dated:  December 15, 2020                    Respectfully submitted,

                                             JEFFREY BOSSERT CLARK
                                             Acting Assistant Attorney General

                                             JOHN V. COGHLAN
                                             Deputy Assistant Attorney General

                                             ELIZABETH J. SHAPIRO (D.C. Bar No. 418925)
                                             Deputy Director
                                             Federal Programs Branch

                                             */s/  Julia A. Heiman*
                                             JULIA A. HEIMAN (D.C. Bar No. 986228)
                                             Federal Programs Branch
                                             U.S. Department of Justice, Civil Division
                                             1100 L Street, N.W.
                                             Washington, DC  20005
                                             Tel. (202) 616-8480 / Fax (202) 616-8470
                                             julia.heiman@usdoj.gov
                                             *Attorneys for Defendants*