# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
NATIONAL SECURITY ARCHIVE, *et al.*,　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　Plaintiffs,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　　　　)　　　Civil Action No. 20-3500-KBJ
　　　　　　　　　　　　　　　　　　　　)
DONALD J. TRUMP, *et al.*,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　　　　　　)
_____)

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STATUTORY FRAMEWORK ........................................................................................... 3

FACTUAL BACKGROUND ............................................................................................. 6

I.      White House Officials' Disregard For Their PRA Obligations ........................... 6

II.     The White House's Official "Screenshotting" Policy ....................................... 8

ARGUMENT ..................................................................................................................... 11

I.      Plaintiffs Plausibly Allege Claims for Declaratory and Mandamus Relief Challenging the Failure of Defendants Trump and EOP to Comply with the PRA's Mandatory Pre-Disposal Notice Requirements (Counts I and II). ........................................................... 11

        A.      Counts I and II Plausibly Allege Each Element of Mandamus Relief. ................ 12

        B.      The PRA Does Not Impliedly Preclude Mandamus Jurisdiction Over Counts I and II. ................................................................................................. 14

                1.      *Armstrong I* Did Not Address Mandamus Claims, and Other D.C. Circuit Precedent Makes Clear That Statutes Cannot Strip Courts of Mandamus Jurisdiction Unless They Do So Expressly. ............................................. 15

                2.      Even if *Armstrong I* Applied to Mandamus Claims, It Would Not Preclude Review of Counts I and II. ........................................................ 17

II.     Plaintiffs Plausibly Allege Claims for Declaratory and Mandamus Relief Challenging the White House's Official Screenshotting Policy as Contrary to the PRA (Counts III and IV). ........................................................................................................... 22

        A.      Counts III and IV Plausibly Allege Each Element of Mandamus Relief. ............ 22

        B.      The PRA Does Not Impliedly Preclude Mandamus Jurisdiction Over Counts III and IV ................................................................................................. 31

                1.      *Armstrong I* Does Not Support Implied Preclusion of Mandamus Jurisdiction. ........................................................................................... 32

                2.      *Armstrong I* Does Not Apply to Alleged Violations of the Subsequently-Enacted 2014 PRA Amendments. ...................................... 32

                3.      *Armstrong II* Permits Review of the White House's Screenshotting Policy Because It Implicitly Classifies Presidential Record Material as Personal Records ................................................................................. 34

4.      Even *Armstrong I* Permits Courts to Review the Facial Legality of an
        Official PRA Policy ................................................................................ 38

III.    Plaintiffs Plausibly Allege Claims for Declaratory and Mandamus Relief Against
        Defendant Kushner (Counts V and VI) ................................................................. 39

IV.     Mandamus Relief is Available Against the President, But Even If It Were Not, the Court
        Can Grant Declaratory Relief Against Him and Mandamus Relief Against His
        Subordinates ....................................................................................................... 40

V.      Plaintiffs Plausibly Allege an APA Claim Against the Archivist and NARA, Who Are
        Necessary Parties (Count VII). ........................................................................... 41

CONCLUSION ......................................................................................................... 43

# TABLE OF AUTHORITIES

**Cases**

*13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758 (D.C. Cir. 1980) .................................. 24

*Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183 (D.C. Cir. 2016) ...................................... 12, 23, 24, 35

*American Historical Ass'n v. Peterson*, 876 F. Supp. 1300 (D.D.C. 1995) .................... 34, 35, 36

*Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991) ..................................................... passim

*Armstrong v. Exec. Office of the President*, 1 F.3d 1274 (D.C. Cir. 1993) .......................... passim

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................... 11, 12

*Block v. Community Nutrition Institute,* 467 U.S. 340 (1984) ............................................... passim

*Cohens v. Virginia*, 19 U.S. 264 (1821) ............................................................................ 21

*Cooper Indus. v. Aviall Servs.*, 543 U.S. 157 (2004) ........................................................ 15, 28

*CREW v. Cheney*, 593 F. Supp. 2d 194, 218 (D.D.C. 2009) .......................................... passim

*CREW v. Trump*, 302 F. Supp. 3d 127 (D.D.C. 2018) .................................................. 2, 15, 17, 40

*CREW v. Trump*, 438 F. Supp. 3d 54 (D.D.C. 2020) ......................................................... 38

*CREW v. Trump*, 924 F.3d 602 (D.C. Cir. 2019) ............................................................ passim

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) .............................................................. 40

*Ganem v. Heckler*, 746 F.2d 844 (D.C. Cir. 1984) ......................................................... 2, 15, 16

*Hurd v. D.C.*, 864 F.3d 671 (D.C. Cir. 2017) ................................................................. 11

*In re al-Nashiri*, 791 F.3d 71 (D.C. Cir. 2015) ........................................................... 2, 15, 16, 17

*Judicial Watch v. Nat'l Energy Policy Dev.*, 219 F. Supp. 2d 20 (D.D.C. 2002) ....................... 41

*Kickapoo Tribe v. Babbitt*, 43 F.3d 1491 (D.C. Cir. 1995) ................................................. 42

*Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020) ....................................... 12, 13, 22, 23, 24

*M.J. v. D.C.*, 401 F. Supp. 3d 1 (D.D.C. 2019) ............................................................... 11

*Marbury v. Madison*, 5 U.S. 137 (1803) ....................................................................... 1

*Montclair v. Ramsdell*, 107 U.S. 147 (1883) .............................................................. 21

*N. States Power Co. v. U.S. Dep't of Energy*, 128 F.3d 754 (D.C. Cir. 1997) ............................ 24

*Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974) ..................... 12, 21, 40, 41

*Nat'l Wildlife Fed'n v. United States*, 626 F.2d 917 (D.C. Cir. 1980) .................................. 14, 40

*Newdow v. Roberts*, 603 F.3d 1002 (D.C. Cir. 2010) ................................................... 40

*Nixon v. Administrator*, 433 U.S. 425 (1977) ............................................................ 20

*Powell v. McCormack*, 395 U.S. 486 (1969) ............................................................. 40

*Reid v. Hurwitz*, 920 F.3d 828 (D.C. Cir. 2019); .......................................................... 11

*Shields v. Barrow*, 58 U.S. 130 (1854) .................................................................... 42

*Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996) ................................................ 12, 24, 41

*United States v. Menasche*, 348 U.S. 528 (1955) ........................................................ 21

*United States v. Monsanto*, 491 U.S. 600 (1989) ......................................................... 13

*United States v. Nixon*, 418 U.S. 683 (1974) ............................................................. 20

*Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579 (1952) ..................................... 19

## Statutes

28 U.S.C. § 1361 ...................................................................................... 2, 12, 16, 40

28 U.S.C. § 1651 .......................................................................................... 16

28 U.S.C. § 2201 .......................................................................................... 40

44 U.S.C. § 2112(c) ..................................................................................... 4, 42

44 U.S.C. § 2201(2)(B) ................................................................................ 34, 35

44 U.S.C. § 2201(3) ....................................................................................... 35

44 U.S.C. § 2202 ............................................................................................ 3

44 U.S.C. § 2203(a) ................................................................................ 3, 22, 23

44 U.S.C. § 2203(c) ............................................................................... 3, 13, 14, 18

44 U.S.C. § 2203(c)(1) .......................................................................................... 3, 14

44 U.S.C. § 2203(c)(2) .............................................................................................. 14

44 U.S.C. § 2203(d) ............................................................................................. 3, 13

44 U.S.C. § 2203(g)(1) .................................................................................... 4, 41, 42

44 U.S.C. § 2204 ................................................................................................. 5, 35

44 U.S.C. § 2204(a) ................................................................................................... 5

44 U.S.C. § 2204(c) ................................................................................................... 5

44 U.S.C. § 2207 ..................................................................................................... 23

44 U.S.C. § 2209(a) ........................................................................................... passim

44 U.S.C. § 2209(a)(1) .......................................................................................... 4, 23

44 U.S.C. § 2209(a)(2) ........................................................................................ 23, 33

44 U.S.C. § 2209(a)(1)-(2) ..................................................................................... 4, 23

44 U.S.C. § 2209(c)(1)(A) ...................................................................................... 5, 39

44 U.S.C. § 2209(c)(1)(C) ...................................................................................... 5, 39

44 U.S.C. § 2209(c)(2) ............................................................................................... 5

44 U.S.C. § 2209(c)(3) ............................................................................................... 5

44 U.S.C. § 2911 ................................................................................................. 4, 32

5 U.S.C. § 701(a)(1) ................................................................................................. 16

5 U.S.C. § 706(1) ..................................................................................................... 41

5 U.S.C. § 706(2)(A) ................................................................................................ 41

## Legislative Materials

H.R. No. 95-1487, 95th Cong., 2d Sess. 11 (1978) .................................................. 3, 36

H.R. Rep. No. 95-1187, 95th Cong., 2d Sess. (1978)......................................................... 18, 19, 42

*Hearings Before a Subcomm. of the Comm. on Gov't Operations on H.R. 10998 and Related Bills*, 95th Cong., 2nd Sess. (1978)............................................................................................ 20

H. Rep. 113-127, 113th Cong., 1st Sess. (2013)..................................................................... 26

S. Rep. 113-218, 113th Cong., 2d Sess. (2014)............................................................... 5, 26, 32

The Presidential and Federal Records Act Amendments of 2014, Pub. L. 113-187, 128 Stat. 2003 (2014)....................................................................................................................................... 4

**Rules**

Fed. R. Civ. P. 12(b)(1)............................................................................................................ 11

Fed. R. Civ. P. 12(b)(6)............................................................................................................ 11

Fed. R. Civ. P. 19(a)(1)(A) ...................................................................................................... 43

Fed. R. Civ. P. 19(a)(1)(B) ...................................................................................................... 43

## INTRODUCTION

Throughout his presidency, Donald Trump has sought to upend the Presidential Records Act ("PRA") and the checks and balances Congress created in that statute by claiming the absolute, unreviewable power to do whatever he wants in all aspects of his recordkeeping. This lawsuit concerns his latest efforts to destroy records without providing the Archivist and Congress the statutorily required notice. In clear, nondiscretionary terms the PRA dictates that the President may destroy any of his Presidential records only after affirmatively determining they no longer have administrative, historical or evidentiary value, and only after securing the written views of the Archivist of the United States. The PRA's notice provisions do not in and of themselves bar the President from moving forward with any proposed destruction, thereby respecting the President's right to control the records of his presidency. But they do preserve the ability of other stakeholders, including the Archivist and Congress, to act in the face of a proposed destruction of the people's history.

