**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL SECURITY ARCHIVE, *et al.*, | |
| Plaintiffs, | |
| v. | No. 20-cv-3500 KBJ |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |

**<u>DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS</u>**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 2

I.      PLAINTIFFS CANNOT OVERCOME THE PRA'S BAR ON JUDICIAL
        REVIEW .................................................................................................................... 2

        A.      *Armstrong I* and its Progeny Bar Counts I–VI, Plaintiffs' Claims Seeking
                Declaratory and Mandamus Relief ................................................................ 2

                1.      The "Clear Statement" Rule Has No Application in This Case.................. 4

                2.      Grafting the Clear Statement Rule onto this Case Would Yield
                        Anomalous Results ...................................................................................... 6

                3.      Plaintiffs Err in Arguing that Counts I–VI May Proceed
                        Notwithstanding the PRA's Preclusion of Judicial Review ...................... 7

                        a.      Counts I and II ................................................................................. 7

                        b.      Counts III and IV ........................................................................... 11

                        c.      Counts V and VI ............................................................................. 14

        B.      *Armstrong I* and its Progeny Bar Count VII, Plaintiffs' APA claim ................... 15

II.     PLAINTIFFS FAIL TO SHOW ENTITLEMENT TO MANDAMUS RELIEF............. 16

        A.      Plaintiffs Have Not Identified a Clear and Indisputable Right to Relief ............. 17

        B.      Plaintiffs Have Not Identified a Clear Duty to Act.............................................. 20

        C.      Plaintiffs Fail to Show that Mandamus Relief Against the President Is
                Available ............................................................................................................... 21

III.    THE EQUITIES WEIGH HEAVILY AGAINST PLAINTIFFS' CLAIMS ................... 22

IV.     COUNT VII IS ALSO SUBJECT TO DISMISSAL FOR FAILURE TO STATE
        A CLAIM ...................................................................................................................... 24

CONCLUSION...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Am. Historical Ass'n v. Peterson*,
    876 F. Supp. 1300 (D.D.C. 1995) ................................................................... 13, 16

*Armstrong v. Bush*,
    924 F.2d 282 (D.C. Cir. 1991) ........................................................................ *passim*

*Armstrong v. EOP*,
    1 F.3d 1274 (D.C. Cir. 1993) ................................................................ 10, 13, 14

*Banks v. Office of Senate Sergeant-At-Arms & Doorkeeper of U.S. Senate*,
    471 F.3d 1341 (D.C. Cir. 2006) ................................................................................. 6

*Belbacha v. Bush*,
    520 F.3d 452 (D.C. Cir. 2008) ................................................................................. 5

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .............................................................................................. 19

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ................................................................................................ 5

*CREW v. Cheney*,
    593 F. Supp. 2d 194 (D.D.C. 2009) ................................................................ 13, 21

*CREW v. Trump*,
    438 F. Supp. 3d 54 (D.D.C. 2020) .................................................................. *passim*

*CREW v. Trump*,
    924 F.3d 602 (D.C. Cir. 2019) ........................................................................ *passim*

*Ctr. for Democracy & Tech. v. Trump*,
    2020 WL 7318008 (D.D.C. Dec. 11, 2020) ............................................................ 22

*Dalton v. Specter*,
    511 U.S. 462 (1994) ................................................................................................ 7

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) .......................................................................................... 7, 22

*FTC v. Dean Foods Co.*,
    384 U.S. 597 (1966) ................................................................................................ 5

*Ganem v. Heckler*,
    746 F.2d 844 (D.C. Cir. 1984) ................................................................................ 4

*Gulf Coast Mar. Supply, Inc. v. United States*,
    867 F.3d 123 (D.C. Cir. 2017) ............................................... 19

*In re al-Nashiri*,
    791 F.3d 71 (D.C. Cir. 2015) ............................................... 4, 5

*Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*,
    845 F. Supp. 2d 288 (D.D.C. 2012) ....................................... 15

*Kickapoo Tribe v. Babbitt*,
    43 F.3d 1491 (D.C. Cir. 1995) ............................................. 16

*Lovitky v. Trump*,
    949 F.3d 753 (D.C. Cir. 2020) ........................................... 6, 22

*Mississippi v. Johnson*,
    71 U.S. 475 (1866) ............................................................. 22

*Nat'l Treasury Emps. Union v. Nixon*,
    492 F.2d 587 (D.C. Cir. 1974) ............................................. 20

*Newdow v. Roberts*,
    603 F.3d 1002 (D.C. Cir. 2010) ........................................... 22

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ............................................................. 24

*13th Reg'l Corp. v. U.S. Dep't of Interior*,
    654 F.2d 758 (D.C. Cir. 1980) ......................................... 20, 23

*Samuels v. Mackell*,
    401 U.S. 66 (1971) ............................................................. 22

*Shapiro v. United States*,
    335 U.S. 1 (1948) ............................................... 11, 13, 19, 24

*Shields v. Barrow*,
    58 U.S. 130 (1854) ............................................................. 16

**Statutes**

28 U.S.C. § 1361 ............................................................. 3, 4, 5, 6

28 U.S.C. § 1651 ............................................................. 1, 3, 5

44 U.S.C. § 2203 ............................................................. 8, 12, 20

44 U.S.C. § 2209(a) ......................................................... 20

**Rule**

Fed. R. Civ. P. 19(a) ................................................................................................ 16

**Legislative Material**

S. Rep. No. 113-218 (2014) ....................................................................................... 11

**Other Authorities**

NARA Bulletin 2015-02,
   *https://www.archives.gov/records-mgmt/bulletins/2015/2015-02.html* .................................. 16

# INTRODUCTION

In their Motion to Dismiss, Defendants explained why Plaintiffs' claims in this case are barred under binding Circuit precedent. *See* ECF No. 14-1 ("Defs.' Mot."). Now, having been unable to find purchase in the applicable law, Plaintiffs look to the "clear statement" rule—a doctrine pertaining to the All Writs Act, 28 U.S.C. § 1651—and ask the Court to import it here to render the writ of mandamus available in a setting where separation of powers concerns led Congress to withdraw every other form of relief. Plaintiffs' position does not bear scrutiny.