In this case, however, President Donald Trump and the Executive Office of the President ("EOP") have ignored the PRA's explicit notice requirements, depriving the Archivist and Congress of any ability to weigh in before historically valuable Presidential records are destroyed. Judicial review of their failure to comply with the PRA's notice requirements poses no separation-of-powers concerns because it leaves the President free to control decisions about the creation, management, and disposal of specific records while in office—the touchstone for any constitutional analysis. To rule otherwise would upset, not uphold, the balance the Constitution strikes among the three branches of government. *See Marbury v. Madison*, 5 U.S. 137 (1803).

1

This case also challenges an official White House policy, followed by Defendant Jared Kushner and others, authorizing staff to preserve Presidential records from a broad array of non-official electronic messaging accounts merely by taking a "screenshot" of the record and forwarding it to an official messaging account. Because a screenshot does not capture metadata, attachments, and functionality associated with the original message, the White House's policy facially contravenes the PRA's non-discretionary requirement to preserve "complete cop[ies]" of such records, 44 U.S.C. § 2209(a), and, if left uncorrected, will result in the removal, loss, or destruction of highly valuable Presidential record material.

Defendants have moved to dismiss the Complaint, relying entirely on *Armstrong v. Bush* ("*Armstrong I*"), 924 F.2d 282 (D.C. Cir. 1991). But *Armstrong I* held only that the PRA "impliedly precludes" judicial review under the Administrative Procedure Act ("APA"). Neither that case nor any other specifically addresses whether the PRA impliedly precludes *mandamus* jurisdiction under 28 U.S.C. § 1361—the basis for Plaintiffs' claims here. *See CREW v. Trump*, 302 F. Supp. 3d 127, 133-34 (D.D.C. 2018) (recognizing this distinction). And three decades of other D.C. Circuit precedent makes clear that statutes cannot strip courts of mandamus jurisdiction unless they do so "expressly," thus foreclosing Defendants' "implied" preclusion theory. *See In re al-Nashiri*, 791 F.3d 71, 77 (D.C. Cir. 2015); *Ganem v. Heckler*, 746 F.2d 844, 850 (D.C. Cir. 1984). Moreover, Congress enacted Section 2209(a) of the PRA over two decades after *Armstrong I* and, through that provision, imposed precisely the type of clear and non-discretionary duties that mandamus requires. Even if *Armstrong I* did apply to mandamus claims, it does not bar Plaintiffs' claims here for several additional reasons.

Accepting Plaintiffs' well-pleaded factual allegations as true, as the Court must at this stage, the Complaint plausibly alleges each mandamus element, and the PRA does not

"impliedly" strip this Court of mandamus jurisdiction. The Court should therefore deny Defendants' Motion to Dismiss and allow this case to proceed on the merits.

## STATUTORY FRAMEWORK

The PRA "'establish[es] the public ownership of records created by . . . presidents and their staffs in the course of discharging their official duties,'" *CREW v. Trump*, 924 F.3d 602, 603 (D.C. Cir. 2019) (quoting H.R. Rep. No. 95-1487, 95th Cong. at 2), under which "[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records," 44 U.S.C. § 2202.

To ensure a full historical record, the PRA directs the President to take all necessary steps:

> to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records[.]

*Id.* § 2203(a).

The PRA imposes a multi-step process on the President before any Presidential records may be destroyed. The President must first make an affirmative determination that the records "no longer have administrative, historical, informational, or evidentiary value[.]" *Id.* § 2203(c). The President must then obtain the written views of the Archivist on the proposed destruction. *Id.* § 2203(c)(1)-(2). Upon receiving written confirmation that the Archivist intends to take any action with respect to the proposed destruction, the President must notify the appropriate congressional committee of the President's intention 60 days before the proposed disposal. 44 U.S.C. § 2203(d). This process reflects the care Congress took to ensure that multiple stakeholders would have an opportunity to weigh in before a President destroys historically important Presidential records.

Once a President leaves office, the Archivist assumes "responsibility for the custody, control, and preservation of, and access to" the former president's records. *Id.* § 2203(g)(1). The PRA empowers the Archivist to "exercise . . . all the functions and responsibilities otherwise vested in him pertaining to Federal records or other documentary materials in his custody or under his control." *Id.* § 2112(c). In negotiating for the deposit of Presidential materials the PRA directs the Archivist "to secure to the Government, as far as possible, the right to have continuous and permanent possession of the materials." *Id.* The PRA imposes on the Archivist "an affirmative duty" to make the records of a former president "available to the public as rapidly and completely as possible[.]" 44 U.S.C. § 2203(g)(1).

In 2014, Congress amended both the PRA and the Federal Records Act ("FRA") through the Presidential and Federal Records Act Amendments of 2014, Pub. L. 113-187, 128 Stat. 2003 (2014) ("2014 Amendments"). The 2014 Amendments sought to "modernize[] records management by focusing more directly on electronic records." NARA Press Release, <u>National Archives Welcomes Presidential and Federal Records Act Amendments of 2014</u>, Dec. 1, 2014, <u>https://bit.ly/3o1Yw7T</u>. As part of that focus, the amended statute explicitly restricts White House employees' use of "non-official electronic messaging account[s]" to "create or send" Presidential records unless they "(1) cop[y] an official electronic messaging account. . . in the original creation or transmission of the Presidential record," or "(2) forward[] a *complete copy* of the Presidential . . . record to an official electronic messaging account . . . not later than 20 days after the original creation or transmission of the Presidential . . . record." 44 U.S.C. § 2209(a)(1)-(2) (emphasis added). The Amendments similarly restrict the use of non-official electronic messaging accounts under the FRA. *Id.* § 2911.

Section 2209 of the PRA defines "covered employee" to include both "the immediate staff of the President," and "a unit or individual of the Executive Office of the President whose function is to advise and assist the President." *Id.* § 2209(c)(1)(A), (C). The amended statute broadly defines "electronic messages" to mean "electronic mail and other electronic messaging systems that are used for purposes of communicating between individuals." *Id.* § 2209(c)(2). It likewise broadly defines "electronic messaging account" to mean "any account that sends electronic messages." 44 U.S.C. § 2209(c)(3). The legislative history for Section 2209 confirms that Congress wanted both the "President" and his "staff" to "ensure that *all* Presidential records, even those sent from a personal electronic messaging account, are properly preserved and maintained in an official electronic messaging account." S. Rep. 113-218, 113th Cong., 2d Sess., at 6 (2014) (emphasis added).

NARA guidance implementing the 2014 Amendments reinforces that a "complete" version of an electronic record—including electronic messages generated in non-official accounts—must include the record's associated metadata, attachments, and functionality. *See* NARA Bulletin 2015-02, July 29, 2015, https://bit.ly/2Jeyrnh; NARA Bulletin 2015-04, Sept. 15, 2015, https://bit.ly/37cA1xX; Compl. ¶¶ 47-54.

The PRA provides that beginning five years after a President leaves office, the public can access Presidential records from NARA through the procedures that the Freedom of Information Act ("FOIA") establishes. 44 U.S.C. § 2204(c). Although some materials can be withheld or redacted for an extended period of time, they too eventually become available to members of the public, *id.* § 2204(a), including Plaintiffs, who are historians and good government groups that frequently use the FOIA to access records of former Presidents. Compl. ¶¶ 8-22.

## FACTUAL BACKGROUND

I.     **White House Officials' Disregard For Their PRA Obligations**

From the outset of his presidency, President Trump has disregarded, if not outright

flouted, his recordkeeping obligations under the PRA. Compl. ¶ 55. For example, the President

rips up his notes at the close of meetings, which some have called "his unofficial 'filing

system.'" *Id.* ¶ 56. He also has used Twitter extensively to communicate official statements, yet

he often deletes his tweets despite a warning from NARA that such records destruction violates

the PRA. *Id.* ¶ 57.

President Trump also has ignored or flouted his statutory obligation under the PRA to

document his essential transactions and communications. *Id.* ¶ 58. The report of Special Counsel

Robert Mueller revealed President Trump's general antipathy toward note taking, describing an

incident where he chastised then-White House Counsel Don McGahn for taking notes,

proclaiming, "Lawyers don't take notes. I never had a lawyer who took notes[.]" Compl. ¶ 59.

With the approaching onset of a new presidency, much public attention has focused on

the likelihood that President Trump, or White House personnel acting at his behest, will destroy

records of his presidency before he leaves office, fearing the consequences to him and his legacy

should the records become public. *Id.* ¶ 61. His previous attempts to suppress unfavorable

evidence and his practice of requiring non-disclosure agreements from those who work for him

do not "bode[] well for the historical record and for the scheduled transfer of materials from the

White House to the National Archives, on January 20, 2021." *Id.* The President's actions since

losing the election—unrestrained by truth and facts—have heightened concerns that he will

destroy records of his "potential malfeasance and crimes." *Id.* ¶ 63.

In light of these concerns Plaintiffs National Security Archive and CREW separately requested that the White House provide assurances of its compliance with its recordkeeping obligations. Compl. ¶¶ 64-65. The White House has not responded to these requests. *Id.* ¶ 66.

Other White House officials have also shown a shocking disregard for their recordkeeping obligations under the PRA. *Id.* ¶ 67. Chief among them is Senior White House Advisor Jared Kushner, who routinely has used non-official, personal messaging accounts to communicate about some of the most pressing domestic and foreign policy issues facing our nation. *Id.* As reported in September 2017, Mr. Kushner "corresponded with other administration officials about White House matters through a private email account set up during the transition [in December 2016], part of a larger pattern of Trump administration aides using personal email accounts for government business." Compl. ¶ 68.

Following this reporting, the House Oversight and Government Reform Committee sent a letter on September 25, 2017, to White House Counsel McGahn requesting documents related to the use by the President's top advisors of private email accounts, non-governmental servers, and private domains to conduct official business. *Id.* ¶ 70. Separately, Ranking Member Elijah Cummings sent a document request to Mr. Kushner that same day, seeking, among other things, email addresses and accounts from which Mr. Kushner conducted official business. *Id.* ¶ 71. The request "explicitly directed Mr. Kushner to preserve his email records, including taking reasonable steps to prevent the 'relocation' of those email records." *Id.* Nevertheless, Mr. Kushner and his wife and Advisor to the President Ivanka Trump reportedly re-routed their personal email accounts to Trump Organization computers within one to two days of receiving the September 25, 2017 letters. Compl. ¶ 72.

In a December 2018 interview with then-House Oversight and Government Reform Chairman Gowdy and Ranking Member Cummings, Mr. Kushner's counsel "confirmed that Mr. Kushner has used—and continues to use—WhatsApp" [a non-official, unsecured electronic messaging application] to create or send Presidential records, including to communicate "with people outside the United States." *Id.* ¶ 73 (quoting Letter from Rep. Elijah E. Cummings to Pat A. Cipollone, Mar. 21, 2019, https://bit.ly/2J7Cfqy ("Mar. 2019 House Oversight Letter")). Mr. Kushner's lawyer further explained that Mr. Kushner preserves Presidential records created or sent from his WhatsApp account by "tak[ing] '*screenshots*' of these communications and forward[ing] them to his official White House email account or to the National Security Council." *Id.* ¶ 75 (emphasis added). Mr. Kushner's attorney also admitted that between January and August 2017, Mr. Kushner used his personal email account to send or receive official emails. *Id.* ¶ 76.