Nearly thirty years ago, the D.C. Circuit carefully considered the structure of the Presidential Records Act ("PRA") and concluded that Congress "sought assiduously" to minimize interference with the recordkeeping practices and decisions of a sitting President. *Armstrong v. Bush* ("*Armstrong I*"), 924 F.2d 282, 290 (D.C. Cir. 1991). Thus, while Congress enacted requirements that the President maintain records documenting the performance of his duties, Congress "declined to give outsiders the right to interfere with White House recordkeeping practices." *Id.* at 290. Even the Archivist's role is limited under the PRA while the President is in office. Nor has Congress itself intervened in White House recordkeeping, apart from its enactment of the 2014 Amendments to the PRA.

Against that backdrop—where the Court of Appeals has concluded that allowing private suits of any kind "would substantially upset Congress' carefully crafted balance," *Armstrong I*, 924 F.2d at 290—Plaintiffs insist that Congress intended the drastic and extraordinary writ of mandamus to remain available. Plaintiffs' position would transform the writ into a kind of catch all, available more broadly than other remedies unless Congress specifically says that it is not.

Unsurprisingly, there is no precedent to support such a view. For all the reasons explained herein, the PRA's implied preclusive effect, recognized in *Armstrong I* and several subsequent

cases, bars all of Plaintiffs' claims. Furthermore, even if they were not barred, Plaintiffs' claims could not proceed because they have failed to plead the elements necessary to establish entitlement to mandamus or to plead a claim under the APA. In particular, Plaintiffs cannot establish a clear and indisputable right to relief, because regardless of what the statute provides, this Circuit has already explained that no private right to relief is available. That alone is sufficient to defeat mandamus, an extraordinary writ sparingly granted. Further, because mandamus is an equitable writ, Plaintiffs are doubly barred. Their complaint makes clear that Plaintiffs' perceived grievances arose years ago. Yet Plaintiffs waited until weeks before Inauguration Day to bring suit, relying on an "emergency" of their own contrivance. Thus, even were it not already abundantly clear based on binding precedent that mandamus is not a work-around to provide jurisdiction where none otherwise exists, the elements of mandamus all weigh heavily against the issuance of an extraordinary writ against the President.

For these reasons and the reasons explained in Defendants' Motion, this Court should dismiss the Complaint in its entirety. As the Court is aware, the parties have briefed Defendants' Motion on an expedited schedule. To further facilitate the expeditious resolution of this matter, Defendants respectfully waive oral argument, unless the Court determines that argument would assist in its consideration of the Defendants' Motion.

## ARGUMENT

### I.   PLAINTIFFS CANNOT OVERCOME THE PRA'S BAR ON JUDICIAL REVIEW.

#### A. *Armstrong I* and its Progeny Bar Counts I–VI, Plaintiffs' Claims Seeking Declaratory and Mandamus Relief.

Under the law of this Circuit, the PRA precludes judicial review "of the president's general compliance with the PRA," including "the adequacy of the President's records management practices" as well as the President's "records creation, management, and disposal decisions."

2

*Armstrong I*, 924 F.2d at 290–91.  Plaintiffs acknowledge that precedent, as they must, but insist

that it is limited to APA claims and does not reach their requests for mandamus under 28 U.S.C. §

1361.  Pls.' Opp'n to Defs.' Mot. to Dismiss, ECF No. 15 ("Pls' Opp'n") at 2–3, 15–17, 32, 40.

First, Plaintiffs argue that mandamus remains available unless there is a "clear statement"

to the contrary.  *See id.* at 15–17.  But in advancing this argument, Plaintiffs erroneously import

precedent concerning the Court's jurisdiction in an entirely different context—the All Writs Act,

28 U.S.C. § 1651.  The All Writs Act is not at issue here.  Nor are the important constitutional

concerns that necessitate a "clear statement" rule in that setting.  Plaintiffs therefore are simply

wrong when they claim that "there is no such thing as implied preclusion of mandamus

jurisdiction."  Pls.' Opp'n at 16.  There is such a thing, and it applies here.  In fact, although

Plaintiffs do not acknowledge it, *see id.* at 2, just last year, another judge of this Court recognized

that the PRA impliedly precluded a strikingly similar request for mandamus relief by three of the

four organizations bringing the instant action.  *See CREW v. Trump*, 438 F. Supp. 3d 54, 60–66

(D.D.C. 2020).

Plaintiffs' position is not only inconsistent with the case law, but it is also at odds with both

the nature of mandamus and the structure of the PRA.  If Plaintiffs' erroneous position were

correct, the writ of mandamus would be transformed from an extraordinary remedy to be issued

only in rare circumstances to a catch-all available unless Congress says otherwise.  Moreover,

Plaintiffs' proposed rule that only APA-based claims are precluded would effectively eviscerate

the PRA's bar to judicial review.  For all these reasons, explained further below, the Court should

reject Plaintiff's attempt to import the "clear statement" doctrine into this setting; the PRA

precludes claims seeking judicial review, regardless of whether they sound in mandamus.

Plaintiffs additionally argue that, even if the PRA impliedly precludes judicial review, the

claims at issue here are not barred.  For the reasons explained below, those arguments, too, are unavailing.

### 1.  The "Clear Statement" Rule Has No Application in This Case.

Plaintiffs cite two cases in support of their contention that "a statute can strip the district court's mandamus power only if it does so expressly":  *Ganem v. Heckler*, 746 F.2d 844 (D.C. Cir. 1984) and *In re al-Nashiri*, 791 F.3d 71 (D.C. Cir. 2015).  Pls.' Opp'n at 15–16 (quotation omitted).  Neither case supports such a conclusion, and, indeed, no such rule applies to mandamus under 28 U.S.C. § 1361, the statute upon which Plaintiffs rely here.

First, far from announcing a broadly applicable rule, the analysis in *Ganem* was no more than straightforward interpretation of statutory text.  *See* 746 F.2d at 850–52.  In the course of determining whether a statute precluded mandamus review with respect to certain benefits decisions, the D.C. Circuit noted that its conclusion that mandamus review remained available "[was] buttressed by the fact that, when Congress desired to prohibit actions in the nature of mandamus *to review analogous benefit decisions*, it did so expressly."  *Id.* at 851 (emphasis added).  In other words, where an analogous statute expressly removed mandamus jurisdiction but the statute before the court did not, the court took the lack of an express statement as "some indication of a congressional intent to preserve that remedy."  *See id.* at 852.  This falls far short of articulating a general principle that mandamus jurisdiction can never be removed in the absence of a clear statement.

Nor did *In re al-Nashiri* articulate such a rule.  *See In re al-Nashiri*, 791 F.3d 71 (D.C. Cir. 2015).  Rather, the D.C. Circuit in that case addressed mandamus jurisdiction under the All Writs Act, a statute that provides:  "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable

to the usages and principles of law."  28 U.S.C. § 1651; *see In re al-Nashiri*, 791 F.3d at 75–76.