Public reporting provides further details about this use. In March 2019, *CNN* reported that Mr. Kushner "has used WhatsApp to communicate with Saudi Crown Prince Mohammed bin Salman. *Id.* ¶ 77. In September 2020, *Vanity Fair* reported that Mr. Kushner "[o]ften" uses WhatsApp to communicate with members of a shadow coronavirus task force he established that operates outside of federal transparency laws. *Id.* ¶ 78. And in October 2020, the *Wall Street Journal* reported that Mr. Kushner had established an "open line" of communication through WhatsApp to discuss policy matters with Facebook CEO Mark Zuckerberg. *Id.* ¶ 79.

## II.    The White House's Official "Screenshotting" Policy

Official White House policy authorizes staff to preserve Presidential records generated in a broad array of non-official electronic messaging accounts—namely, SMS text message accounts, instant messaging systems, social networks, and other non-email means of electronic

communication, including WhatsApp—merely by taking a "screenshot" of the record and forwarding the screenshot to an official White House account. *See* Compl. ¶¶ 82-87.

The White House has repeatedly confirmed the existence of this policy. For instance, in February 2017, the White House Counsel issued a memorandum purportedly to remind staff "of their obligation to preserve and maintain presidential records" under the PRA. White House Memorandum, Presidential Records Act Obligations, Feb. 22, 2017, https://bit.ly/3o06VbV ("Feb. 2017 Memo").[1] Pertinent here, the memo outlines two distinct preservation schemes for Presidential records generated in non-official electronic messaging accounts: one that applies to "email," and another that applies to "other forms of electronic communication," including "text messages, . . . instant messaging systems, social networks, or other [non-email] internet-based means of electronic communication." *Id.* at 2-3. For email, the memo instructs: "If you ever send or receive email that qualifies as a presidential record using any [non-official] account, you must preserve that email by copying it to your official EOP email account or by forwarding it to your official email account within twenty (20) days." *Id.* at 3. For *non-email* electronic messages, the memo instructs: "If you ever generate or receive presidential records on such platforms, you must preserve them by sending them to your EOP email account *via a screenshot* or other means." *Id.* (emphasis added).

In an October 2017 briefing with congressional staff, White House officials reiterated that they "advise[] employees that if texts occur involving official records on personal devices, individuals should *screenshot the text* and email it to their official account to be captured under [the] PRA." Compl. ¶ 85 (emphasis added). During the same briefing, White House officials

---

[1] Defendants claim the White House issued "substantively identical guidance" in 2019, Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss ("Ds' Mem.") at 1 n.1, but they have not provided a copy of the 2019 guidance or otherwise made it publicly available, so there is no way for Plaintiffs to verify the accuracy of this claim.

stated that "direct messages sent to official [White House] Twitter accounts are not automatically captured," and that "[t]hese direct messages to official Twitter accounts would have to be *screenshot* and forwarded by email than official account to be captured under PRA." *Id.* ¶ 86 (emphasis added). As noted above, counsel for Mr. Kushner has confirmed that he utilizes this screenshotting method to preserve Presidential records from his WhatsApp account. *Id.* ¶ 87.

A "screenshot" of an electronic message is not a complete copy of the original message because it does not capture the message's associated metadata, attachments, functionality (including text searchability), or other digital artifacts needed to authenticate the message. *Id.* ¶ 88; *see* Ds' Mem. at 19 (recognizing screenshots "may not include metadata or attachments"). Indeed, as NARA has acknowledged, "[s]creenshots only create[] a picture of content and do not preserve the metadata and functionality of the content, which does not comply with NARA's transfer guidance for permanent web content records." Compl. ¶¶ 54, 89 (quoting NARA, White Paper on Best Practices for the Capture of Social Media Records, May 2013, https://bit.ly/2V5Zm74). WhatsApp messages, in particular, include high-value metadata "showing which numbers contacted which over WhatsApp, when, and for how long, as well as the IP addresses and phone identifiers." *Id.* ¶ 90. A screenshot would not fully capture this metadata, if at all. *Id.*

The metadata, attachments, and functionality associated with an electronic message can be captured and preserved by accessing the original message from the application, service, or device in which it is stored. *Id.* ¶ 91; *see also id.* ¶¶ 47-50 (citing NARA Bulletin 2015-02, July 29, 2015) (identifying methods for capturing "complete" copies of electronic messages generated in various platforms, including instant messages, text messages, and messaging apps such as "WhatsApp," among others)). But the White House does not utilize any such preservation

10

methods with respect to Presidential records created via text message, instant messaging systems, social networks, and other non-email means of electronic communication. Compl. ¶ 91. It instead utilizes the screenshotting method described above.

By letters dated October 28, November 12, and November 20, 2020, CREW notified the White House Counsel, Mr. Kushner, and NARA that the White House's screenshotting policy does not comply with the PRA because it authorizes preserving incomplete copies of Presidential records. *Id.* ¶ 93. Neither the White House, nor Mr. Kushner, nor NARA has responded to CREW or otherwise addressed CREW's concerns. *Id.* ¶ 94.[2]

## STANDARD OF REVIEW

Defendants move to dismiss Counts I through VI of the Complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), and Count VII for failure to state a claim under Rule 12(b)(6). For both motions, the "court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff." *M.J. v. D.C.*, 401 F. Supp. 3d 1, 7 (D.D.C. 2019); *see also Reid v. Hurwitz*, 920 F.3d 828, 830 (D.C. Cir. 2019); *Hurd v. D.C.*, 864 F.3d 671, 678 (D.C. Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## ARGUMENT

I.  **Plaintiffs Plausibly Allege Claims for Declaratory and Mandamus Relief Challenging the Failure of Defendants Trump and EOP to Comply with the PRA's Mandatory Pre-Disposal Notice Requirements (Counts I and II).**

Counts I and II of the Complaint challenge the failure of the President and the EOP to comply with the mandatory pre-disposal notice requirements of the PRA, including obtaining the written views of the Archivist and transmitting a disposal schedule to Congress before destroying

---

[2] Since the filing of the Complaint, attorneys general from 15 states wrote a letter to White House Counsel Pat Cipollone on December 16, 2020, raising similar concerns. *See* https://on.ny.gov/3h2xJ9c.

any Presidential records. To remedy these violations, Plaintiffs seek declaratory and mandamus relief. *See* Compl. ¶¶ 96-103 (Count I), ¶¶ 104-114 (Count II).

In moving to dismiss Counts I and II, Defendants assert Plaintiffs have failed to sufficiently demonstrate their entitlement to mandamus relief, and that the PRA, as construed in *Armstrong I*, "impliedly precludes" mandamus jurisdiction over the claims. *See* Ds' Mem. at 10-14, 21-26. Defendants are wrong on both counts.

### A.      Counts I and II Plausibly Allege Each Element of Mandamus Relief.

To state a claim for mandamus relief under 28 U.S.C. § 1361, Plaintiffs must plausibly allege "(1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016).[3] For a duty to be "clear" and enforceable through mandamus, it must "admit[] of no discretion, so that the official in question has no authority to determine whether to perform the duty." *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996). But "[t]his does not mean that mandamus actions are ruled out whenever the statute allegedly creating the duty is ambiguous." *Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020). "Instead, the court must interpret the statute and if, 'once interpreted,' the statute 'creates a peremptory obligation for the officer to act, a mandamus action will lie.'" *Id.* "At the motion-to-dismiss stage," the court need only determine that the "[the facts alleged] plausibly give rise to an entitlement to [mandamus] relief." *CREW v. Trump*, 924 F.3d at 606 (quoting *Iqbal*, 556 U.S. at 679) (first alteration in original).

Defendants dispute only the first two mandamus elements: "clear right to relief and clear duty to act." *Lovitky*, 949 F.3d at 760; *see* Ds' Mem. at 22. Considering these two elements

---

[3] As discussed *infra* Part IV, a valid mandamus claim also provides grounds for declaratory relief. *See Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974).

"concurrently, as [the Circuit] often does," Counts I and II "plausibly allege" that the PRA,

"once interpreted, impose[s] clear and indisputable dut[ies]" that Defendants Trump and EOP

have violated. *Lovitky*, 949 F.3d at 760.[4]

As another judge of this court has held, "the PRA creates ministerial obligations for the

President" that "may form the basis for [a] mandamus claim." *CREW v. Cheney*, 593 F. Supp. 2d

194, 218, 220 (D.D.C. 2009). Plaintiffs' claims here rest, in part, on the ministerial duty to

comply with the PRA's notification procedures that the PRA imposes on the President in clear,

mandatory terms. Specifically, the statute dictates that the President may destroy any of his

Presidential records only after affirmatively determining they no longer have administrative,

historical or evidentiary value, and only after securing the written views of the Archivist of the

United States and in some cases advising Congress. 44 U.S.C. §§ 2203(c), (d). These provisions

leave the President no discretion to ignore this duty. *See United States v. Monsanto*, 491 U.S.

600, 607 (1989).

Defendants nonetheless insist that the PRA affords the President "'virtually complete

control'" over all of his records creation, management, and disposal decisions. Ds' Mem. at 24

(quoting *Armstrong I*, 924 F.2d at 290). The "complete control" the *Armstrong I* court

referenced, however, was to the disposition of particular documents that the President proposed

to destroy while in office. As explained in further detail below, enforcing the notification

requirements in no way hinders the President's ability to exercise his right to make a disposition

---

[4] Defendants do not dispute that Plaintiffs have adequately alleged the third mandamus element—lack of an
adequate alternative remedy. *See* Compl. ¶¶ 93-94, 132, 134 (alleging this element); Ds' Mem. at 22 (disputing only
the "first" and "second requirement[s]" of mandamus relief). Nor can there be any doubt that there are "compelling
equitable grounds" warranting mandamus relief, *Lovitky*, 949 F.3d at 759, given the compelling need to preserve
complete versions of historically valuable Presidential records, and the records from this administration in particular.
*See* Compl. ¶¶ 1-4; 8-22; Declaration of Thomas S. Blanton ¶¶ 6-15, ECF No. 9-2; *see also* Letter from Nine House
Committee Chairs to Pat Cipollone, Nov. 10, 2020, https://bit.ly/36e8YmC (raising similar concerns); Letter from
Fifteen State Attorneys General to Pat Cipollone, Dec. 16, 2020, https://on.ny.gov/3h2xJ9c (same).

decision as neither Congress nor the Archivist have the ability to veto any of his disposition decision. *See infra* Part I.B.2.