The D.C. Circuit clearly limited its holding to that setting:  "A statute does not strip our authority *under the All Writs Act* absent a 'clear' statement to that effect."  791 F.3d at 76 (quoting *Belbacha v. Bush*, 520 F.3d 452, 458 (D.C. Cir. 2008)) (emphasis added).  As the court explained, in that context, "[t]he clear-statement rule is a species of the constitutional avoidance doctrine: if the Congress stripped our power to issue writs of mandamus, some constitutional violations would escape review altogether.  This would present a 'serious constitutional question'—one we should avoid, if possible."  *In re al-Nashiri*, 791 F.3d at 77 (citation omitted).  For example, in *Belbacha v. Bush*, the D.C. Circuit invoked the All Writs Act in considering a Guantanamo Bay detainee's request to temporarily enjoin his transfer to Algeria in order to preserve the court's jurisdiction to review the constitutionality of the Military Commissions Act.  *See Belbacha*, 520 F.3d at 458.

Thus, the clear statement rule ensured that the court could preserve its jurisdiction over a constitutional claim, a consideration not applicable in this case. *See also Califano v. Yamasaki,* 442 U.S. 682, 705 (1979) ("Absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction"); *FTC v. Dean Foods Co.,* 384 U.S. 597, 608 (1966) ("In the absence of explicit direction from Congress," under the All Writs Act, a court may act to preserve the status quo when "necessary to protect its own jurisdiction").

This authority, controlling in cases involving the All Writs Act, has no application to Plaintiffs' claims under 28 U.S.C. § 1361.  Section 1361, the mandamus statute at issue here, *see* Compl., ECF No. 1, ¶ 6, provides:  "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.  This statute does not preserve

the Court's ability to consider constitutional questions, or otherwise secure the Court's independently existing jurisdiction. Therefore, the withdrawal of mandamus jurisdiction under Section 1361 raises none of the above-discussed constitutional concerns implicated when authority under the All Writs Act is rendered unavailable. Accordingly, no case of which Defendants are aware has imported the clear statement rule from the All Writs Act context into a case brought under Section 1361. This Court should not be the first to do so now.

### 2.  Grafting the Clear Statement Rule onto this Case Would Yield Anomalous Results.

The lack of authority for applying the clear statement rule in this setting constitutes reason enough to reject Plaintiffs' argument. In addition, however, Plaintiffs' position makes little sense in light of the nature of the mandamus remedy and the claims that reasonably could be expected to arise under the PRA.

First, Plaintiffs' position that mandamus review remains available except in the few situations when it is expressly foreclosed, turns the law of the Circuit on its head. The writ of mandamus is not a broad, catch-all remedy to be invoked whenever other avenues of relief fail; rather "[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary circumstances." *Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020) (citation omitted); *CREW v. Trump*, 924 F.3d 602, 606 (D.C. Cir. 2019) (same); *see also*, *e.g. Banks v. Office of Senate Sergeant-At-Arms & Doorkeeper of U.S. Senate*, 471 F.3d 1341, 1350 (D.C. Cir. 2006) ("So reluctant are we to consider mandamus relief that even where we have been presented 'really extraordinary' cases, we are careful to caution against indiscriminate mandamus review").

Second, Plaintiffs' position that the PRA impliedly precludes only APA cases would leave such preclusion largely without effect. Suits seeking judicial review of the President's compliance with the PRA—the very claims that *Armstrong I* determined Congress intended to foreclose, *see*

6

924 F.2d at 290—would not arise under the APA, since the President is not an "agency," and therefore is not subject to suit under the APA. *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992) (plurality opinion) ("Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA . . . . As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements."); *Dalton v. Specter*, 511 U.S. 462, 470 (1994); *see also*, *e.g.*, *Armstrong I*, 924 F.2d at 289.  Instead, as in this case, such claims would sound in mandamus.  Thus, if Plaintiffs were right and preclusion extended no further than the APA, the PRA's preclusive effect would reach only those claims that are otherwise already barred.

### 3. Plaintiffs Err in Arguing that Counts I–VI May Proceed Notwithstanding the PRA's Preclusion of Judicial Review.

As to each of their sets of claims for declaratory and mandamus relief, Plaintiffs offer reasons why they contend those claims are beyond the reach of *Armstrong I*.  Plaintiffs err in each of those arguments.

#### a.  Counts I and II

Plaintiffs contend that Counts I and II may proceed because, according to Plaintiffs, "the PRA does not preclude judicial review of claims challenging the President's failure to comply with the [PRA's] pre-destruction notice requirements."  Pls.' Opp'n at 22.  Implying that no court has yet made such a determination, Plaintiffs argue that "extending the *Armstrong I* court's sweeping pronouncement about the extent to which the PRA precludes judicial review to the PRA's notice provisions would conflict with the statutory scheme, its objectives, and its legislative history."  *Id.* But such a holding would not amount to "extending" *Armstrong I*; rather, it would be a straightforward application of Circuit precedent.  Although Plaintiffs write as though on a blank

slate, the Court of Appeals recently addressed this very issue and another judge of this Court thereafter rejected nearly identical claims.

In *CREW v. Trump*, a case brought by two of the Plaintiffs now before the Court, the Court of Appeals held that the PRA barred judicial review of a claim that "the use of message-deleting apps violate[d] the President's duty to follow [the PRA's pre-disposal] notification procedures." *CREW*, 924 F.3d at 607.  Plaintiffs brush this case aside as concerning "a failure to comply with a White House directive requiring personnel 'to conduct all work-related communication on official email," Pls.' Opp'n at 22 (quoting *CREW*, 924 F.3d at 609).  They neglect to disclose, however, that the case also involved claims under the very pre-disposal notification provisions that they invoke in this case and that the Court of Appeals held that those claims were barred.  *Compare* Compl. ¶¶ 97, 106, 107 (citing 44 U.S.C. § 2203(c), (d)) *with CREW*, 924 F.3d at 607 (citing 44 U.S.C. § 2203(c)-(e) in describing the plaintiffs' claims).