Moreover, the language and the structure of the PRA make manifest that the President has a duty to provide the required notice. The statute states that the President **"**may dispose of" records after first determining that they "no longer have administrative, historical, informational, or evidentiary value[.]" 44 U.S.C. § 2203(c). Toward that end, the President must "obtain[] the views, in writing, of the Archivist concerning the proposed disposal." *Id.* § 2203(c)(1). Not only must the Archivist's view be "in writing," but the Archivist must explicitly state that "the Archivist does not intend to take any action under [the PRA]." 44 U.S.C. § 2203(c)(1)-(2). The language of this provision affords the President no discretion to determine whether to comply with these requirements.

This litigation also presents exceptional circumstances warranting mandamus relief—a President at the end of his term in office and White House staff threatening the irrevocable loss of records of incalculable historical value. Because the President is beyond the reach of the Administrative Procedure Act, *Armstrong I*, 924 F.2d at 288, no other cause of action is available. The overwhelming public interest must therefore guide this Court's "discretion to issue a writ of mandamus[.]" *Nat'l Wildlife Fed'n v. United States*, 626 F.2d 917, 924 (D.C. Cir. 1980).

## B.   The PRA Does Not Impliedly Preclude Mandamus Jurisdiction Over Counts I and II.

Defendants rely primarily on their characterization of *Armstrong I* as "impliedly" stripping this Court of mandamus jurisdiction over Counts I and II. *See* Ds' Mem. at 10-13. This argument fails for two independent reasons.

1.    *Armstrong I* **Did Not Address Mandamus Claims, and Other D.C. Circuit Precedent Makes Clear That Statutes Cannot Strip Courts of Mandamus Jurisdiction Unless They Do So Expressly.**

Most fundamentally, *Armstrong I* is inapposite here because it "solely involved *APA* claims and thus did not squarely present the question of whether the PRA precludes *mandamus* claims as well." *CREW v. Trump*, 302 F. Supp. 3d 127, 133-34 (D.D.C. 2018) (citing *Armstrong I*, 924 F.2d at 297). Raising this point *sua sponte* in *CREW v. Trump*, Judge Cooper discussed at length the "reasons to think that implied preclusion of APA review might not by itself prevent mandamus review," including that the D.C. Circuit "has permitted mandamus review even when the relevant statute *expressly* stripped all other bases of jurisdiction." *Id.* at 134 & n.2 (citing *Ganem*, 746 F.2d at 850, and *In re al–Nashiri*, 791 F.3d at 77) (emphasis added). Judge Cooper thus concluded it was "not as clearly established as the government suggests that *Armstrong I* prevents mandamus review in addition to review under the APA." *Id.* at 135. Ultimately, he did not resolve this question because he held that, even assuming *Armstrong I* did not bar review, the plaintiffs did not state a valid mandamus claim. *Id.* at 135. The issue was not briefed in either the district court or on appeal, nor did the Circuit address it in affirming Judge Cooper's decision. *See CREW v. Trump*, 924 F.3d at 606-10; *see also Cooper Indus. v. Aviall Servs.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.").

A close review of the precedent cited by Judge Cooper readily confirms his observations. In *Ganem*, the Circuit held that a broad preclusion-of-review statute providing that "[n]o action against the United States, the Board, or any officer or employee thereof shall be brought under [the statutory grants of jurisdiction to the district courts] to recover on any claim arising under

this title" did *not* preclude mandamus jurisdiction under 28 U.S.C. § 1361, because it did not

"expressly" address mandamus actions. *See* 746 F.2d at 850-52. Years later in *In re al-Nashiri*,

the Circuit invoked *Ganem* for the general principle that "when Congress desire[s] to prohibit

actions in the nature of mandamus . . . . , it d[oes] so expressly." 791 F.3d at 77 (quoting *Ganem,*

746 F.2d at 851) (alterations in original). Applying this "clear-statement rule" in *In re al-Nashiri*,

the Circuit held that the statute at issue did not strip courts of mandamus jurisdiction because it

"'ma[de] no mention of 'mandamus'—an important omission under our case law." *Id.* at 77.[5]

Under the law of this Circuit, then, a statute can "strip[] the district court's mandamus

power" only if it does so "expressly," meaning there is no such thing as *implied* preclusion of

mandamus jurisdiction. *Id.* Yet that is precisely Defendants' argument here—that the PRA, as

construed in *Armstrong I*, "impliedly preclude[s]" jurisdiction over Plaintiffs' mandamus claims.

Ds' Mem. at 11, 20.

As Judge Cooper observed in *CREW v. Trump*, *Armstrong I* did not address mandamus

claims; it held only that the PRA "impliedly precludes" *APA* review. *See Armstrong I*, 924 F.2d

at 288-90 & n.5. In so holding, the *Armstrong I* court invoked an APA provision precluding APA

review where a separate "statute[] preclude[s] judicial review." *See id.* (citing 5 U.S.C. §

701(a)(1)). The court also applied the standard set forth by the Supreme Court in *Block v.

Community Nutrition Institute*, which governs implied preclusion under Section 701(a)(1) of the

APA. *See* 467 U.S. 340, 345 (1984).

*Armstrong I*'s analysis is wholly inapposite in the mandamus context, where Section

701(a)(1) does not apply and implied preclusion is not possible under D.C. Circuit precedent.

---

[5] Although *In re al-Nashiri* concerned a mandamus claim under the All Writs Act, 28 U.S.C. § 1651, the above-quoted language applies equally to mandamus jurisdiction under 28 U.S.C. § 1361. The court's extensive reliance on *Ganem*—a Section 1361 case—confirms as much.

And as *Armstrong I* recognized, "the PRA contains no provision expressly precluding judicial review," 924 F.2d at 290, let alone any provision expressly precluding *mandamus* jurisdiction. Such "statutory silence does not equate to [the] clear statement" needed to strip courts of mandamus jurisdiction. *In re al-Nashiri*, 791 F.3d at 77. Indeed, if the broad preclusion-of-review statute at issue in *Ganem* did not suffice to divest courts of mandamus jurisdiction, then surely the PRA, which includes *no* express preclusion provision, does not do so either. *See also CREW v. Trump*, 302 F. Supp. 3d at 134 (noting that "courts should take a cautious approach to foreclosing mandamus review given the backstop nature of mandamus relief," and deeming it "somewhat counterintuitive to conclude that a statute like the PRA (1) impliedly forecloses APA review, (2) thereby creating a need for mandamus review, and yet (3) impliedly forecloses that review as well.").

Defendants are therefore flatly incorrect when they say "[n]early three decades of D.C. Circuit precedent preclude[s]" Plaintiffs' *mandamus* claims. Ds' Mem. at 1. To the contrary, well over three decades of precedent, starting with *Ganem* and continuing through *In re al-Nashiri*, confirms that statutes such as the PRA do *not* strip courts of mandamus jurisdiction.[6]

### 2.    Even if *Armstrong I* Applied to Mandamus Claims, It Would Not Preclude Review of Counts I and II.

Even if the PRA did impliedly strip courts of mandamus jurisdiction as to some PRA violations, the scope of that preclusion would not extend to Counts I and II.

---

[6] For similar reasons, the Court should reject Defendants' derivative argument that the status of *Armstrong I* as longstanding precedent forecloses any "clear and indisputable" right to mandamus relief here. *See* Ds' Mem. at 22-23. As noted, neither *Armstrong I* nor any other case specifically addresses whether the PRA impliedly strips courts of mandamus jurisdiction, and other Circuit precedent squarely forecloses that conclusion. Even weaker is Defendants' claim that *Armstrong I* bars mandamus claims alleging violations of Section 2209, a uniquely specific PRA provision enacted over 20 years after *Armstrong I* was decided. *See infra* Part II.B.2.

Defendants' arguments against judicial review of Counts I and II rest on their assertion that the President and EOP can ignore the PRA's requirements with impunity because to conclude otherwise would upset "'the intricate statutory scheme Congress carefully drafted to keep in equipoise important competing political and constitutional concerns.'" Ds' Mem. at 11 (quoting *Armstrong I*, 924 F.3d at 290). But Defendants overstate the reach of *Armstrong I* and its preclusion of judicial review, and ignore its foundational principle that judicial review is precluded only where it would otherwise interfere with "the day-to-day operations of the President and his closest advisors[.]" *Id.*

The Court in *Armstrong I* began with the principle that judicial review of administrative action ordinarily is presumed, but concluded that as set forth in the case before it, "the PRA is one of the rare statutes that does impliedly preclude judicial review." 924 F.2d at 290. It reached this conclusion after examining the statute's language, its structure, "'its objectives, its legislative history, and the nature of the administrative action involved.'" *Id.* (citing *Block*, 467 U.S. at 345). Applying that same analysis here points to the availability of judicial review of Plaintiffs' claim that the President and EOP have not complied with the PRA's pre-disposal notice requirements.

The PRA in clear, nondiscretionary terms dictates that the President may destroy any of his Presidential records only after affirmatively determining they no longer have administrative, historical or evidentiary value, and only after securing the written views of the Archivist of the United States and in some cases advising Congress, 44 U.S.C. §§ 2203(c), (d). But it gives neither the Archivist nor Congress "the authority to veto the President's disposal decision." *Armstrong I*, 924 F.2d at 290 (citation omitted). The legislative history reinforces this fact. *See* H.R. Rep. No. 95-1187 at 13 (1978) ("The Congress is not given a veto over the disposal

schedule filed by the President."). Even with the mandated notice, the President retains control

over his records and remains free to accomplish his "constitutionally assigned functions," which

the Supreme Court in *Youngstown Sheet & Tube Co. v. Sawyer* defined vis-à-vis an act of

Congress (here the PRA) as limited to the President's "functions in the lawmaking process to the

recommending of laws he thinks wise and the vetoing of laws he thinks bad . . . the Constitution

is neither silent nor equivocal about who shall make laws which the President is to execute."

343 U.S. 579, 587-88 (1952).

On the other hand, allowing the President to ignore the notification requirements free

from any judicially imposed consequences would undermine a provision Congress included in

the PRA to protect its own prerogatives. As the legislative history explains, the records schedule

the Act requires the President to file with Congress for any proposed destruction

> is solely for notification though the Congress would have its traditional means
> of voicing objection to particulars in the proposal directly to the President, or
> ultimately by passing legislation to block the destruction of certain records.

H. R. Rep. No. 95-1187 at 13 (1978). Similarly, while the PRA does not afford the Archivist any

ability to prevent the President from disposing of any of his Presidential records, it also

recognizes the valuable role the Archivist can play "to properly comment on their [the records

the President proposes to destroy] value." *Id.* Just as importantly, that role is assigned to an entity

within the executive branch ensuring, as in *Nixon*, "executive branch control over presidential

records during the President's term in office." *Armstrong I*, 924 F.2d at 290.