Less than one year later, another judge of this Court held that the PRA impliedly precludes claims remarkably similar to Counts I and II.  *See CREW*, 438 F. Supp. 3d at 63, 65–66.  In that case, plaintiffs, including three organizations now before this Court, challenged the alleged failure of the President and his staff to create, maintain, and properly dispose of records of interactions with foreign leaders.  *Id.* at 56.  Certain allegations in that case closely tracked the Complaint here. *Compare* Compl. ¶ 56 ("For example, President Trump has a practice of ripping up his notes at the close of meetings, a practice some have called 'his unofficial 'filing system.'") *with CREW*, 438 F. Supp. 3d at 63 ("For example . . . President Trump had and may still have a habit of ripping up papers when he was done with them, which some described as 'his unofficial filing system.'").  Plaintiffs in that case sought, *inter alia*, mandamus and declaratory relief based on the same PRA pre-disposal notification requirements at issue here.  *See CREW*, 438 F. Supp. 3d at 63, 65–66.

The court found that those claims were barred, concluding that the claim that "President Trump has disposed of presidential records without first obtaining the views of the Archivist in writing and transmitting a disposal schedule to Congress prior to disposing of the record . . . . cannot be viewed as anything other than a challenge to the President's day-to-day management of his records under the PRA." *Id.* at 65–66.

     Counts I and II here likewise can be viewed in no other way. Plaintiffs argue that judicial review of compliance with the PRA's pre-disposal notification requirements would not interfere with the President's day-to-day operations because the President would retain control over his records and would remain free to dispose of those records. *See* Pls.' Opp'n at 18–20. But even cursory consideration of the matter confirms that the district court in *CREW v. Trump* was correct. If relief under the pre-disposal notice requirements were available to private litigants, parties could rush to court to seek an injunction each time a President or a member of his staff sought to discard any piece of paper without allegedly seeking the views of NARA. It takes little imagination to see how disruptive to the day-to-day operations of the White House such circumstances would be.

Moreover, as *Armstrong I* makes plain, the concerns animating the PRA's bar on judicial review were not just practical but constitutional. As the Court of Appeals explained, "Congress was also keenly aware of the separation of powers concerns that were implicated by legislation regulating the conduct of the President's daily operations." *Armstrong I*, 924 F.2d at 290. In light of those concerns, Congress "[left] the implementation of [the PRA's requirements] in the President's hands," *id.*, "declining to give outsiders the right to interfere with White House recordkeeping practices." *Id.* Plaintiffs contend that "because they leave the President free to dispose of any of his records, judicial review of [the PRA's pre-disposal] notice provisions would cause no harm to the balance Congress struck." Pls.' Opp'n at 20. But Plaintiffs plainly are

mistaken.  The Court of Appeals in *Armstrong I* carefully analyzed the balance that Congress struck in light of the separation of powers concerns implicated in this setting, and concluded just the opposite:  "Allowing judicial review of the President's general compliance with the PRA at the behest of private litigants would substantially upset Congress' carefully crafted balance of presidential control of records creation, management, and disposal during the President's term of office and public ownership and access to the records after the expiration of the President's term." *Armstrong I*, 924 F.2d at 291.

Plaintiffs acknowledge that the D.C. Circuit used "broad sweeping language" in *Armstrong I* when stating its holding that the PRA impliedly precludes judicial review.  *See* Pls.' Opp'n at 21. But Plaintiffs urge that their claims be permitted to proceed because they "do not seek to 'overrule' any of the President's records decisions . . . but seek instead to give meaning to provisions that enhance and protect the rights of Congress and the public."  *Id.*  In effect, Plaintiffs contend that *Armstrong I* permits claims to go forward so long as they do not challenge the proposed destruction of specific documents.  But the bar on judicial review announced in *Armstrong I* encompasses *any* review of the President's compliance with the PRA, and the sole exception to that rule, announced in *Armstrong II*, plainly is inapplicable here.  *See Armstrong v. EOP*, 1 F.3d 1274, 1290 (D.C. Cir. 1993) ("*Armstrong II*") (holding that "the courts are accorded the power to review guidelines outlining what is, and what is not, a 'presidential record' under the terms of the PRA"); *see also CREW*, 924 F.3d at 609.

In light of this precedent, as discussed above, the Court of Appeals and another judge of this Court have already determined that the PRA precludes review of the President's compliance with the PRA's pre-disposal notice provisions.  For the same reasons, the Court should dismiss Counts I and II here.

### b. Counts III and IV

Plaintiffs offer three arguments as to why Counts III and IV, challenges to the inclusion of screenshots as a means for preserving electronic communications, should be permitted notwithstanding *Armstrong I*'s jurisdictional bar.  All three arguments miss the mark.

First, Plaintiffs argue that Counts III and IV are not barred by *Armstrong* because those claims are grounded in Section 2209(a) of the PRA, a provision that was added to the statute in 2014, well after the *Armstrong I* decision.  Plaintiffs contend that Section 2209(a)'s specificity and purpose demonstrate that Congress intended that it—unlike other provisions of the PRA—should be subject to enforcement by private litigants.  *See* Pls.' Opp'n at 32–34.

That Section 2209(a) postdates *Armstrong I*, however, cuts against, not in favor of, Plaintiffs' claims.  At the time Congress enacted that provision, the bar on judicial review announced in *Armstrong I* had been in place for over twenty years.  As the court in *CREW v. Trump* recently noted, Congress "has the power to revisit its decision to accord the executive such unfettered control or to clarify its intentions if they were mischaracterized by the Court of Appeals." 438 F. Supp. 3d at 64.  That Congress amended the PRA to add Section 2209(a), but did not expressly make judicial review available under that provision, demonstrates that Congress intended that actions under Section 2209 should be treated just like any other provision of the statute. *Cf. Shapiro v. United States*, 335 U.S. 1, 16 (1948) (noting presumption that, when Congress reenacts statutory provisions, Congress is aware of settled judicial constructions of those provisions).[1]

Furthermore, although Plaintiffs argue that the specificity and purpose of Section 2209

---

[1] Notably, the Senate Report addressing the 2014 amendments specified that, in cases of intentional violation of Section 2209, appropriate disciplinary action would be authorized. *See* S. Rep. No. 113-218, at 7–8 (2014).  The Senate Report says nothing about authorization of suits by private parties. *See id.*

should render it exempt from the bar on judicial review, Pls.' Opp'n at 32–33, Section 2209 does not differ materially in those respects from the other provisions of the PRA. Section 2209 is no more specific than, for example, Section 2203's predisposal notice provisions, which, like Section 2209, identify specific actions that particular individuals must take within a specified period of time. *See* 44 U.S.C. § 2203(d), (e) (in situations in which the Archivist notifies the President that the Archivist intends to seek advice of Congress as to the proposed disposal of Presidential records, requiring the President to submit a disposal schedule to Congress at least 60 days in advance of the proposed disposal date).