Thus, the PRA's notice provisions protect and advance congressional interests,

preserving Congress' ability to act in the face of a proposed document destruction to which it

objects outside of any judicial process. They also carve out an important role for the Archivist,

ensuring that before a President disposes of Presidential records that President has the benefit of

19

the Archivist's expertise, especially on the long-term value to history of any particular document. At the same time, because they leave the President free to dispose of any of his records, judicial review of these notice provisions would cause no harm to the balance Congress struck between the President's right to control his records while in office and the public's right to own and access those records once a President's term expires. *See id.* at 291. *See also CREW v. Cheney*, 593 F. Supp. 2d at 215 (noting that *Armstrong v. Exec. Office of the President*, 1 F.3d 1274 (D.C. Cir. 1993) ("*Armstrong II*") suggests "the executive suffers no undue interference where a court's inquiry does not call into question the President's 'day-to-day operations'").

Indeed, Congress enacted the PRA with the constitutional considerations in mind that the Supreme Court applied to the predecessor statute, the Presidential Recordings and Materials Preservation Act of 1974 ("PRMPA") in *Nixon v. Administrator*, 433 U.S. 425 (1977). *See Hearings Before a Subcomm. of the Comm. on Gov't Operations on H.R. 10998 and Related Bills*, 95th Cong., 2nd Sess., 89 (1978) (recognizing that under *Nixon v. Administrator* "it is within the appropriate ambit of Congress' power to legislate with respect to the preservation of historically valuable papers of the Chief Executive" (Statement of Lawrence A. Hammond, Deputy Atty' Gen., Office of Legal Counsel)). In that case the Court adopted a "pragmatic, flexible approach" to separation of powers concerns, explaining that "in determining whether the [PRMPA] disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions." 433 U.S. at 443 (citing *United States v. Nixon*, 418 U.S. 683, 711-12 (1974)). Judicial review of the notice requirements at issue here would cause no

interference with the President's ability to carry out his "constitutionally assigned functions," and Defendants have not demonstrated otherwise.[7]

To be sure, the D.C. Circuit used broad sweeping language when it concluded in *Armstrong I* that "to keep in equipoise important competing political and constitutional concerns," the PRA "impliedly preclude[s] judicial review." 924 F.2d at 290. But it reached that conclusion in a case challenging only the proposed destruction of a specific set of documents where judicial review would interfere directly with the President's management of his records. Moreover, as the Circuit subsequently explained in *Armstrong II*, "[t]he *Armstrong I* opinion does not stand for the unequivocal proposition that all decisions made pursuant to the PRA are immune from judicial review." 1 F.3d at 1293. To the contrary, cases like this one where Plaintiffs do not seek to "overrule" any of the President's records decisions, *id.*, but seek instead to give meaning to provisions that enhance and protect the rights of Congress and the public, are properly subject to judicial review because they raise no "competing political and constitutional concerns." *Armstrong I,* 924 F.2d at 290. Moreover, to deny judicial review here by failing "'to give effect, if possible, to every clause and word of a statute' . . . rather than to emasculate an entire section," *United States v. Menasche*, 348 U.S. 528, 538-29 (1955) (quoting *Montclair v. Ramsdell*, 107 U.S. 147 (1883)), would infringe on this Court's "constitutional duty of requiring the executive branch to remain within the limits stated by the legislative branch." *Nat'l Treasury Emps. Union*, 492 F.2d at 604; *accord Cohens v. Virginia*, 19 U.S. 264, 404 (1821) (court "must take jurisdiction if it should").

---

[7] While Defendants suggest repeatedly that constitutional concerns require this Court to dismiss the Complaint, they have not identified a single way in which the President would be unable to carry out his constitutional functions should the Court agree with Plaintiffs that he must satisfy the PRA's notice requirements.

In short, extending the *Armstrong I* court's sweeping pronouncement about the extent to which the PRA precludes judicial review to the PRA's notice provisions would conflict with the statutory scheme, its objectives, and its legislative history—factors that under *Block*, 467 U.S. at 345, compel the conclusion that the PRA does not preclude judicial review of claims challenging the President's failure to comply with the pre-destruction notice requirements.

In arguing to the contrary, Defendants rely on *CREW v. Trump*, 924 F.3d at 609, which they falsely characterize as rejecting a challenge similar to that raised here. Ds' Mem. at 13-14. To the contrary, that case involved what the court characterized as a failure to comply with a White House directive requiring personnel "to conduct all work-related communication on official email[.]" 924 F.3d at 609. As to the scope of judicial review precluded by *Armstrong I* and *II*, the Court expressly declined to "resolve that debate[.]" *Id.* Thus Defendants are simply wrong in their claim that the D.C. Circuit has rejected claims similar to those Plaintiffs bring here.

## II.    Plaintiffs Plausibly Allege Claims for Declaratory and Mandamus Relief Challenging the White House's Official Screenshotting Policy as Contrary to the PRA (Counts III and IV).

### A.    Counts III and IV Plausibly Allege Each Element of Mandamus Relief.

Counts III and IV challenge the White House's official screenshotting policy as contrary to law because it authorizes staff to preserve incomplete copies of Presidential records in violation of Defendants' mandatory statutory duties under the PRA. *See* Compl. ¶¶ 115-123 (Count III) (declaratory relief), ¶¶ 124-136 (Count IV) (mandamus relief). These claims "plausibly allege" that the PRA, "once interpreted, impose[s] clear and indisputable dut[ies]" that Defendants Trump and EOP have violated by adopting and implementing the challenged policy. *Lovitky*, 949 F.3d at 760.

**1.**  At issue are two interrelated PRA provisions. The first provides that, "[t]hrough the implementation of records management controls . . . , the President shall take all such steps as may be necessary to assure that . . . [Presidential] records are preserved . . . as Presidential records pursuant to the requirements of this section and other provisions of law." 44 U.S.C. § 2203(a). The second mandates that when specified White House officials "create or send a Presidential . . . record using a non-official electronic message account," they must either "(1) cop[y] an official electronic messaging account. . . in the original creation or transmission of the Presidential record," or "(2) forward[] a complete copy of the Presidential . . . record to an official electronic messaging account . . . not later than 20 days after the original creation or transmission of the Presidential . . . record." 44 U.S.C. § 2209(a)(1)-(2).

Construed together, Sections 2203(a) and 2209(a) "create[] . . . peremptory obligation[s] for the officer to act." *Lovitky*, 949 F.3d at 760. Section 2203(a) "uses the typically mandatory 'shall,'" *Am. Hosp. Ass'n*, 812 F.3d at 190, in describing the President's obligation to implement "records management controls . . . to assure that . . . [Presidential] records are preserved . . . *pursuant to the requirements of this section and other provisions of law.*" 44 U.S.C. § 2203(a) (emphasis added). Whatever discretion the President has over other types of PRA matters, Section 2203(a) at a minimum forbids him from adopting an official policy—or a "records management control[]"—that facially conflicts with non-discretionary "requirement[s]" set forth elsewhere in the PRA. *See CREW v. Cheney*, 593 F. Supp. 2d at 220 (holding that Section 2203(a) imposes a "ministerial obligation to preserve Vice-Presidential Records" as that term is separately defined in § 2201 of the PRA).[8]

---

[8] The PRA provides that Vice-Presidential records are subject to the same PRA provisions as Presidential records, and that the Vice President has the same duties with respect to his records that the President has as to Presidential records. *See* 44 U.S.C. § 2207.

The particular PRA "requirement" at issue here is set forth in Section 2209(a), a relatively new provision added by the 2014 Amendments. This provision plainly has the level of specificity needed to support mandamus relief. In unequivocal terms, it directs a particular group of officials ("the President, the Vice President, or a covered [White House] employee") to preserve a particular subset of Presidential records (those "create[d] or sen[t] . . . using a non-official electronic message account") in one of two manners, within a specified time period (either by "cop[ying]" an official account "in the original creation or transmission of the" record, or by "forward[ing] a complete copy" of the record to an official account "not later than 20 days after [its] original creation or transmission"). And pertinent to Plaintiffs' claims here, Section 2209(a)(2) leaves no room for judgment: White House officials must forward a "complete copy" of any Presidential record created or sent from a non-official electronic messaging account within 20 days, without exception. This duty plainly "admits of no discretion, so that the official in question has no authority to determine whether to perform the duty." *Swan*, 100 F.3d at 977. The Circuit has deemed similarly explicit statutory directives to be enforceable through mandamus. *See, e.g.*, *N. States Power Co. v. U.S. Dep't of Energy*, 128 F.3d 754, 755, 758 (D.C. Cir. 1997) (statute providing that agency "'shall begin' disposing'" of nuclear waste by January 31, 1998 created an "unconditional obligation" to act that "could hardly be more clear"); *Am. Hosp. Ass'n*, 812 F.3d at 190-92 (statute requiring agency to conduct a hearing and render a decision within 90 days "impose[d] a clear duty").

It is equally clear and indisputable that the term "complete copy," as used in Section 2209(a), refers to the entirety of an electronic message, including its associated metadata, attachments, and functionality. *See 13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980) (whether a duty is "clearly defined" for mandamus purposes is a "question of

statutory interpretation" for the court); *Lovitky*, 949 F.3d at 760 (same). Starting with the plain meaning of the statutory text, "complete" means "total," "absolute" or "having all necessary parts, elements, or steps." Merriam-Webster Dictionary, Definition of "Complete" (adj.), https://bit.ly/3pm0VLd. And "copy" means a "reproduction of an original work" or a "duplicate." Merriam-Webster Dictionary, Definition of "Copy" (noun), https://bit.ly/3nNTVGt. To be a "complete copy" of an electronic message, then, a record must be a "total" "duplicate" or "reproduction" of the original message "having all necessary parts" or "elements"—*i.e.*, it must include the message's metadata, attachments, and functionality.

NARA guidance implementing the 2014 Amendments confirms that a "complete" version of an electronic message includes its metadata, attachments, and functionality. *See* NARA Bulletin 2015-02, July 29, 2015; NARA Bulletin 2015-04, Sept. 15, 2015. NARA guidance further confirms that the term "electronic records," as used in the 2014 Amendments, broadly applies to "text messaging, chat/instant messaging, messaging functionality in social media tools or applications, voice messaging, and similar forms of electronic messaging systems." NARA Bulletin 2015-02, July 29, 2015; *see* Compl. ¶¶ 47-54.