And, with respect to Section 2209's purpose, while Plaintiffs emphasize that the goal of the 2014 Amendments was to "ensur[e] complete preservation of electronic records," Pls.' Opp'n at 32, with an allowance for the change in technology, this purpose echoes Congress's goal in enacting the entire statute. *See Armstrong I*, 924 F.2d at 290 (In the PRA, "Congress sought to establish public ownership of presidential records and ensure the preservation of presidential records for public access after the termination of a President's term"). *Armstrong I* recognized that, in the PRA, Congress intended to balance that purpose with the "competing goal[]" of addressing the "separation of powers concerns that were implicated by legislation regulating the conduct of the President's daily operations." *Armstrong I*, 924 F.2d at 290. There is no reason to suppose that balance was in any way disturbed when Congress updated the statute to track advances in technology.

Plaintiffs also argue that Counts III and IV are not barred because the option to preserve an electronic communication via screenshot "implicitly classifies" portions of Presidential records as personal records. *See* Pls.' Opp'n at 36. Plaintiffs rely on case law permitting judicial review of claims challenging the classification of records as Presidential, *see id.* at 35–38 (citing *CREW*

*v. Cheney*, 593 F. Supp. 2d 194 (D.D.C. 2009) and *Am. Historical Ass'n v. Peterson*, 876 F. Supp. 1300 (D.D.C. 1995)), because such claims fall within the ambit of *Armstrong II*'s exception to *Armstrong I*.  *Id.* at 35.  Plaintiffs' reliance on these cases, however, is flawed, because neither of the cited cases concerns an "implicit" classification.  *See id.* at 35–38.  Indeed, while no court, to Defendants' knowledge, has permitted judicial review based on such a characterization, two courts—including the D.C. Circuit—have rejected Plaintiffs' approach.  *See CREW*, 924 F.3d at 609; *CREW*, 438 F. Supp. 3d at 64.

Just last year, when rejecting Plaintiff's previous effort to intercede in White House records management practices, the court wrote that, "[a]dding a conclusory allegation that these practices, in effect, 'improperly classify agency records as presidential records' does not change the outcome."  438 F. Supp. 3d at 64 (citing *CREW*, 924 F.3d at 609).  The court reasoned that, "if the Court of Appeals rejected CREW's attempt to cast the intentional, regular use of an application that ensured the deletion of an entire set of communications between aides as a reviewable 'classification' decision covered by *Armstrong II* . . . then this Court is constrained by that precedent to reject a similar attempt here."  *Id.*  The same precedent binds this Court.

Finally, Plaintiffs contend that Counts III and IV are not barred because *Armstrong I* permits a challenge to the facial legality of a PRA policy, citing the D.C. Circuit's analysis of the February 2017 Memo as support for their position.  But Plaintiffs are clearly mistaken.  If Plaintiffs were correct that review of any PRA policy is permitted under *Armstrong I*, then the D.C. Circuit's careful analysis carving out the exception in *Armstrong II* would make little sense.  *Armstrong II* involved a challenge to guidelines defining presidential records.  *See* 1 F.3d at 1290.  Instead of simply holding that such a claim could proceed under *Armstrong I* because it entailed examination of a policy for facial compliance with the PRA, the Court reasoned that "the courts are accorded

13

the power to review guidelines outlining what is, and what is not, a 'presidential record' under the terms of the PRA." *Id.*; *see also id.* ("the court may review the EOP guidelines for the limited purpose of ensuring that they do not encompass within their operational definition of presidential records materials properly subject to FOIA").

And, while Plaintiffs miss the import of the court's analysis in *Armstrong II*, they misunderstand the significance of the D.C. Circuit's discussion of the February 2017 Memo in *CREW v. Trump*. Far from being evidence that judicial review of any PRA policy is permitted under *Armstrong I*, *CREW v. Trump* completes its assessment of the lawfulness of the February 2017 Memo in the context of discussing the first element required for mandamus jurisdiction: whether plaintiffs had "plausibly allege[d] that the White House is, in effect, defying the law." *CREW*, 924 F.3d at 606. The court discusses *Armstrong I* only after that analysis, as a "second and related obstacle to mandamus relief." *Id.* at 608.

In sum, there are no grounds in any Circuit precedent to conclude that judicial review of Counts III and IV is permitted.

### c. **Counts V and VI**

Counts V and VI seek review of Mr. Kushner's compliance with the PRA. Plaintiffs say little in support of the Court's jurisdiction over these claims. *See* Pls.' Opp'n at 40 (reasserting that claims based on the 2014 Amendments to the PRA are not subject to *Armstrong I*'s bar on judicial review); *see supra* 11–12 (explaining why Plaintiffs err in that argument). Indeed, as challenges to a Senior Advisor to the President's day-to-day compliance with the PRA, these claims are at the very heart of the actions foreclosed by *Armstrong I*. *See* Defs.' Mot. at 10–16 (discussing case law).

* * * * * * *

14

For all these reasons, the Court should dismiss Plaintiffs' claims for declaratory and mandamus relief, Counts I-VI, for lack of subject matter jurisdiction.

### B. *Armstrong I* and its Progeny Bar Count VII, Plaintiffs' APA claim.

As to the Court's jurisdiction over Count VII, Plaintiffs are silent. *See* Pls.' Opp'n at 41–43. It appears Plaintiffs mistakenly concluded that Defendants' motion to dismiss for lack of subject matter jurisdiction pertains only to Counts I-VI. Pls.' Opp'n at 11. It is not clear why Plaintiffs thus limited Defendants' motion, as Defendants specifically stated that every count of the complaint, including Count VII in particular, is precluded under the law of this Circuit. *See* Defs.' Mot. at 10 ("The Presidential Records Act's Bar on Judicial Review Requires Dismissal of this Case *in its Entirety*") (emphasis added), 14 ("Counts III-VII impermissibly Challenge the Implementation of PRA Guidance"); 14 ("The PRA likewise bars the balance of Plaintiffs' claims addressing the availability of screenshots as an option to preserve electronic records, *see* Counts III–VII.").