Nor is there any dispute that, as a factual matter, a "screenshot" of an electronic message fails to capture its associated metadata, attachments, or functionality. *See* Compl. ¶ 88. Defendants appear to concede that point. Ds' Mem. at 19 (recognizing screenshots "may not include metadata or attachments"). And NARA has long acknowledged that "[s]creenshots only create[] a picture of content and do not preserve the metadata and functionality of the content, which does not comply with NARA's transfer guidance for permanent web content records." Compl. ¶ 89 (quoting NARA, White Paper on Best Practices for the Capture of Social Media

Records, May 2013). The clear and indisputable conclusion is that a screenshot is in no way a "complete copy" of an electronic record within the meaning of Section 2209(a).

Although it long predated the 2014 Amendments, the D.C. Circuit's decision in *Armstrong II* reinforces the concept that a screenshot is not a complete copy of an electronic record. There, certain White House components that generated records covered by the FRA insisted that they "reasonably discharged their FRA obligations by instructing employees to print out a paper version of any electronic communication that falls within the statutory definition of a 'record' and by managing the 'hard-copy' documents so produced in accordance with the Act." *Armstrong II*, 1 F.3d at 1277. The Circuit squarely rejected this argument, explaining that "the government's basic position [was] flawed because the hard-copy print-outs that the agencies preserve"—precisely like the screenshots at issue here—"may omit fundamental pieces of information which are an integral part of the original electronic records, such as the identity of the sender and/or recipient and the time of receipt." *Id.*

The legislative history also strongly supports Plaintiffs' reading of Section 2209(a). A Senate report explains that the provision was intended to "clarif[y] that a President, Vice President or their staff should ensure that *all* Presidential records, even those sent from a personal electronic messaging account, are properly preserved and maintained in an official electronic messaging account." S. Rep. 113-218, 113th Cong., 2d Sess., at 6 (2014) (emphasis added); *see also id.* at 4. And a House report affirms that Congress wanted White House officials to broadly preserve all aspects of electronic Presidential records, not just the fragments captured by screenshots. The report explains that the "PRA and the FRA have become increasingly antiquated, particularly in regard to electronic information." H. Rep. 113-127, 113th Cong., 1st Sess., at 5 (2013). "Despite the rapid migration over the last several decades toward electronic

26

communication and recordkeeping, federal recordkeeping laws are still focused on the media in which a record is preserved, not the information that constitutes the record itself." *Id.* "To correct this flaw," the report explains that Congress was amending the PRA and FRA to "shift the onus of recordkeeping onto the record and not the media it is contained in as a way to better enable NARA . . . to handle growing amounts of electronic communication." *Id.*

Thus, the statutory text, NARA guidance, case law, and legislative history all point to the conclusion that Section 2209(a)'s "complete copy" requirement is a clear and unequivocal command enforceable through mandamus, and that a screenshot of an electronic record is not a "complete copy" within the meaning of Section 2209(a).

**2.**   Plaintiffs also plausibly allege that Defendants Trump and EOP have violated their non-discretionary duties by adopting an official records preservation policy that, on its face, contravenes Section 2209(a)'s "complete copy" directive.

The Complaint pleads, with ample factual support, that the White House has adopted and implemented a policy authorizing staff to preserve Presidential records created via specified non-official electronic messaging accounts—namely, text message, instant messaging systems, social networks, and other non-email means of electronic communication, including WhatsApp—merely by taking a screenshot of the record and forwarding it to an official White House account. *See* Compl. ¶¶ 82-87. To support this claim, Plaintiffs cite a February 2017 White House Counsel memorandum to staff, an October 2017 memorandum by congressional staff summarizing a meeting with the White House Counsel, and a March 2019 letter summarizing a meeting where Defendant Kushner's attorney confirmed to Congress that Mr. Kushner utilizes the White House's screenshotting method to preserve Presidential records from his non-official WhatsApp account. *See id*. While Defendants focus solely on the February 2017 memo, *see* Ds'

Mem. at 14-16, the other sources cited in the Complaint enhance the plausibility of Plaintiffs' allegations. *See CREW v. Cheney*, 593 F. Supp. 2d at 201-02, 217 (deeming various actions and directives by White House officials pertinent to challenged PRA policy).

Accepting these well-pleaded allegations as true, the White House's screenshotting policy defies Section 2209(a)'s plain language, Congress's stated intent to require preservation of all "information that constitutes the [electronic] record itself," NARA guidance implementing the 2014 Amendments, and the principles espoused in *Armstrong II* regarding the capture of electronic records. Plaintiffs have therefore plausibly alleged that Defendants Trump and EOP, by adopting and implementing the facially unlawful policy, are violating their non-discretionary duties under the PRA.

**3.** Defendants' contrary arguments are unavailing. Tellingly, they never dispute Plaintiffs' central premise that a screenshot is not a "complete copy" within the meaning of Section 2209(a), and effectively concede as much. *See* Ds' Mem. at 19. The few defenses of the screenshotting policy they offer all fall flat.

First, Defendants repeatedly quote out-of-context snippets from *CREW v. Trump*, Ds' Mem. at 1, 14, 17, where the Circuit held that the White House's February 2017 memo was "facially . . . compliant" with "the three PRA obligations *at issue in [that] case*." 924 F.3d at 607-08 (emphasis added). But the three PRA provisions "at issue" in *CREW v. Trump* did not include Section 2209(a), nor did the Plaintiffs there assert any claim challenging the White House's screenshotting policy. *See id.* That case thus has no effect on Plaintiffs' claims here. *See Cooper Indus.*, 543 U.S. at 170 (questions "neither brought to the attention of the court nor ruled upon[] are not to be considered as having been so decided as to constitute precedents").[9]

---

[9] Nor would it have been feasible for the plaintiffs in *CREW v. Trump* to assert such a claim. The White House did not disclose the February 2017 memo until well after the litigation commenced, when Defendants filed their reply

Defendants next insist that the screenshotting policy is facially "[c]onsistent with the PRA" because the February 2017 memo "first calls for electronic forwarding" and "[o]nly after that, when discussing various other [non-email] platforms such as social networks and instant messaging where copying to email or electronic forwarding may not have been available, . . . indicate[s] that presidential records may be preserved 'via screenshot or other means.'" Ds' Mem. at 15-16. The memo is more accurately characterized as outlining two distinct preservation schemes for Presidential records generated in non-official electronic messaging accounts: one for "email," and another for all "other forms of electronic communication" including "text messages," "instant messaging systems, [and] social networks." Feb. 2017 Memo at 2-3. For the latter category, the memo expressly authorizes screenshotting as a preservation method, *id.* at 3, which is what Plaintiffs challenge.

Defendants nonetheless claim screenshotting is an appropriate preservation method for this broad category of non-email electronic communications because "electronic forwarding may not . . . [be] available" for those records. But, even assuming the factual accuracy of this premise, it effectively rewrites the statute to only require preservation of "complete copies" of Presidential records when "electronic forwarding" is available, and to permit preservation of *incomplete* copies (*i.e.*, screenshots) when such forwarding is not available. That is not what Section 2209(a) says. The statute unequivocally requires Defendants to preserve "complete copies" of electronic records generated in non-official accounts, which a screenshot indisputably is not. If anything, Defendants' characterization of the White House's policy—together with their implicit

---

brief in support of their motion to dismiss. *See* Ds' Reply at 9, *CREW v. Trump*, 17-cv-1228, ECF No. 19 (D.D.C., filed Nov. 21, 2017).

concession that a screenshot is not a "complete copy"—confirm that the policy defies the PRA's clear requirements.

In addition to rewriting the statute, Defendants' argument rewrites the February 2017 memo. Nowhere does the memo make the "capable of electronic forwarding" distinction Defendants seek to advance now. Instead, it indiscriminately authorizes screenshotting as a preservation method for a wide variety of non-email electronic communications from non-official messaging accounts, without calling for any inquiry as to whether electronic forwarding is possible. *See* Feb. 2017 Memo at 2-3. On its face, then, the memo authorizes screenshotting as a preservation method for non-email electronic communications even where electronic forwarding *may be* available.[10]

Defendants' argument also prematurely raises factual issues regarding the technological feasibility of preserving complete copies of Presidential records from certain types of electronic messaging accounts. With no evidentiary support, Defendants suggest it may not be possible to preserve complete copies of messages generated via "social networks and instant messaging" accounts, and that a screenshot may be the best, or only, method of preservation. *See* Ds' Mem. at 15-16 & n.5. These bald assertions simply dispute Plaintiffs' factual allegations, which must be accepted as true at the pleading stage. *See* Compl. ¶ 91 (alleging that there are means of preserving "[m]etadata, attachments, and functionality associated with" the types of electronic messages at issue here, including methods that involve "accessing the original message from the application, service, or device in which it is stored"); *id.* ¶¶ 47-50 (citing NARA Bulletin 2015-

---

[10] Defendants' characterization of the screenshotting policy also dramatically minimizes its impact. In keeping with the policy's facially-broad scope, the Complaint alleges that senior officials have routinely utilized the deficient screenshotting method to preserve highly valuable Presidential records generated during the Trump Administration, including Defendant Kushner's WhatsApp messages with foreign officials, his shadow coronavirus task force, and Facebook CEO Mark Zuckerberg, among others. *See* Compl. ¶¶ 73-79.

02, July 29, 2015) (identifying various methods for capturing complete copies of the types of electronic messages at issue here)). At any rate, Defendants' assertions are immaterial because Plaintiffs have no burden to demonstrate the ease or feasibility of complying with Section 2209(a)'s "complete copy" directive; for present purposes, all that matters is that White House's policy facially contravenes the statute.[11]

As a fallback, Defendants insist that the February 2017 memo complies with the PRA because it generally "calls for the preservation of presidential records regardless of platform." Ds' Mem. at 16 n.5. But insofar as the memo relays any such general directive, it is plainly superseded by the memo's more specific, unlawful authorization to preserve certain electronic records by screenshot.

Defendants also incorrectly argue that Plaintiffs have not alleged that Defendants are "defying the law." Ds' Mem. at 23. But that is precisely what Counts III and IV allege: that the White House has adopted an official policy that facially defies Section 2209(a)'s "complete copy" directive. As noted, Defendants' brief largely confirms this point.[12]

**B.    The PRA Does Not Impliedly Preclude Mandamus Jurisdiction Over Counts III and IV.**

As with Counts I and II, Defendants' primary argument is that the PRA "impliedly precludes" mandamus jurisdiction as to Counts III and IV. *See* Ds' Mem. at 14-16. Defendants are wrong for four independent reasons.

---

[11] While Plaintiffs have no such burden, they will be prepared, at the appropriate stage of this case, to offer competent evidence demonstrating that it is in fact technologically feasible to preserve complete copies of the Presidential records at issue here in compliance with Section 2209(a).