In any event, there is little that could be said in defense of the Court's jurisdiction over Count VII. Plaintiffs acknowledge that "*Armstrong I* held . . . that the PRA 'impliedly precludes' judicial review under the Administrative Procedure Act." Pls.' Opp.'n at 2. Count VII is an APA claim, targeted at policing the President's compliance with the PRA.[2] For the reasons explained

---

[2] Although Count VII is nominally directed against NARA and the Archivist, the substance of the claim concerns the White House's compliance with the PRA during the President's term. *See* Compl. ¶ 161 (noting request "that the NARA Defendants take action to address the White House's unlawful PRA policy"); *id.* ¶ 165 (seeking injunctive relief "directing the NARA Defendants to take all necessary action to ensure the preservation of 'complete copies'" of certain Presidential records); *Cf. Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*, 845 F. Supp. 2d 288, 298 (D.D.C. 2012) (expressing "serious doubts" as to whether the court had subject matter jurisdiction to hear claims brought against NARA, but directed at the President's classification decisions). Thus, although one court has held that the PRA's bar on judicial review did not preclude claims addressing the Archivist's actions at the conclusion of the President's term of office, *see Am. Historical Ass'n*, 876 F. Supp. at 1315–18, that analysis has no application here.

in Defendants' Motion and as effectively conceded in Plaintiffs' Opposition, that claim is barred.

Instead of presenting any argument as to the Court's jurisdiction, Plaintiffs assert that Count VII must proceed because NARA and the Archivist would be "necessary parties" under Federal Rule of Civil Procedure 19(a).[3]  But Rule 19(a) is inapposite.  Even in situations where a party is deemed necessary, that party cannot be joined in the absence of subject matter jurisdiction. *See*, *e.g.*, *Kickapoo Tribe v. Babbitt*, 43 F.3d 1493, 1495–96 (D.C. Cir. 1995) (State of Kansas, held a necessary party to litigation over a compact between Kansas and the Kickapoo Tribe, but could not be joined because Kansas had not waived sovereign immunity).  Because the Court has no jurisdiction over Count VII, for all the reasons explained above and in Defendants' Motion, Count VII must be dismissed.

## II. PLAINTIFFS FAIL TO SHOW ENTITLEMENT TO MANDAMUS RELIEF

Plaintiffs fail to show that this case presents an "extraordinary situation[]" warranting the "drastic" remedy of mandamus relief.  *See CREW*, 924 F.3d at 606.  Plaintiffs contend that this case "presents exceptional circumstances warranting mandamus relief" because it allegedly involves "a President at the end of his term in office and White House staff threatening the irrevocable loss of records of incalculable historical value."  Pls.' Opp'n at 14.  But, far from being exceptional, the situation Plaintiffs describe is the very one that gave rise to *Armstrong I*.  In that case, plaintiffs sought relief to prevent the President, the Archivist, and the National Security Council ("NSC") from erasing materials stored on the NSC computer system during the last two weeks of the Reagan administration.  *Armstrong I*, 924 F.2d at 284.  While *Armstrong I* did not

---

[3] Plaintiffs err, and the two cases on which they rely—situations where the parties to an agreement were deemed "necessary parties" to litigation regarding that agreement, *see* Pls.' Opp'n at 43 *(*citing *Shields v. Barrow*, 58 U.S. 130, 139 (1854) and *Kickapoo Tribe v. Babbitt*, 43 F.3d 1491 (D.C. Cir. 1995))—bear no resemblance to the situation now before the Court.  There is no reason, however, for the Court to delve into counterfactual hypotheticals about whether NARA and the Archivist would need to be made parties were they not already defendants in this case.

sound in mandamus, Plaintiffs' two prior actions—which also alleged that Presidential records of historical value were threatened with destruction—did.  *See CREW*, 924 F.3d at 603; *CREW*, 438 F. Supp. 3d at 62.  In both cases, the Courts determined that Plaintiffs had failed to establish the elements of mandamus jurisdiction.  Counts II, IV, and VI should be dismissed for the same reason.[4]

### A.     Plaintiffs Have Not Identified a Clear and Indisputable Right to Relief

"[A] clear and indisputable right to relief" is "the most fundamental element of mandamus."  *CREW*, 924 F.3d at 603.  As explained in Defendants' Motion, the D.C. Circuit's holding that judicial review is precluded for PRA claims like those alleged here compels the conclusion that Plaintiffs cannot fulfill this requirement.  That is, in this setting, *Armstrong I* and its progeny foreclose *any relief at all*, much less relief to which Plaintiffs can claim "a clear and indisputable right."  Plaintiffs largely ignore this glaring impediment to establishing the "clear and indisputable right to relief," but, for this reason alone—the inability to establish entitlement to any relief at all under the statute—their claims must be dismissed.

Furthermore, as the Court of Appeals explained in the context of one of Plaintiffs' prior cases, in order to satisfy this requirement at the motion to dismiss stage, Plaintiffs "must plausibly allege that the White House is, in effect, defying the law."  *CREW*, 924 F.3d at 606.  Yet, as the Court of Appeals found in that case, the White House's PRA policy, set forth in the February 2017 Memo "unquestionably speaks to the White House's efforts to satisfy the President's PRA obligations" and "does just what the PRA requires."  *Id.* at 607, 608.

Plaintiffs dismiss these conclusions as "out-of-context snippets," Pls.' Opp'n at 28,

---

[4] As explained in Defendants' Motion, Plaintiffs' claims for declaratory relief (Counts I, III, and V) rise or fall together with their attendant mandamus claims (respectively, Counts II, IV, and VI), *see* Defs.' Mot. at 26; Plaintiffs' failure to establish mandamus jurisdiction therefore necessitates dismissal of their claims for declaratory relief as well.

asserting that they have little to do with the claims asserted in this action, but the Court of Appeals in that case discusses the very provisions that are at issue here.  *CREW*, 924 F.3d at 607.  To be sure, Plaintiffs had not yet decided to bring their challenge to the inclusion of screenshots as an option to preserve certain communications.  *See infra* 22–23 (explaining that Plaintiffs' delay in bringing these claims is one more reason why mandamus relief should be denied).  However, in the context of the Plaintiffs' challenge to the use of certain electronic communications platforms, the Court of Appeals approved, as compliant with the PRA, the February 2017 Memo's provisions that directed that:  (1) staff must use official email rather than unofficial internet-based means of electronic communications; and (2) "if White House personnel ever generate or receive presidential records on such platforms they 'must preserve [the messages] by sending them to [an official] email account via screenshot or other means.'"  *CREW*, 924 F.3d at 607 (alterations in original) (quoting February 2017 Memo).  Additionally, the Court of Appeals highlighted that the Memo directs that "electronic records that are presidential records" "must be preserved."  *Id.*