[12] Defendants further argue in a footnote that Plaintiffs cannot obtain mandamus relief because the duties at issue are not "owed to Plaintiffs" but rather are owed to "the public at large." Ds' Mem. at 25 n.8. Defendants do not cite a single case where a court denied mandamus relief on this ground. In any event, Plaintiffs have amply alleged their standing to bring this suit, *see* Compl. ¶¶ 8-22, which Defendants do not challenge. Nor can there be any doubt that as "researchers and historians who make extensive use of government documents" Plaintiffs "are within the zone of interests of the records creation and management provisions of the PRA." *Armstrong I*, 924 F.2d at 288.

1.      *Armstrong I* Does Not Support Implied Preclusion of Mandamus
        Jurisdiction.

As explained *supra* Part I.B.1, *Armstrong I* did not address implied preclusion of

mandamus claims, and, under the law of this Circuit, a statute cannot impliedly strip a court of

mandamus jurisdiction; it must do so expressly. Thus, *Armstrong I* does not and cannot support

implied preclusion of Counts III and IV.

2.      *Armstrong I* Does Not Apply to Alleged Violations of the
        Subsequently-Enacted 2014 PRA Amendments.

Even if *Armstrong I* could be read to hold that the PRA impliedly strips courts of

mandamus jurisdiction, the scope of that preclusion would not extend to Plaintiffs' claims

asserting violations of Section 2209(a) of the PRA. That is because Congress added Section 2209

via the 2014 Amendments, enacted over 20 year after *Armstrong I* was decided. Since Section

2209's enactment, no court has held that the requirements it imposes are unenforceable through

mandamus or otherwise shielded from judicial review.

Indeed, the rationale of *Armstrong I* supports the opposite conclusion. The holding in

*Armstrong I* that the PRA impliedly precludes APA review was based on the statute's then-

existing "express language" as well as "the structure of the statutory scheme, its objectives, its

legislative history, and the nature of the administrative action involved." *Armstrong I*, 924 F.2d

at 290 (quoting *Block*, 467 U.S. at 345). Conducting that holistic analysis of the statutory scheme

as it existed in 1991, the court determined that APA review "would upset the intricate statutory

scheme Congress carefully drafted to keep in equipoise important competing political and

constitutional concerns." *Id.*

With the 2014 Amendments, Congress substantially revised this "intricate statutory

scheme" with the express goal of ensuring complete preservation of electronic records. Section

32

2209 was a critical component of those amendments, designed to "ensure that *all* Presidential records, even those sent from a personal electronic messaging account, are properly preserved and maintained in an official electronic messaging account." S. Rep. 113-218, 113th Cong., 2d Sess., at 6 (2014) (emphasis added). Notably, the 2014 Amendments also added a materially identical provision to the FRA. *Compare* 44 U.S.C. § 2209 (PRA), *with* 44 U.S.C. § 2911 (FRA). This is strong evidence that Congress intended to create uniform requirements for the preservation of Presidential and Federal records generated in non-official electronic messaging accounts, and did not intend to relax those requirements for the President or the White House. *Cf. Armstrong I*, 924 F.2d at 290 (highlighting discrepancies between the PRA and FRA as proof of Congress's deference to the President on certain PRA matters).

Section 2209(a) also imposes on a specific group of White House officials (including the President himself) clearly defined duties mandating preservation of a particular category of Presidential records within a specified time period. *See* 44 U.S.C. § 2209(a)(2). This level of specificity is yet another reflection of Congress's intent to impose a clear and unequivocal command, as opposed to a general guideline that the President has discretion to implement. *See supra* Part II.A (Section 2209(a) is sufficiently specific to support mandamus relief).

Defendants insist that "[n]either the age nor the specificity of any particular PRA provision has any role in" assessing the continued applicability of *Armstrong I*, because the case turned on Congress's delicate balancing of competing political and constitutional concerns in "creating the entire statutory framework." Ds' Mem. at 20. But, as noted, the statutory scheme interpreted over 20 years ago in *Armstrong I* is not the same as it is today. It is nonsensical to treat the reasoning of *Armstrong I* as etched in stone, unalterable by any intervening PRA amendments, especially since the APA-based implied-preclusion standard applied in *Armstrong I*

demands a holistic analysis of the statutory scheme. *See Armstrong I*, 924 F.2d at 290 (citing *Block*, 467 U.S. at 345).

Defendants also assert that *Armstrong I* categorically forbids courts from "rul[ing] on the adequacy of the President's records management practices." Ds' Mem. at 20. But *Armstrong II* squarely rejected such an expansive reading of *Armstrong I*, stating that "[t]he *Armstrong I* opinion does not stand for the unequivocal proposition that all decisions made pursuant to the PRA are immune from judicial review." 1 F.3d at 1293. And Plaintiffs here seek review not of the President's day-to-day "records management practices," Ds' Mem. at 20, but rather a facially deficient PRA policy, *see infra* Part II.B.4. In any event, "*Armstrong I* and *Armstrong II* do not mark the beginning and end of the complicated inquiry regarding judicial review under the PRA," *American Historical Ass'n v. Peterson*, 876 F. Supp. 1300, 1314 (D.D.C. 1995), particularly when it comes to statutory amendments enacted decades after both decisions.

> **3.    *Armstrong II* Permits Review of the White House's Screenshotting Policy Because It Implicitly Classifies Presidential Record Material as Personal Records.**

Even if the Court were to find both that *Armstrong I* supports implied preclusion of mandamus jurisdiction and that the case applies to alleged violations of the subsequently-enacted 2014 Amendments, judicial review of Counts III and IV is consistent with the holding in *Armstrong II* that courts have "power to review guidelines outlining what is, and what is not, a 'presidential record' under the terms of the PRA." 1 F.3d at 1290. That is because the challenged screenshotting policy implicitly and unlawfully classifies Presidential record material (namely, metadata and attachments) generated in certain non-official electronic messaging accounts as personal records, thus precluding eventual public access to it under the provisions of the PRA.

*Armstrong II* held that courts may review the White House's PRA guidelines to ensure "they do not encompass within their operational definition of presidential records materials properly subject to the FOIA." *Id.* Central to this holding was the PRA's "exclusion of records subject to the FOIA from the class of materials that may be treated as presidential records." *Id.* at 1292; *see* 44 U.S.C. § 2201(2)(B). The Circuit reasoned that if PRA guidelines "were not reviewable for compliance with the statute's definition of presidential records, non-presidential materials that would otherwise be immediately subject to the FOIA [c]ould be shielded from its provisions, whether wittingly or unwittingly, if they were managed as presidential records." *Armstrong II*, 1 F.3d at 1293.

The same logic applies to policies that improperly classify, either explicitly or implicitly, Presidential records as personal records. Just as the PRA excludes records subject to FOIA from the definition of Presidential records, so too does it exclude "personal records," 44 U.S.C. § 2201(2)(B), a term separately defined in the statute, *id.* § 2201(3). And unlike Presidential records, *see id.* § 2204, there is no right of public access to a President's personal records. So, if Presidential record material is improperly treated as personal record material, it may be destroyed or permanently shielded from public view in violation of the PRA. For these reasons, two judges of this court have held that *Armstrong II* permits review of policies that improperly classify PRA material as personal records. *See CREW v. Cheney*, 593 F. Supp. 2d at 212-17; *American Historical Ass'n*, 876 F. Supp. at 1313-14.

In *CREW v. Cheney*, the court deemed reviewable various guidelines and policies that had the effect of excluding Vice-Presidential records from the PRA's reach "under the theory that they are personal records and therefore not covered by the PRA." 593 F. Supp. 2d at 227, 217. The court held that these allegations fell "squarely within the types of claims concerning

'guidelines describing which existing materials will be treated as presidential records' that are subject to judicial review," and thus deemed the plaintiffs' mandamus claims reviewable. *Id.* at 217 (quoting *Armstrong II*, 1 F.3d at 1294). As the court reasoned, "the absence of judicial review" in such cases "could result in the same type of anomalous classification of records that gave the D.C. Circuit pause in *Armstrong II*"—namely, the Vice President could adopt guidelines improperly treating records fitting the statutory definition of Vice-Presidential records as personal records, thus rendering those records "susceptible to destruction." *Id* at 215.

In *American Historical Association*, 876 F. Supp. at 1313-14, the court deemed reviewable an agreement under which former President George H.W. Bush classified categories of his Presidential records as "personal records" not subject to the PRA. The court reasoned that the PRA's "legislative history makes clear that '[d]efining the types of documentary materials falling within the ambit of either 'presidential' or 'personal' records is of primary importance to the act. The definitions of these terms must be both *mutually exclusive* and all encompassing.'" *Id.* (quoting H.R. No. 95-1487, 95th Cong., 2d Sess. § 11 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5732, 5742). Thus, the court held that *Armstrong II* permitted judicial review "to ensure that Presidential records are not disposed of as personal records at the end of an Administration." *Id.*

Consistent with this caselaw, the screenshotting policy is reviewable because it implicitly classifies Presidential record material (namely, metadata and attachments) associated with messages generated in certain personal electronic messaging accounts as personal records outside the scope of the PRA. The classification is implicit because the challenged White House policy applies exclusively to Presidential records generated in *personal*, or non-official, accounts. *See* Compl. ¶¶ 82-92. By only requiring preservation of screenshots, or fragments, of

Presidential records generated in personal accounts, the screenshotting policy necessarily deems the remaining portion not captured to be a personal record outside of the purview of the PRA. Judicial review of the policy is therefore appropriate "to ensure that Presidential records are not disposed of as personal records." *Am. Historical Ass'n*, 876 F. Supp. at 1314. While Defendants dispute that the February 2017 memo classifies Presidential record material as personal records, Ds' Mem. at 19, they ignore the fact that the memo on its face authorizes preserving mere fragments of Presidential records generated in specified personal messaging accounts, reflecting an implicit determination that the material not captured by a screenshot is personal record material.

Defendants also dispute the applicability of *Armstrong II* because Plaintiffs do not assert FRA or FOIA claims. *See* Ds' Mem. at 16-17. The court rejected this precise argument in *CREW v. Cheney*, explaining that "[t]he distinction between *Armstrong I* and *Armstrong II*, according to the D.C. Circuit, was the type of conduct the plaintiffs were seeking to challenge, not the vehicle by which plaintiffs were challenging it." 593 F. Supp. 2d at 214-15. The court thus agreed with the plaintiffs that the "holding of *Armstrong II* 'cannot be reconciled with the narrow, FOIA or FRA-based interpretations [D]efendants urge this Court to adopt.'" *Id.* at 215. This Court should adopt the same reasoning.

Defendants lastly make the wildly exaggerated claim that deeming the screenshotting policy a reviewable classification guideline would mean that "every disposal of a record would be subject to challenge." Ds' Mem. at 19. This ignores the key difference between a claim challenging an *official policy* that implicitly classifies Presidential record material as personal records—the claim made here and in *Armstrong II*—and a claim challenging a particular "act of disposal" like that presented in *Armstrong I*. Challenges to an official policy fall "squarely within

37

the types of claims concerning 'guidelines describing which existing materials will be treated as presidential records' that are subject to judicial review." *CREW v. Cheney*, 593 F. Supp. 2d. at 217 (quoting *Armstrong II*, 1 F.3d at 1294).