Plaintiffs' Opposition carves the February 2017 Memo's provisions into "two distinct preservation schemes," and argues that the preservation scheme pertaining to non-email electronic communications "facially defies Section 2209(a)'s 'complete copy' directive."  Pls.' Opp'n at 29, 31.  Plaintiffs are able to reach this conclusion only by wholly ignoring a key sentence in the February 2017 Memo.  After instructing users that, if they "*ever send or receive email that qualifies as a presidential record using [a non-EOP account], [they] **must** preserve that email by copying it to [their] official EOP email account within twenty (20) days.*" 2017 Memo at 3 (emphasis in original).  It goes on to admonish users that "[**a]ny employee who intentionally fails to take these actions may be subject to administrative or even criminal penalties.**" *Id.* (emphasis in original). In the next line, the memo states: "The same rules apply to other forms of electronic

communication, including text messages." *Id.*  Thus, there are not two schemes, but, emphatically, one—"the same rules apply" to both categories.

The February 2017 Memo is broadly worded, and allows for multiple preservation options, including electronic forwarding or preservation via screenshot or other means.  As Defendants noted in their motion, this flexible policy makes sense given the changing technical landscape and the disparate capabilities of different platforms.  Puzzlingly, Plaintiffs seem to argue that preservation via electronic forwarding is required even when it is not available.  *See* Pls.' Opp'n at 29 (complaining that permitting screenshots as a means of preservation when electronic forwarding is not available "effectively rewrites the statutes").  But failing to do that which is not possible cannot amount to "defying the law" such that it would support a mandamus claim.

Plaintiffs also complain that Defendants "prematurely raise[] factual issues" in discussing the differing technical capabilities of different platforms.  *Id.* at 30.  But it is established that the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  *Gulf Coast Mar. Supply, Inc. v. United States*, 867 F.3d 123, 128 (D.C. Cir. 2017).  Moreover, the Court may "take notice of the full contents" of published documents "referenced in the complaint"  *Id. (quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n.13 (citing FED. R. EVID. 201))).  Here, in the very Bulletin that Plaintiffs cite in the Complaint, *see* Compl. ¶¶ 47-50, NARA observes that, "[e]lectronic messaging systems are not designed with records management functionality, such as the ability to identify, capture, and preserve records."  *See* NARA Bulletin 2015-02, https://www.archives.gov/records-mgmt/bulletins/2015/2015-02.html.  The same Bulletin states:  "Electronic messaging is a fluid, evolving technology and new tools are always being created."  *Id.*  That the February 2017 Memo directs that electronic messages that are Presidential records must be preserved—but gives

19

multiple options for how that preservation may be achieved—accounts for that fluidity.

Notwithstanding the memo's directive that "the same rules" requiring electronic forwarding "apply to other forms of electronic communication, including text message," February 2017 Memo at 3, Plaintiffs argue that staff may nonetheless use screenshots to preserve communications capable of electronic forwarding. Pls.' Opp'n at 30. As with the news reports regarding the use of message-deleting apps in *CREW v. Trump*, "these types of 'open questions' regarding the precise scope and effect of the facially PRA-compliant February 2017 Memo 'are the antithesis of the "clear and indisputable" right to relief needed for mandamus relief.'" *CREW*, 924 F.3d at 608 (quotation omitted).

### B.      Plaintiffs Have Not Identified a Clear Duty to Act

Nor can Plaintiffs establish the second requirement for mandamus jurisdiction: a clear duty to act. The "clear duty" prong can only be satisfied if a duty is not only "ministerial" but "peremptory" and "clearly defined." *13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980). A "ministerial" duty has been described as "simple," "definite," and as "leaving no room for the exercise of judgment." *CREW*, 438 F. Supp 3d at 67 (quoting *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974)). As explained in Defendants' Motion, the PRA does not impose ministerial duties that the Court could enforce. Defs.' Mot. at 23–25.

The three provisions giving rise to the duties at issue here are: (1) the PRA's pre-disposal notice provisions, *see* 44 U.S.C. § 2203; (2) the PRA's requirement that the President "implement[] records management controls" and "take such steps as may be necessary to assure that [Presidential] records are preserved," *see* 44 U.S.C. § 2203(a); and (3) the PRA's requirement that officials forward to an official account a complete copy of any record sent or received on a nonofficial account, *see* 44 U.S.C. § 2209(a). None of these is ministerial.

As to the pre-disposal notice provisions of Section 2203, none specifies *when* their described actions should be carried out, and the prerequisite steps to records disposal, set forth in Section 2203(c), can only be triggered *if* the President intends to "destroy presidential records." So, too, with Section 2209—nothing in that section requires that messages be sent or received via non-official platforms to begin with, and its requirements would be triggered only if such messages were sent or received.

Plaintiffs also plainly err in their contention that Section 2203(a) creates ministerial duties. As the court in *CREW v. Trump* explained when rejecting that argument in that case, "Plaintiffs' attempt to liken the statutory obligations here to a purely ministerial duty is inconsistent with the language of the provisions themselves and the decisions of this Circuit interpreting the PRA." 438 F. Supp. 3d at 68.[5]  Indeed, to construe the PRA as imposing ministerial duties would be incompatible with the D.C. Circuit's recognition that the President has "virtually complete control" over records creation, management, and disposal during his term in office.  *Armstrong I*, 924 F.2d at 290.

Plaintiffs thus fail to establish the "clear duty to act" prong of mandamus jurisdiction, and their mandamus claims accordingly should be dismissed.

## C.    Plaintiffs Fail to Show that Mandamus Relief Against the President Is Available

The Court also should dismiss Counts II and IV because the Court lacks jurisdiction to issue a writ of mandamus against the President himself in order to compel his compliance with the PRA.  Plaintiffs argue that, "[a]lthough courts are reluctant to enjoin the President, no court has

---

[5] *CREW v. Cheney*, 593 F. Supp. 2d 194 (D.D.C. 2009), on which Plaintiffs rely, is not to the contrary.  In that case, the court held that the Vice President had no discretion "to *change* the definition of Vice–Presidential records provided by Congress," 593 F.Supp.2d at 220 (emphasis in original), which plaintiffs in that case alleged had occurred. *Id.*

held that he cannot be enjoined." Pls.' Opp'n at 40. Plaintiffs are wrong.