> ### 4.      Even *Armstrong I* Permits Courts to Review the Facial Legality of an Official PRA Policy.

Finally, even if Counts III and IV did not fall within *Armstrong II*, they would still be reviewable because *Armstrong I* does not bar claims challenging the facial legality of an official PRA policy. This conclusion flows from the core concern motivating *Armstrong I*: minimizing "interference with the day-to-day operations of the President and his closest advisors." 924 F.2d at 290. As the Circuit explained in *CREW v. Trump*, claims that would require courts to "micromanage the President's day-to-day compliance with the PRA," or determine "whether White House personnel are in fact complying" with "facially PRA-compliant" policies are the types of claims "proscribed by *Armstrong I*." 924 F.3d at 608-09; *see also CREW v. Cheney*, 593 F. Supp. 2d at 215 (noting *Armstrong II* suggests "the executive suffers no undue interference where a court's inquiry does not call into question the President's 'day-to-day operations'" (quoting *Armstrong II*, 1 F.3d at 1292)).

Counts III and IV assert no such claims. They instead challenge the White House's screenshotting policy as facially non-compliant with the PRA. Courts can review the facial validity of an official PRA policy without interfering with the White House's "day-to-day" operations. Indeed, the Circuit in *CREW v. Trump* devoted several pages to explaining its conclusion that the February 2017 memo was "facially . . . compliant" with the "three PRA obligations at issue" in that case, 924 F.3d at 607-08, and Defendants repeatedly try to invoke that reasoning (albeit unpersuasively) here, *see* Ds' Mem. at 1, 14, 17. If, as Defendants claim,

*Armstrong I* categorically forbids courts from reviewing the facial validity of a PRA policy, then the Circuit would have lacked jurisdiction to provide this lengthy exposition.

Defendants also liken Counts III and IV to claims dismissed in a prior case involving *unofficial* policies and practices that violated certain PRA provisions (not including Section 2209). *See* Ds' Mem. at 18 (citing *CREW v. Trump*, 438 F. Supp. 3d 54 (D.D.C. 2020)). But neither in that case, nor any other case cited by Defendants, did a court refuse to review an *official* PRA policy that contravened a non-discretionary requirement akin to Section 2209(a)'s "complete copy" directive. And there is good reason for that: such a rule would allow a President to adopt official policies that affirmatively violate the PRA with impunity, even though judicial review of such a policy would require no intrusion of the White House's day-to-day operations. Neither *Armstrong I*, nor any other precedent, supports this conclusion.

## III. Plaintiffs Plausibly Allege Claims for Declaratory and Mandamus Relief Against Defendant Kushner (Counts V and VI).

For the reasons outlined *supra* Part II.A with respect to Counts III and IV, Plaintiffs have also plausibly alleged claims for declaratory and mandamus relief challenging Defendant Kushner's non-compliance with his mandatory duties under Section 2209(a). *See* Compl. ¶¶ 137-44, ¶¶ 145-56. As a Senior Advisor to the President, Mr. Kushner is plainly a "covered employee" under Section 2209 because he is both part of "the immediate staff of the President," and an "individual of the Executive Office of the President whose function is to advise and assist the President." 44 U.S.C. § 2209(c)(1)(A), (C). And Mr. Kushner's own attorney has confirmed that he preserves Presidential records from his non-official electronic messaging accounts not by forwarding a "complete copy" to an official White House account as required by Section 2209(a), but rather by taking screenshots of such records, in keeping with the White House's unlawful screenshotting policy. *See* Compl. ¶¶ 75, 87 (citing Mar. 2019 House Oversight Letter).

Nor does *Armstrong I* bar Counts V and VI. As explained above, *Armstrong I* did not hold that the PRA impliedly strips courts of mandamus jurisdiction (which is not possible under D.C. Circuit precedent), and, even if it did, that bar does not apply to the subsequently-enacted 2014 Amendments on which Counts V and VI are based. *See supra* Parts I.B.1, II.B.2.

IV.     **Mandamus Relief is Available Against the President, But Even If It Were Not, the Court Can Grant Declaratory Relief Against Him and Mandamus Relief Against His Subordinates.**

Defendants claim that the President's status alone renders him immune from the reach of mandamus jurisdiction. Ds' Mem. at 25-26. To the contrary, "[m]andamus is not precluded because the federal official at issue is the President of the United States." *Nat'l Wildlife Fed'n*, 626 F.2d at 917 (citing *Nat'l Treasury Emps. Union*, 492 F.2d at 587). Although courts are reluctant to enjoin the President, no court has held that he cannot be enjoined. Instead, as the D.C. Circuit has explained, "no immunity, established under any case known to this Court bars every suit against the President for injunctive, declaratory or mandamus relief." *Id.* at 609. *See also Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (leaving open "the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty").

None of the authorities Defendants cite support their sweeping claim that separation-of-powers considerations prevent the judiciary from enforcing clear duties that Congress has established for the Executive. In dicta, the D.C. Circuit in *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010), claimed that courts "have never submitted the President to declaratory relief," even though the Circuit did just that in *National Treasury Employees Union*, 492 F.2d at 616. *See CREW v. Trump*, 302 F. Supp. 3d at 139 n.6 (explaining this error and noting that "*Newdow* never cites or discusses *National Treasury Employees Union*"). Nor are the views Justice Scalia expressed in his partial concurrence in *Franklin v. Massachusetts* that Defendants

40

cite (Ds' Mem. at 25) binding on this Court and, in any event, they hold little persuasive weight because the plurality concluded that declaratory relief directed at a subordinate official—one of the options available here—was sufficient to resolve the plaintiff's injury. *See* 505 U.S. at 824 (Scalia, J., concurring).

Moreover, the mandamus jurisdiction and cause of action that 28 U.S.C. § 1361 confers also support declaratory relief. *See* 28 U.S.C. § 2201; *Powell v. McCormack*, 395 U.S. 486, 499 (1969) (court may issue declaratory relief in lieu of mandamus relief). Thus, even if the Court declines to issue mandamus relief, it may invoke its mandamus jurisdiction as predicate for issuing declaratory relief against the President, as the Circuit did in *Nat'l Treasury Emps. Union*, 492 F.2d at 616. And if the Court determines that mandamus relief is necessary here, the Court could issue that relief first to a subordinate officer or to the EOP rather than the President. *See Judicial Watch v. Nat'l Energy Policy Dev.*, 219 F. Supp. 2d 20, 44 (D.D.C. 2002); *see also Swan v. Clinton*, 100 F.3d at 978-79 (in declining to issue injunctive relief on the merits the court noted the possibility that if the plaintiff's "injury can be redressed by injunctive relief against subordinate officials, he clearly has standing").

## V.    Plaintiffs Plausibly Allege an APA Claim Against the Archivist and NARA, Who Are Necessary Parties (Count VII).

As set forth in the Complaint, the PRA imposes on NARA and the Archivist a non-discretionary and "affirmative duty to make" a former President's "records available to the public as rapidly and completely as possible consistent with the provisions of this chapter." Compl. ¶ 159 (quoting 44 U.S.C. § 2203(g)(1)). The actions of the other Defendants complained of here—the President's failure to comply with the notice provisions, which provide the Archivist an opportunity to weigh in on any planned disposal, and the White House's reliance on a facially non-compliant records policy that authorizes the destruction of Presidential record

41

material—will result in the irretrievable removal, loss, or destruction of President Trump's records. *Id.* ¶ 154. By failing to act to prevent this loss, the Archivist and NARA have failed in their duty to make the fullest possible historical record of the Trump presidency available for future access by Plaintiffs and the public at large. Their failure to act constitutes "agency action unlawfully withheld or unreasonably delayed" in violation of the APA, 5 U.S.C. §§ 706(1), 706(2)(A).

In arguing against this claim, Defendants advance an interpretation of the PRA that robs NARA and the Archivist of any role whatsoever, contrary to the intent of Congress. As explained above, with the notice requirements Congress conferred on the Archivist the valuable role "to properly comment on their [the records the President proposes to destroy] value." H. R. Rep. No. 95-1187 at 13 (1978). Claim VII seeks to give meaning and force to this intent.

Moreover, and perhaps most critically, in just a few weeks President Trump will leave office and the Archivist, pursuant to the terms of the PRA, will assume the "responsibility for the custody, control, and preservation of, and access to" the records of Donald Trump's presidency. 44 U.S.C. § 2203(g)(1). In that role, he will "exercise . . . all the functions and responsibilities otherwise vested in him pertaining to Federal records or other documentary materials in his custody or under his control." 44 U.S.C. § 2112(c). Further, in any negotiations with the soon-to-be former President, the Archivist must "secure to the Government, as far as possible, the right to have continuous and permanent possession of the materials." *Id.*

As the soon-to-be custodian of President Trump's records by operation of statute, the Archivist unquestionably is a necessary party whose joinder would be required under Fed. R. Civ. P. 19(a) were he not already a named defendant. Both the Archivist and NARA "not only have an interest in the controversy" this case presents, "but an interest of such a nature that a

final decree cannot be made without . . . affecting that interest[.]" *Shields v. Barrow*, 58 U.S.

130, 139 (1854). This Court lacks the ability to afford Plaintiffs full relief absent the

participation of NARA and the Archivist, and their interest in the fullest possible historical

record of the Trump presidency—an interest shared by Plaintiffs and the public—would be

impaired or impeded absent their participation in this litigation. *See* Fed. R. Civ. P. 19(a)(1)

(A),(B). *See generally Kickapoo Tribe v. Babbitt*, 43 F.3d 1491 (D.C. Cir. 1995).

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.


Dated: December 29, 2020                                Respectfully submitted,

                                                        */s/ Anne L. Weismann*
                                                        Anne L. Weismann
                                                        (D.C. Bar No. 298190)
                                                        5335 Wisconsin Avenue, N.W.
                                                        Suite 640
                                                        Washington, D.C. 20015
                                                        Telephone: (301) 717-6610
                                                        weismann.anne@gmail.com

                                                        */s/ Nikhel S. Sus*
                                                        Nikhel S. Sus
                                                        (D.C. Bar No. 1017937)
                                                        CITIZENS FOR RESPONSIBILITY AND ETHICS
                                                        IN WASHINGTON
                                                        1101 K St. N.W., Suite 201
                                                        Washington, DC 20005
                                                        Telephone: (202) 408-5565
                                                        Fax: (202) 588-5020
                                                        nsus@citizensforethics.org

                                                        *Counsel for Plaintiffs*