For a century and a half, the Supreme Court has maintained that courts, "in general," have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (plurality opinion) (quoting *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866)). And in *Newdow v. Roberts*, the D.C. Circuit held that, "'[w]ith regard to the President, courts do not have jurisdiction to enjoin him.'" 603 F.3d 1002, 1013 (D.C. Cir. 2010)). As recently as last month, another judge of this Court quoted and followed this "uniequivocal[]" holding. *Ctr. for Democracy & Tech. v. Trump*, 2020 WL 7318008, at *8 (D.D.C. Dec. 11, 2020). *Newdow*'s unequivocal holding remains binding on this Court too, and presents one more reason why this Court should dismiss Plaintiffs' mandamus claims against the President.

## III.   THE EQUITIES WEIGH HEAVILY AGAINST PLAINTIFFS' CLAIMS.

Where, as in this case, the elements for mandamus jurisdiction are not satisfied, the Court lacks subject matter jurisdiction, and the action should be dismissed on that basis alone. *See Lovitky*, 949 F.3d at 763. But, "[e]ven when the legal requirements for mandamus jurisdiction have been satisfied . . . a court may grant relief only when it finds compelling equitable grounds." *Lovitky*, 949 F.3d at 759 (quotation omitted). Plaintiffs' remaining claims, seeking declaratory and injunctive relief, also depend upon a showing that the equities weigh in their favor. *See Samuels v. Mackell*, 401 U.S. 66, 70 (1971) (suit for declaratory judgment is "essentially an equitable cause of action"). Plaintiffs contend that "compelling equitable grounds" are present here, Pls.' Opp'n at 13 n. 4, but, in reality, the equitable considerations favor Defendants.

"As any remedy governed by equitable principles, mandamus must be sought with reasonable promptness." *13th Reg'l Corp.*, 654 F.2d at 762 (quotation omitted). The Court of

Appeals previously has found that "an unexplained delay of four years" precluded a finding that a party had filed its mandamus petition with reasonable promptness. *See id.* In that case, a party sought to modify the method used in a Department of the Interior study seven years after the study had been authorized and four years after the study had been published. *See id.* The Court of Appeals held that the very fact of plaintiffs' delay "indicate[d] that this [was] not a 'compelling' case worthy of the invocation of an extraordinary remedy." *Id.*

So, too, in this case. With respect to both categories of Plaintiffs' claims, the alleged facts underlying the Complaint have been known to them for years. With respect to Plaintiffs' claims directed at alleged disposal decisions by the President, the Complaint and Plaintiffs' Opposition insist that the alleged actions by the President have been ongoing "[f]rom the outset of his presidency," Compl. ¶ 55; Pl.'s Opp'n at 6, that is, January 2017. In support of their allegations, Plaintiffs cite reporting as old as September 2017, *see* Compl. ¶ 68, and June 2018, *see id.* ¶ 56, and a letter and document request from Congress dated September 2017. *See id.* ¶¶ 70–71.

The second category of claims, addressing what Plaintiffs term the White House's "screenshotting policy," is grounded in materials that are older still. As the Complaint acknowledges, the White House policy that Plaintiffs seek to challenge was issued in February 2017. Compl. ¶ 82. That policy became public in October 2017. Plaintiffs further cite an October 2017 briefing with congressional staff, quoting statements from White House officials stating that they advise employees to take screenshots of texts and direct messages sent to White House Twitter accounts to preserve such communications. *See id.* ¶¶ 85–88.

Thus, Plaintiffs were aware of the facts underlying their Complaint, including the White House policy regarding screenshots, for over three years before they chose to initiate this action. This delay is one more independent reason why equitable relief is not appropriate in this case.

## IV.    COUNT VII IS ALSO SUBJECT TO DISMISSAL FOR FAILURE TO STATE A CLAIM.

In Count VII, Plaintiffs seek injunctive relief directing NARA Defendants to "take action to ensure preservation of 'complete copies' of certain records."  Defendants explained, in their Motion, that Count VII fails to state a claim under APA Section 706(1) because Plaintiffs cannot identify in this case "a *discrete* agency action" that NARA Defendants are "*required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original); *id.* (the APA "empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing how it shall act.'").

Plaintiffs' Opposition only underscores that deficiency.  *See* Pls.' Opp'n at 41–43.  Rather than attempting to identify any action that could plausibly fulfill this statutory requirement, Plaintiffs simply reiterate their vague allegation that the Archivist and NARA have "failed to act to prevent [the] loss" of President Trump's records.  *Id.* at 42.  The sole specific action to which Plaintiffs refer is the Archivist's potential role in commenting on records that a President proposes to destroy.  *Id.*  Plaintiffs assert that Count Seven "seeks to give meaning and force" to Congress's intent in giving the Archivist that role.[6]  *Id.*  But it is not at all clear how that action relates to the relief Plaintiffs actually seek in Count VII—an action "to address the White House's unlawful PRA policy."  Compl. ¶ 163.  Moreover, Plaintiffs offer no answer to Defendants' observation that an intervention by the Archivist and NARA in the President's records management now, before the end of his term, actually would be contrary to the provisions of the PRA on which Plaintiffs rely.  *See* Defs.' Opp'n at 28.

---

[6] Additionally, although Plaintiffs' Opposition suggests an active role for Congress, with frequent consultations by the Archivist regarding a proposed disposal of documents under the PRA, *see e.g.*, Pls.' Opp'n at 1, Plaintiffs cite to not a single example of such consultation, and Defendants are aware of none.

Finally, Plaintiffs' discussion of joinder, *see* Pls.' Opp'n at 42–43, has no application here. Plaintiffs cite no authority for their apparent position that a party's interest in a case can stand in for deficiencies in a pleading to prevent dismissal, and Defendants are aware of no case that would support that proposition.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss Plaintiffs' claims in their entirety, with prejudice.

Dated:  January 5, 2021                    Respectfully submitted,

                                           JEFFREY BOSSERT CLARK
                                           Acting Assistant Attorney General

                                           JOHN V. COGHLAN
                                           Deputy Assistant Attorney General

                                           ELIZABETH J. SHAPIRO (D.C. Bar No. 418925)
                                           Deputy Director
                                           Federal Programs Branch

                                            */s/ Julia A. Heiman*
                                           JULIA A. HEIMAN (D.C. Bar No. 986228)
                                           Federal Programs Branch
                                           U.S. Department of Justice, Civil Division
                                           1100 L Street, N.W.
                                           Washington, DC  20005
                                           Tel. (202) 616-8480 / Fax (202) 616-8470
                                           julia.heiman@usdoj.gov
                                           *Attorneys for Defendants*